## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CLIFTON J. SHOWELL JR.** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A. No. 05-462 JJF** |
| | : | |
| **GAMING ENTERTAINMENT (DELAWARE),** | : | |
| **L.L.C., d/b/a MIDWAY SLOTS AND** | : | **JURY TRIAL DEMANDED** |
| **SIMULCAST GAMING ENTERTAINMENT,** | : | |
| **A Delaware Limited Liability Company,** | : | |
| **Defendant.** | : | |

## APPENDIX TO DEFENDANT, GAMING ENTERTAINMENT (DELAWARE) L.L.C.'S OPENING BRIEF IN SUPPORT OF ITS MOTION OF SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Seth. J. Reidenberg, Esquire (I.D. No. 3657)
The Brandywine Building
1000 West Street, 17th Floor

P. O. Box 391
Wilmington, DE  19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Attorneys for Defendant Gaming Entertainment*
*(Delaware) L.L.C.*

Dated:  February 29, 2008

# TABLE OF CONTENTS

Page

Amended Complaint of Clifton J. Showell, Jr.
dated January 10, 2006 (D.I. 7) ................................................................................A1

Excerpts from the Deposition Transcript of
Beverly Pope dated November 20, 2006 .................................................................A13

Excerpts from the Deposition Transcript of
Clifton J. Showell, Jr. dated November 2, 2006 .....................................................A45

Yearly Promotions of Clifton J. Showell, Jr
For the Years of 1998-2003 .....................................................................................A84

Evaluation of Clifton J. Showell, Jr
By Darryl Nashold dated June 6, 2003 ...................................................................A90

Excerpts from the Deposition Transcript of
Tracy Dorsey dated November 28, 2006 .................................................................A96

Excerpt from the GS 101 System Configuration & Administration I
Training Guide .......................................................................................................A101

Excerpts from the Deposition Transcript of
Sabrina Jenkins dated November 29, 2006 ...........................................................A104

Final Warning Issued to
Clifton J. Showell, Jr. dated January 13, 2004 .....................................................A110

Excerpts from the Deposition Transcript of
Georgia Kimball dated November 3, 2006 ............................................................A113

Excerpts from the Deposition Transcript of
Jay Lewis dated November 29, 2006 .....................................................................A123

Excerpts from the Deposition Transcript of
Scott A. Saxon dated November 28, 2006 .............................................................A128

Termination Notice Issued to
Clifton J. Showell, Jr. dated March 5, 2004 .........................................................A147

Surveillance Department Incident Report
Dated March 1, 2004 .............................................................................................A148

Excerpts from the Deposition Transcript of
Darryl B. Nashold, Sr. dated November 28, 2006 ................................................A151

Plaintiff's Answers to Defendant's First Set of Interrogatories
Directed To Plaintiff, dated August 24, 2006 ...................................................................A157

Final Warning Issued to
Georgia Kimball dated March 1, 2004 ...........................................................................A174

Termination Notice Issued to
Georgia Kimball Dated March 26, 2004...........................................................................A177

Termination Notice Issued to
Sabrina Jenkins dated November 24, 2004........................................................................A179

Progressive Disciplinary Policy.....................................................................................A184

Disciplinary Notes Regarding
Clifton J. Showell, Jr. dated April 24, 2003 to January 14, 2004 ............................................A189

Employee Handbook with Acknowledgements of Receipt .....................................................A209

Final Determination and Right to Sue Notice
From the Delaware Department of Labor dated February 28, 2005..........................................A239

Charge of Discrimination .............................................................................................A240

Memo to All Supervisors and Leads
Regarding IGS Passwords dated March 4, 2004 ................................................................A243

Additional Excerpts from the Deposition Transcript of
Scott A. Saxon dated November 28, 2006...........................................................................A244

DB01:2524242.1
058578.1009

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.       :

           :

      Plaintiff,           :       **CIVIL ACTION NO.** 05-462 JJF

           :

      v.            :

           :

GAMING ENTERTAINMENT       :

(DELAWARE), L.L.C., d/b/a       :

MIDWAY SLOTS & SIMULCAST       :

GAMING ENTERTAINMENT,       :

a Delaware Limited Liability Company,       :       **JURY TRIAL DEMANDED**

           :

      Defendant.          :

## FIRST AMENDED COMPLAINT[1]

1.     This is a civil action for compensatory and punitive damages and injunctive

relief for age, race, and sex discrimination arising from the discharge of a then 47 year old

African-American male who was employed by Defendant Gaming Entertainment (Delaware),

L.L.C. for over 5 years.

### I. JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343;

the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1991, Pub.L. No. 102-

166, 105 Stat. 1071, 42 U.S.C. § 1981a; Title VII of the Civil Rights Act of 1964, as amended,

---

[1] Because no responsive pleading has been served, the Complaint is amended as a matter of
right pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Specifically, the caption
has been revised to include the full legal name of Defendant and the complete civil action
number with designation of the Judge. Also, the original ¶¶ 1-14 and the attachments have been
replaced with ¶¶ 1 - 75, and the prayer for relief has been replaced with a Wherefore Clause.

42 U.S.C. § 2000e et seq. ("Title VII"); and the Age Discrimination in Employment Act, 29

U.S.C. § 621 et seq. ("ADEA").

3.    The causes of action arise under 42 U.S.C. §§ 1981, Title VII, and the ADEA.

4.    All conditions precedent to jurisdiction have occurred or have been complied

with. Plaintiff filed a timely administrative complaint with the Delaware Department of Labor

which was dually filed with the United States Equal Employment Opportunity Commission. All

administrative proceedings have been terminated. Plaintiff received a Notice of Suit Rights on or

about April 4, 2005. He filed the initial Complaint in this action on July 5, 2005.

5.    Venue is proper in this district because it is the judicial district where Plaintiff

was employed, the unlawful employment practices complained of occurred, and the claims arose.

## II. **THE PARTIES**

6.    Plaintiff Clifton J. Showell, Jr. is a 49 year old African-American male. He is a

resident of the State of Delaware and resides at 9354 S. DuPont Highway, Felton, Delaware

19943.

7.    From approximately July 15, 1998 to March 5, 2004, Plaintiff was employed

continuously by Gaming Entertainment (Delaware), L.L.C. At all times material hereto, he was a

diligent, honest, and loyal employee who always performed his job in an exemplary manner.

8.    Defendant Gaming Entertainment (Delaware), L.L.C. is a Delaware limited

liability company doing business as "Midway Slots & Simulcast Gaming Entertainment"

("Midway Slots"). Midway Slots has more than 500 employees. It operates a casino at the

Delaware State Fairgrounds, Route 13, Harrington, DE 19952. Its registered agent for service of

process is The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

2

## III. FACTS GIVING RISE TO THE ACTION

### A.    Good Employment History

9.    Plaintiff was employed by Midway Slots since approximately July 15, 1998, initially as a Slot Floor Attendant.

10.    He later was promoted to Slot Shift Manager where he managed 14 to 20 people.

11.    Throughout his employment, Plaintiff received annual evaluations.

12.    Plaintiff's annual evaluations rated his performance above expectations.

13.    Plaintiff was nominated for an Employee of the Month award in 2002.

14.    Plaintiff never received a negative annual evaluation from Defendant.

### B.    Demonstrated Antagonism by White Supervisor

15.    In 2003, Plaintiff's supervisor, Slot Director Beverly Pope, gave him a favorable annual evaluation and a 5% raise.

16.    However, Tech Slot Manager Daryl Nashold, a white male then approximately age 45, tore up the evaluation and voided Plaintiff's raise.

### C.    Factors Usually Ignored Considered

#### (1)    Use of Supervisor's Password by Subordinates

17.    On or about December 30, 2003, Plaintiff gave his IGS password to Attendant Georgia Kimball solely to complete hopper fill slips in order to meet a deadline imposed by his supervisor, Slot Director Beverly Pope.

18.    At all material times hereto at Midway Slots, it was a common practice for managers to let their subordinates use their IGS passwords to complete assigned work.

3

19.     For example, Sabrina Jenkins, a white female manager in her 30's, and Brandy Shahan, a white female manager in her early 20's, allowed their subordinates to use their IGS passwords to complete assigned work.

20.     However, Defendant did not discipline or discharge Jenkins or Shahan.

21.     Several of Defendant's Slot Attendants still possess the IGS passwords of their sufficiently younger, white, and/or female Slot Shift Supervisors.

**(2)    Plaintiff's Absence**

22.     On Sunday, February 29, 2004, Plaintiff was not on duty and not on the premises of Defendant's casino.

23.     On that day, Slot Attendant Georgia Kimball, a white female in her 40's, received a slip from the Time, Date, Number machine ("TDN machine"), but the TDN machine did not disburse the funds of a jackpot.

24.     At that time, Kimball used Plaintiff's password without his knowledge or permission to request an override in order to pay out the jackpot.

25.     Kimball was not disciplined for this incident.

26.     Kimball was not discharged for this incident.

**D.    Discharge**

27.     On or about March 3, 2004, Defendant's Human Resources Director Scott Saxon, discharged Plaintiff for allegedly improper use of his IGS password on February 29, 2004.

28.     Upon information and belief, the decision was made by Saxon, a white male approximately age 40, and Executive Director of Security and Surveillance Jay Lewis, a white male then approximately age 45.

4

E.    **Violation of Procedures: Progressive Discipline Policy**

29.    Defendant has a progressive discipline policy which mandates that an employee be given a first and then a second warning and then a third warning before a final warning is issued.

30.    The policy also requires that a final warning be issued before an employee is discharged.

31.    Defendant issued Plaintiff a final warning on or about January 13, 2004.

32.    Defendant violated its progressive discipline policy by not issuing Plaintiff a second or third warning before issuing him the final warning.

33.    Under Defendant's progressive discipline policy, a human resources representative must be present whenever an employee is issued a third or final warning.

34.    No human resources personnel was present for Plaintiff's final warning.

35.    Neither Scott Saxon nor any other human resources representative signed Plaintiff's final warning.

36.    Plaintiff's supervisor Beverly Pope did not sign Plaintiff's final warning. Instead, Defendant forged her signature in order to discharge Plaintiff.

F.    **Workplace Statistics**

37.    At all times material hereto, the majority of Defendant's Slot Shift managers were white.

38.    Out of six managers, Plaintiff was the only African-American Slot Shift manager on the night shift in the Slot Department.

**G.    Other Disparate Treatment: No opportunity for Non-management Position**

39.    Previously in November of 2003, Plaintiff had to undergo dental surgery to have his teeth removed.

40.    At that time, Defendant forced Plaintiff to take an unpaid leave of absence because it did not want him to work on the casino floor with his teeth missing.

41.    Plaintiff requested that he be allowed to take a demotion to a non-management position away from the casino floor. Defendant refused his request.

42.    In contrast, Defendant accommodated female managers with medical issues, including Regina Burrell in 2002, and Sonja in 2004. Both women were allowed to take demotions from management to non-management positions because of medical issues.

43.    Defendant denied Plaintiff the same opportunity to take a demotion.

**H.    Plaintiff's Injuries and Damages**

44.    As a direct and proximate result of the discriminatory actions of Defendant and its agents, as detailed herein, Plaintiff suffered and is suffering lost wages, earnings, overtime, and bonuses; diminished earning capacity now and upon his expected retirement at age 65; decreased employment and earnings opportunities; lost benefits, including but not limited to health, dental, vision, and life insurance, and 401(k) plan participation; loss of enjoyment of life; mental, emotional, and physical pain and anguish; permanent physical injuries; humiliation; embarrassment; injury to reputation; and other pecuniary and non-pecuniary losses and injuries. Plaintiff also has been required to pay for medical visits and medications which he otherwise would not have been required to pay, is still undergoing continuing medical treatment requiring medication, and his injuries are permanent.

6

## IV. OTHER ALLEGATIONS REGARDING DEFENDANT'S CONDUCT

45.    The actions of Defendant were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federally protected rights. Defendant either knew or showed a negligent or reckless disregard for the matter of whether its conduct violated federal rights. Its actions were outrageous and taken with evil or improper motive, in bad faith, out of personal animus or motivated by bias and without any reasonable grounds to support them. Its actions were wanton and malicious or taken with reckless indifference to federally protected rights.

46.    Additionally, Defendant, its agents, and employees engaged in the discriminatory practices with malice or with reckless indifference to Plaintiff' federally protected rights, and Defendant is liable for punitive damages pursuant to 42 U.S.C. § 1981a(b).

### COUNT I (DISCHARGE - ADEA)

47.    Plaintiff repeats and realleges paragraphs 1 - 46 set out above.

48.    Plaintiff's rights were violated under 29 U.S.C. § 621 et seq. because he was discharged or otherwise discriminated against on the basis of his age.

49.    Plaintiffs' statutory right to be free of age discrimination has been denied under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.

### COUNT II (DISCHARGE - TITLE VII AND § 1981 - RACE)

50.    Plaintiff repeats and realleges paragraphs 1 - 49 set out above.

51.    Plaintiff's rights were violated under 42 U.S.C. § 1981 and Title VII, because he was discharged or otherwise discriminated against on the basis of his race.

7

52.    Plaintiffs' statutory right to be free of racial discrimination has been denied under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII.

## COUNT III
## (DISCHARGE - TITLE VII - SEX)

53.    Plaintiff repeats and realleges paragraphs 1 - 52 set out above.

54.    Plaintiff's rights were violated under Title VII, because he was discharged or otherwise discriminated against on the basis of his sex.

55.    Plaintiffs' statutory right to be free of sex discrimination has been denied under Title VII, 42 U.S.C. § 2000e et seq.

## COUNT IV (TERMS AND CONDITIONS - ADEA)

56.    Plaintiff repeats and realleges paragraphs 1 - 55 set out above.

57.    Because of his age, Plaintiff suffered intentional discrimination which was severe or pervasive, regular and continuous.  This detrimentally affected him, and it would do so for a reasonable person of the same age in his position.

58.    The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of an older worker.

59.    The acts identified herein were severe and pervasive, regular and continuous, and they created an intimidating, hostile, or offensive work environment.

60.    Under all the circumstances, Plaintiff has been illegally discriminated against in terms and conditions of employment, and otherwise harassed, by a discriminatory, hostile, and abusive work environment which was created, approved, and tolerated by management because of age.

61.    Plaintiffs' statutory right to be free of discrimination because of age has been denied under the ADEA and 19 Del. C. § 711(a)(1).

## COUNT V (TERMS AND CONDITIONS - TITLE VII and 42 U.S.C. § 1981 - RACE)

62.    Plaintiff repeats and realleges paragraphs 1 - 61 set out above.

63.    Because of his race, Plaintiff suffered intentional discrimination which was severe or pervasive, regular and continuous. This detrimentally affected him, and it would do so for a reasonable person of the same race in his position.

64.    The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of an African-American.

65.    The acts identified herein were severe and pervasive, regular and continuous, and they created an intimidating, hostile, or offensive work environment.

66.    Because of race, Plaintiff suffered intentional discrimination which was severe or pervasive, regular, and continuous. This detrimentally affected him, and it would do so for a reasonable person of the same race in his position. The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of an African-American.

67.    Under all the circumstances, Plaintiff has been illegally discriminated against in terms and conditions of employment, and otherwise harassed, by a discriminatory, hostile, and abusive work environment which was created, approved, and tolerated by management because of race.

68.    Plaintiffs' statutory right to be free of discrimination because of race has been denied under Title VII and 42 U.S.C. § 1981.

9

A9

## COUNT VI (TERMS AND CONDITIONS - TITLE VII - SEX)

69.    Plaintiff repeats and realleges paragraphs 1 - 68 set out above.

70.    Because of his sex, Plaintiff suffered intentional discrimination which was severe or pervasive, regular and continuous.  This detrimentally affected him, and it would do so for a reasonable person of the same sex in his position.

71.    The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of a man.

72.    The acts identified herein were severe and pervasive, regular and continuous, and they created an intimidating, hostile, or offensive work environment.

73.    Because of sex, Plaintiff suffered intentional discrimination which was severe or pervasive, regular, and continuous.  This detrimentally affected him, and it would do so for a reasonable person of the same sex in his position.  The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of a male.

74.    Under all the circumstances, Plaintiff has been illegally discriminated against in terms and conditions of employment, and otherwise harassed, by a discriminatory, hostile, and abusive work environment which was created, approved, and tolerated by management because of sex.

75.    Plaintiffs' statutory right to be free of discrimination because of sex has been denied under Title VII.

**WHEREFORE,** Plaintiff prays that the Court:

(a)    Enter a declaratory judgment declaring the acts of Defendant to be a violation of Plaintiff's statutory rights.

(b)    Enter a judgment against Defendant for compensatory damages, including lost wages, earnings, overtime, and bonuses; diminished earning capacity now and upon his expected retirement at age 65; decreased employment and earnings opportunities; lost benefits, including but not limited to health, dental, vision, and life insurance, and 401(k) plan participation; loss of enjoyment of life; mental, emotional, and physical pain and anguish; permanent physical injuries; humiliation; embarrassment; injury to reputation; and other pecuniary and non-pecuniary losses and injuries.

(c)    Enter a judgment for reimbursement of medical visits and medications which he otherwise would not have been required to pay.

(d)    Under Title VII and § 1981, enter a judgment against Defendant for punitive damages.

(e)    Under the ADEA, enter a judgment against Defendant for statutory liquidated damages.

(f)    Issue a mandatory injunction directing Defendant to reinstate Plaintiff to the position of Slot Shift Manager or an equivalent position, or alternatively, issue a mandatory injunction directing the Defendant to place him in the position to which he would have normally progressed but for the illegal discrimination against him.

(g)    Alternatively, issue a mandatory injunction requiring Defendant to place Plaintiff in the next appropriate vacancy to which he normally would have been entitled.

11

**A11**

(h)    Award front pay until Plaintiff can be reinstated or placed in a comparable or appropriate position.

(i)    Issue a permanent injunction requiring Defendants to:

(i)    Notify everyone who learned of Defendant's treatment of Plaintiff that its conduct was illegal,

(ii)    Expunge Plaintiff's personnel files of any derogatory information relating to this matter,

(j)    Award Plaintiff costs, interest, and attorney's fees for this suit.

(k)    Require such other and further relief as the Court deems just and proper under the circumstances.

**LAW OFFICE OF JOHN M. LaROSA**

/s/ John M. LaRosa
**JOHN M. LaROSA, ESQUIRE**
Delaware Bar No. 4275
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JLR@LaRosaLaw.com

Attorney for Plaintiff Clifton J. Showell, Jr.

Dated: January 9, 2006

Attorney Files/John's Files/Client Files/SHOWELL/Pleadings/First Amended Complaint

12

A12



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Showell

## v.

# Gaming Entertainment L.L.C., et al.

### C.A. # 05-462 JJF

---

## Transcript of:

## Beverly Pope

## November 20, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A13

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.,   )
              )
    Plaintiff,    )
              ) Civil Action
v.            ) No. 05-462 JJF
              )
GAMING ENTERTAINMENT (DELAWARE) )
L.L.C., D/B/A MIDWAY SLOTS AND )
SIMULCAST GAMING ENTERTAINMENT, )
a Delaware limited liability  )
company,          )
              )
    Defendant.    )

    Deposition of BEVERLY POPE taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, LLP, Brandywine Building,
1000 West Street, 16th Floor, Wilmington, Delaware,
beginning at 10:30 a.m., on Monday, November 20, 2006,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

   JOHN M. LaROSA, ESQ.
   LAW OFFICE OF JOHN M. LaROSA
    Two East 7th Street - Suite 302
    Wilmington, Delaware  19801
    For the Plaintiff

   SETH J. REIDENBERG, ESQ.
   YOUNG CONAWAY STARGATT & TAYLOR, LLP
    The Brandywine Building
    1000 West Street - 17th Floor
    Wilmington, Delaware  19801
    For the Defendant

     WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
     (302) 655-0477
     www.wilfet.com    A14

Beverly Pope

1    Q.   Do you recall whether you were the only person

2    who interviewed Mr. Showell for the position of slot

3    attendant?

4    A.   I'm not sure, but I know that I did interview

5    him, that part I do know, that I did interview him.

6    Q.   Do you recall who was responsible for the

7    decision to hire Mr. Showell?

8    A.   At that time my supervisor's name was Rich

9    Jefferies, yes.

10   Q.   Mr. Jefferies would have been responsible for

11   hiring --

12   A.   For help, yeah.  Well, Mr. Jefferies would have

13   been responsible with me for making the decision.  We

14   talked about whenever I hired, you know, any of the

15   new employees anyway, that that was mandatory with me

16   talking to my bosses about them.

17   Q.   So you interviewed Mr. Showell and you decided

18   that you wanted to make him a job offer, but you

19   cleared that with Mr. Jefferies?

20   A.   Yes.

21   Q.   Mr. Jefferies would have approved that

22   decision?

23   A.   Yes, as far as, you know, sitting down and

24   asking me questions like, you know, how was his

**A15**

1  mannerism, you know, what do you think he would bring

2  to the company, you know, all those things like that.

3  You know, by Mr. Showell being a -- I have seen him in

4  the building as a customer and I spoke to him quite a

5  few times, I mean, in fact a lot of times.  You know,

6  I asked him how everything was going and stuff like

7  that, you know.

8           And he had pulled my attention that he had

9  put in for a position at Midway when we first opened

10 up.  And I said, "Really?"  He said, "Yeah."  And he

11 says he doesn't understand why he never got a chance

12 to be interviewed.  I said, "That didn't sound like

13 what I went through."  So we talked about it.

14          And then if I would see him like a couple

15 of weeks later or whatever, you know, he would get

16 back on the subject again.  Then that's when he told

17 me he used to work in Las Vegas at -- I hope I get it

18 right -- Tropicana, one of those casinos out in Vegas.

19 So I said to him "So you got gambling, gaming

20 experience, which is a plus.  That's good."

21   Q.   So you interviewed Mr. Showell and made a

22 recommendation to Mr. Jefferies to hire him?

23   A.   Yes, I did.

24   Q.   What is Mr. Jefferies' race?                    A16

Beverly Pope

1    A.    White male.

2    Q.    Do you know approximately how old Mr. Jefferies

3    at the time that you recommended Mr. Showell for the

4    position how old he was?

5    A.    I'm not sure how old Rich was.  I'm really not.

6    Q.    Was there anyone else involved in the hiring

7    decision when it came to hiring Mr. Showell?

8    A.    Nobody that I know of, you know, not from my

9    side, nobody that I know of.

10    Q.    Once Mr. Showell was hired, am I correct that

11    he was hired as a slot attendant?

12    A.    Yes, he was.

13    Q.    Who was Mr. Showell's supervisor at Midway when

14    he was first hired?

15    A.    Oh, God, I can't remember who was supervisors

16    there.

17         I think Bob Schuler was a supervisor.  I

18    think.  I'm not sure.  I can't remember exactly who

19    was in the lineup of the supervisors when he started.

20    I really truly can't.

21    Q.    Were you a supervisor of Mr. Showell when he

22    was a slot attendant?

23    A.    No.  I had already, I think I had already been

24    promoted to director.

A17

1    A.    Yes, I did.  Yes, I did.

2    Q.    Was anyone else involved in that decision to

3    promote Mr. Showell to lead attendant?

4    A.    No.  Nobody that I could think of outside of me

5    and Mr. Jefferies.

6    Q.    And is the promotion from slot attendant to

7    lead the only promotion that Mr. Showell received

8    before you left in 2000?

9    A.    No.  Because he was a shift manager when I

10   left.

11   Q.    Do you recall whose decision it was to promote

12   him to shift manager?

13   A.    It was both ours, Mr. Jefferies and myself.

14   Q.    Did you recommend to Mr. Jefferies that he be

15   promoted or did Mr. Jefferies come to you?

16   A.    We actually had a position that we both said

17   was available.  And do you know what?  I'm thinking

18   that he might have been the only one to put in because

19   I don't remember who else put in for it at that time.

20   Q.    He was the only one that applied for it?

21   A.    Yes, sir.

22   Q.    Was it still your opinion that Mr. Showell

23   would make a good slot shift manager?

24   A.    I was under that impression, yes, sir.

Beverly Pope

1    know why I'm thinking a year, but I'm thinking like

2    nine months to a year after I had gotten back.  I

3    don't think it was as soon as I got back in the

4    building.

5        Q.    Do you recall whether any training was provided

6    to any GED employees in how to use the IGS System?

7        A.    Yes.  Every last one of us was trained,

8    including me, including me.

9        Q.    When you say, "every last one of us," us being

10   whom?

11       A.    Us being the slot shift managers, my technical

12   person, the one lone technical person that I had at

13   that time now and myself and Darrell Nashold too.

14       Q.    Do you recall if slot attendants were part of

15   this training?

16       A.    Slot attendants got the basic part of the

17   training because a lot of that stuff they were not

18   privy to and they weren't allowed to have, but they

19   did get trained.

20       Q.    Let me ask you this:  How much training did you

21   receive?  Do you recall?

22       A.    Three to four days of training.  Three to four

23   days of training.                                    A19

24       Q.    Was Mr. Showell part of this training as well?

Beverly Pope

Page 42

1    A.    Yes, sir, he was.

2    Q.    Was Mr. Schuler part of this training?

3    A.    Mr. Schuler, yes, he was.

4    Q.    You say Mr. Nashold was part of the training?

5    A.    Yes, sir.

6    Q.    Do you recall what other slot shift managers

7    were in the training when it was given?

8    A.    Okay.  You had Tony Williams and Regina

9    Burrell.

10              Did I miss anybody?  Tony Williams and

11   Regina Burrell.

12   Q.    Let me ask you this:  Who put on the training

13   for the IGS System?

14   A.    The IGT Corporation.

15   Q.    Was there any training given to you by any GED

16   employees or was it all done by --

17   A.    GED employees like as in you mean somebody from

18   MIS or something like that?

19   Q.    Correct.

20   A.    No. The main training was by the IGT rep and

21   his name was Scott.  I can't remember what Scott's

22   last name was, but it was Scott.

23   Q.    Do you recall any training being provided to

24   you from IGT on the IGS System with respect to

A20

1    passwords?

2      A.    In fact, that gentleman, the same gentleman,

3    Scott was the one who gave us the training.

4      Q.    What did he tell you about, what were you

5    trained on with respect to the password?

6      A.    We were trained on with respect to the password

7    the secrecy as in it could -- use it or think of it as

8    your ATM card.  You don't give your ATM card pass

9    number to anybody.  It's your number, your number

10   only.  On the back side of the MIS, the one MIS guy

11   did tell us, the only time that he did really get into

12   anything with us was that whatever your number is is

13   your number.  They don't have no idea what your number

14   is.  If you forget your number, which I proved it, if

15   you forget your number, you're going to have to start

16   again and you're going to have to input your number in

17   the system.  We don't have the number.

18     Q.    Do you recall who the gentleman was from MIS

19   that talked to you about this is your number; if you

20   forget it, you're going to have to start over again?

21     A.    Yeah.  Kevin Washington.

22     Q.    Do you recall if during that particular

23   training if Mr. Showell was in attendance?

24     A.    Yes, he was.  In fact, he was standing at I

Beverly Pope

1   call them AJ's where we are now, but TDN machine, they

2   call them TDN's. He was standing at the TDN machine

3   over by the surveillance and security office when I

4   walked in and opened up the door because I was kind of

5   a couple of minutes late getting there.

6      Q.   Do you recall if there was anything provided to

7   you or to the slot shift managers in writing that said

8   this is your password; don't give it out or you treat

9   it as if it were your ATM card?

10     A.   No.   I don't remember seeing that, that

11   particular thing.

12     Q.   Do you recall seeing anything when you were

13   going through the training in writing that said your

14   IGS password is yours and yours alone?

15     A.   No.   No, sir.   No, I didn't.

16     Q.   But it was part of the verbal training that you

17   received?

18     A.   Yes.   Yes, sir.

19     Q.   Do you recall any other training or anything

20   else being told to you by anyone prior to the

21   implementation of the system about the IGS password?

22     A.   I know when we were -- I remember us being set

23   up in the conference room before they did what they

24   did in the conference room and they had all of the

A22

Beverly Pope

1    computers for us to be able to work on.  And I

2    remember from then, from when we were getting that

3    part of the training Scott said that, you know, the

4    information as far as your pass is yours, is yours

5    only.  So we could set it up to match anything that we

6    want to, you know, any number, any word, you know,

7    something like that would make it easier for the

8    individual to remember.

9        Q.    What did the IGS password allow slot employees

10    to do?

11        A.    Okay.  Depending on your level, okay, and your

12    line-level employees, which is your slot attendants,

13    they were allowed to go and do jackpots, you know,

14    retrieve money, print up tickets for jackpots and

15    receive the money out of the TDN machine and go ahead

16    and pay the customer out on that level.

17        Q.    Do you recall how much they were authorized to

18    pay out?

19        A.    Oh, God, no.  That I don't remember.

20        Q.    Were there any restrictions with respect to

21    hopper-fill overrides as it related to the IGS

22    password?

23        A.    Hopper-fill overrides?  Let me think.

24              The hopper-fills had to be implemented by

A23

Beverly Pope

Page 46

1    the supervisors.  We had a machine set up in the shift

2    office.  Actually, we had a computer that we worked on

3    and they could actually input the information and we

4    had a little ticket machine that would generate the

5    slip.  So we would take the slip that was generated

6    and take the written one, the handwritten one and

7    staple it together.

8                See, what we would do is we would have

9    drop-off boxes at different and various locations.

10   And what the supervisors would do during the course of

11   their scheduled time, they would go around and check

12   those boxes and remove those slips and go to the

13   office when the TDN was over there by the security

14   office and we had a table where they could input this

15   information and do the same exact thing.

16   Q.    Could slot attendants input hopper-fills at

17   all?

18   A.    No.  No.  But let me back it up.  Hold up.

19               We had new hires that came in that we

20   actually couldn't put on the floor because there was a

21   new way of doing things kind of with the lottery and

22   they couldn't actually touch the money or you couldn't

23   do the transferring.  So what we would do -- and

24   keeping it until everything was cleared the way it was

Beverly Pope

1    Q.    Did you ever say to anyone I hope so-and-so

2    doesn't get caught giving out his or her IGS password?

3    A.    No, sir.

4    Q.    When was the first time you became aware that

5    anyone was giving out his or her IGS password?

6    A.    When accounting brought to my attention there

7    was a jackpot paying out for a hundred dollars, but

8    they didn't have a slip and I'm like how?  You

9    can't -- money can't come out of the TDN machine, at

10   least it hadn't come out in front of me without a slip

11   being generated.  Are you sure they just didn't forget

12   to put the slip together or whatever?

13          So we went to go research the information

14   and we found that there was an override for a hundred

15   dollars or something like that, if I got it right, for

16   a hundred dollars or something like that.  And then we

17   kept on because we couldn't understand why it was

18   overridden, why the jackpot was like that.  It didn't

19   seem right.  So we kept on researching and researching

20   until we found out that one of our slot attendants

21   went to go -- they short paid the customer and went to

22   go back to get the money and used a shift manager's

23   pass code.

24   Q.    And that shift manager's pass code was

A25

Beverly Pope

Page 51

1    Mr. Showell's?

2    A.    Yes.

3    Q.    The slot attendant that you're referring to, do

4    you recall who that individual was?

5    A.    Her name is Georgia.

6    Q.    That's Georgia Kimball?

7    A.    Yes.

8    Q.    When you say, we did, we investigated, were you

9    part of the investigation?

10    A.    Well, I was with a young lady in accounting.    I

11    forget her name in accounting.    I can't think of her

12    name, but I can see her face.

13            Yeah, a young lady in accounting.

14    Q.    Is she a white female?

15    A.    A white female, yes.

16    Q.    What steps did you take in terms of

17    investigating to determine that Ms. Kimball had used

18    Mr. Showell's password to override this jackpot?

19    A.    Well, we pulled some information that had the

20    time and the date of the transaction and I think it

21    had, at that time that particular paper had the

22    transaction pass number.    And we went looking back to

23    see who that name matches up, matched up, you know,

24    with different slips.                                    A26

1          And when we came across that number again
2    we found out that it was Mr. Showell's.  And what
3    happened was that on this particular day that she did
4    this a hundred dollars, it was a day that Mr. Showell
5    was off and that's what made us really suspicious
6    then.  How could he have overridden something and he
7    was off, he wasn't here?
8    Q.    Did you at any point in time ask to see any
9    surveillance tapes?
10   A.    Of Ms. Kimball?
11   Q.    Yes.
12   A.    Yes.  Yes, we did.  Yes, I did.
13   Q.    Let me ask you this:  Who did you report -- you
14   find out that Mr. Showell's number is on this slip,
15   but we know he's not working.
16   A.    Right.
17   Q.    Did you report that to anyone else at GED at
18   the time?
19   A.    Yes, I did.  Not only did I talk to
20   surveillance, the executive director of surveillance
21   and security, I also told my boss, Mr. Tranchitella.
22   Q.    And the executive director of security and
23   surveillance was who at the time?
24   A.    Jay Lewis.

                                              A27

Beverly Pope

Page 53

1    Q.    What happened after you brought it to

2   Mr. Tranchitella's and Mr. Lewis's attention?

3    A.    Mr. Tranchitella informed me that -- well, he

4   asked me what was the steps that I had already taken.

5   I explained to him that we had already checked the

6   paperwork and the date, so we were going to bring

7   up -- I went to surveillance to bring up that time

8   because I wanted to make sure that everything matched

9   up and that what it was is what it was.

10             And we looked at that videotape at the

11   time of that jackpot and once she realized when she

12   was at the machine that she had not given the customer

13   the right amount of money, she did go back to try to

14   get another hundred.

15    Q.    To the TDN machine?

16    A.    To the TDN machine, right.

17    Q.    And she was able to get the hundred dollars?

18    A.    Yeah.

19    Q.    Or whatever the amount of money was?

20    A.    Yes.

21    Q.    And that's because she used Mr. Showell's

22   password?

23    A.    Exactly.

24    Q.    What happened after you brought this to

**A28**

Beverly Pope

1  Mr. Lewis's and Mr. Tranchitella's attention?

2    A.    Then we started -- we questioned Ms. Kimball.

3  I'm not sure if it was the same exact day, but I know

4  we questioned Ms. Kimball.

5          And we asked her about it, you know,

6  Mr. Lewis asked her, you know, what happened?  And

7  then she explained what she did.

8    Q.    Were you present during this interview?

9    A.    Yes.  Yes.  She explained that, you know, when

10  she got to the machine, you know  -- I watched her

11  when she was at the TDN machine count the money.  When

12  she got to the slot machine, she read off the machine

13  to the customer like she was supposed to.  And she

14  counted the money to the customer and you could see

15  her in the tape a little bit being kind of hesitant.

16          Maybe she -- you know, I'm thinking maybe

17  she realized she was short then.  She went and reset

18  the machine and went back to the TDN, straight back to

19  where the room is, to the TDN room and began to go

20  into the TDN and try to override and get the money

21  that she owed the customer.

22    Q.    The interview with Ms. Kimball, do you recall

23  if that was in person?

24    A.    Oh, that was in person because she was sitting

Beverly Pope

1    right in Jay's office and I was sitting there and Jay

2    was there.  I don't know if anybody else was there.  I

3    can't seem to remember.

4    Q.    What happened after you interviewed Ms. Kimball

5    about the incident?

6    A.    She was asked, actually she was asked "Well,

7    how did you get his number?  Because he wasn't here.

8    So how did you get it?  You just couldn't, you know,

9    luck up and think of somebody's number like that and

10   be right on the money."

11             So that's when she said Cliff gave it to

12   her.  And I said to her "You got to be kidding me."

13   Q.    What happened after that?

14   A.    Then she started telling us "Well, we do it all

15   the time."  And that's when Jay and I in unison said,

16   "Who's 'we'?"

17   Q.    Who was "we"?

18   A.    Then she was saying that, she said Bob and

19   Sabrina, yeah, Sabrina Jenkins.

20   Q.    And at the time you learned of all of this

21   Mr. Schuler had already passed away?

22   A.    Yes.  Yes.

23   Q.    What did you do after you interviewed

24   Ms. Kimball?

**A30**

Beverly Pope

1    A.    Well, we interviewed her, we interviewed her

2    because Ms. Kimball said, "Well, you should ask

3    Patty."  I think that's what we interviewed Patty for,

4    yeah.

5    Q.    Do you recall what Patty told you about this

6    IGS password?

7    A.    No.

8    Q.    What happened after you interviewed all of

9    these employees?

10    A.    Well, once we interviewed all of the employees

11    I talked to Lenny about it and since because of the

12    delicacy of that came to the conclusion of terminating

13    Mr. Showell because he had already had a final written

14    warning.

15    Q.    Prior to this incident?

16    A.    Yes, sir.  And Ms. Jenkins got a final written

17    warning because she didn't have anything in her file

18    at that time.  That's the only thing she had in her

19    file.  Her file had nothing in there.

20    Q.    You said you spoke to Lenny and

21    Mr. Tranchitella about the incident and what you had

22    learned and everything else.

**A31**

23    A.    Mm-hmm.

24    Q.    Whose decision was it to terminate Mr. Showell?

Beverly Pope

1    A.    Mine.

2    Q.    Once a decision was made to terminate

3   Mr. Showell, what happened?

4    A.    Well, I went over and talked to Scott about it.

5    Q.    "Scott" means Scott Saxon?

6    A.    Yes, Scott Saxon about it.  And that was it.

7    Q.    Was there any point in time when you thought

8   about not terminating Mr. Showell?

9    A.    There's always a point in time when I'm always

10   thinking about not terminating somebody because I

11   think there's got to be something positive in this

12   person.

13    Q.    Did you ever suggest to anyone after you made

14   your initial decision to terminate in this

15   conversation with Mr. Tranchitella to terminate

16   Mr. Showell "Do you know what, I changed my mind; I

17   don't want to terminate him"?

18    A.    I'm not saying I didn't say that or anything

19   like that, but I don't recall.

20    Q.    Do you recall ever having a conversation with

21   anyone that "Maybe we shouldn't terminate him because

22   there's not going to be enough people on the floor, to

23   work the floor"?

24    A.    We have been shorthanded before many a time.

A32

Beverly Pope

1    No.

2       Q.    So you went over to Mr. Saxon and you discussed

3    the issue with him?

4       A.    Mm-hmm.

5       Q.    Yes?

6       A.    Yes.  Yes.

7       Q.    That's okay.

8              And what did you talk to Mr. Saxon about?

9       A.    I talked to Mr. Saxon about my feelings about

10   Cliff doing wrong as far as doing this and I was

11   upset.  And the reason why I was upset was because

12   like now, as you can see, Cliff has an effect on me.

13   He has always affected me to the point where my

14   pressure has gone up bad and I've always used Scott as

15   my sounding board to try to get me calmed down.

16              And I know I had to do a job, so I had to

17   get myself prepared because I knew it wasn't going to

18   be easy.  I knew it.

19      Q.    What about Mr. Showell would cause your

20   pressure to always go up?

21      A.    He has always been -- case in point:  When we

22   had to really come together as a team because of

23   emergencies that happened and different things like

24   that, he has always been the one that always would

A33

Beverly Pope

Page 61

1    lash out "Why do I have to give up my day off?  Why

2    can't you do it this way?"  I mean, just out like

3    that, all the time.

4              It was never where, you know, right now we

5    need you to help us as a team, we need to come

6    together and cover this time and do this, he wouldn't

7    do it.  He wouldn't do it.  Like I said earlier, if it

8    wasn't beneficial to him, it was always wrong.  It was

9    always wrong.

10   Q.   Let me ask you this:  What did Mr. Saxon tell

11   you with respect to the decision to terminate

12   Mr. Showell?  Anything?

13   A.   The only thing that Scott said to me was that,

14   you know, if he did, if he's at that point and he did

15   the crime -- I'm using my own words.  I'm not using

16   his words per se.  Okay?

17   Q.   Okay.

18   A.   This is what it is.  You know, what he has in

19   his file, this is what it is.

20             He didn't tell me not to do it and he

21   didn't tell me to do it.  This is your picture.

22   Q.   Did anyone at GED tell you to fire or not to

23   fire Mr. Showell?

24   A.   No.

A34

Beverly Pope

Page 69

1    Q.    What does that mean?

2    A.    We accelerated it from, say, a verbal to a

3    final written warning.

4    Q.    Was that permissible as you understood it under

5    the progressive disciplinary policy?

6    A.    Yes, sir.

7    Q.    Do you recall who was hired to replace

8    Mr. Showell?

9    A.    I don't know if it was Jonathan...

10            I'm getting bad with names.

11            Jonathan -- God, I don't know.  Jonathan?

12    Jonathan?  He's a shift manager.  I guess he's still

13    employed at Midway.  Jonathan?

14            I can't remember his last name.

15    Q.    You said you don't remember if it was Jonathan

16    or was there anyone else that it could be?

17    A.    I don't know if it was just him or, you know,

18    who came, who came behind Cliff.

19    Q.    Would you have been the person to interview and

20    hire Jonathan?

21    A.    Yes, I did hire Jonathan.  Yes, I did hire

22    Jonathan.

23            Jonathan?

24    Q.    Jonathan, what's his race?                    A35

Beverly Pope

Page 70

1    A.    African-American male.

2    Q.    Do you know approximately how old he is?

3    A.    Right now Jonathan should be -- I'm going to

4    give him credit -- 26.  But I'm not sure.  But I know

5    he's in his twenties.

6    Q.    Was he employed by GED at the time he was

7    promoted to slot shift manager?

8    A.    Yes, he was.

9    Q.    Was there a woman named Tracy Dorsey that was

10   also hired?

11   A.    Yes, she was too.

12   Q.    Was she hired to replace, as a replacement for

13   Mr. Showell or was Jonathan and Ms. Dorsey, were they

14   hired together?

15   A.    I think Tracy came in before Jonathan.  In

16   fact, they were close, in close proximity, but she did

17   come in before he did, if I got it right.

18   Q.    What is Ms. Dorsey's race?

19   A.    African-American.

20   Q.    Do you know approximately how old she is?

21   A.    I'm going to say she's in her thirties.

22   Q.    Were you responsible for hiring both Jonathan

23   and Ms. Dorsey?

24   A.    Yes.                                    **A36**

Beverly Pope

1    this meeting (indicating).

2    Q.    What was the purpose of the January 11th

3    meeting?

4    A.    We have meetings, you know, departmental

5    meetings to bring them up on issues, things that have

6    been happening, concerns or complaints from the

7    customers, letters that I might have received, you

8    know, good, bad or indifferent letters that I might

9    have received from the customers and, you know, brush

10   up on general -- and Sundays was a good day I thought

11   because we didn't open up until later at that time.   I

12   don't think we would open up until about 1:00 o'clock.

13   It might even have been 12:00 o'clock at the time.

14              And Sunday, the majority voted that Sunday

15   would have been a good day because it would have been

16   easier to get everybody to get there instead of having

17   a meeting on Tuesday at 1:00 o'clock and another one

18   on Tuesday at 5:00 o'clock because people weren't

19   getting the same understanding.   Everybody was

20   interpreting the meeting differently, so that's why we

21   had, that's why we had this meeting, those meetings on

22   Sundays or meetings on Sundays.

23   Q.    Do you recall presenting this disciplinary

24   report to Mr. Showell?                              A37

Page 76

1    A.    Yes, I do.

2    Q.    Do you recall who was present when you

3    presented it to him?

4    A.    No.  No, I don't.  Actually, I don't.

5    Q.    Where it says, if you look on the third page of

6    this document, "Employee refused to sign" and there's

7    January 14, 2004 written there, do you see that?

8    A.    Yes.

9    Q.    Is that your handwriting?

10   A.    Yes, that is my handwriting.

11   Q.    Do you recall Mr. Showell refusing to sign?

12   A.    Yes, sir.

13   Q.    Do you recall why he refused to sign?

14   A.    Because he said it wasn't fair; that he

15   shouldn't get written up for not showing up for a

16   meeting; "I told you I had something that I had to

17   do."

18   Q.    That's what he said to you?

19   A.    That's what he claimed he said to me.

20         And I'm like "Cliff, I don't remember that

21   conversation.  I don't remember that conversation."

22   And that's when I told him "If you did, then you

23   should have reminded me."

24   Q.    Okay.

**A38**

Beverly Pope

Page 92

1    knowledge.

2      Q.   Were you working for Midway in November of

3    2003?  Do you recall?

4      A.   Yes, I was.

5      Q.   Do you remember a point around that time when

6    Mr. Showell had to undergo dental surgery to have

7    teeth removed?

8      A.   Yes, I do.

9      Q.   And at that time was Mr. Showell required to

10   take an unpaid leave of absence?

11     A.   Excuse me.  That's my stomach.  I'm sorry.

12          Yeah.  What do you mean by "required"?

13   Okay.  Explain.

14          MR. LaROSA:  Can you read my question

15   back?

16          If you need me to rephrase it or explain

17   it, I'll do that.

18          THE WITNESS:  Okay.

19          (The reporter read back the pending

20   question.)

21          THE WITNESS:  For?

22   BY MR. LaROSA:

23     Q.   In connection with having his dental surgery

24   and having his teeth removed?

A39

Beverly Pope

Page 93

1    A.    I don't know about being required, but I know

2    he did take an unpaid leave of absence.

3    Q.    Do you know if Midway allowed him to work on

4    the casino floor with his teeth missing?

5    A.    Would they have allowed him?

6    Q.    Yes.

7    A.    Yes, they would have.

8    Q.    And Midway had FMLA leave?

9    A.    Yes, they did.  Yes, they did.

10   Q.    I think you told us that Regina Burrell was one

11   of the slot shift managers when you worked there?

12   A.    Yeah.  When I left, yes, sir.

13   Q.    Was there a point in time where she had a

14   medical issue?

15   A.    She had had a medical issue before I got there.

16   Q.    And if you know, did she take a demotion from a

17   management to a non-management position because of her

18   medical issue?

19   A.    Now that I couldn't tell you.  I wouldn't know.

20   Q.    How about Sonya Clendaniel, did she have a

21   medical issue at some point?

22   A.    Yes, she did.

23   Q.    Was that in 2004 while you were working there?

24   A.    Yeah.  I think it was 2004.

**A40**

1    A.    I do.  I do.

2    Q.    The convention you went to in Nevada or Reno --

3    A.    Yes.

4    Q.    -- was that an annual thing or just a one-time

5    event?

6    A.    Actually, it was a one-time event.

7    Q.    Was that in '03 or '04?  Would it have been in

8    '03?

9    A.    '03.  '03 I'm sure.

10    Q.    Do you remember what month in 2003?

11    A.    All I know is in January and I remember

12    January.

13    Q.    So either January of '03 or '04?

14    A.    I'm pushing over more on -- yeah, January.

15    Q.    You think it was January of 2004, to the best

16    of your recollection?

17    A.    I can't remember.  I know it was January.

18    Q.    And you told us that Georgia Kimball was

19    someone that you had to discharge?

20    A.    Yes, sir.

21    Q.    And is it true that she had prior disciplinary

22    actions prior to the last incident that led to her

23    discharge?

24    A.    Yes, sir.

A41

Beverly Pope

1    Q.    And so she had had all of the different

2    warnings in the progressive discipline policy that we

3    talked about, verbal counselings, first, second,

4    third, written warnings and final warnings before her

5    termination?

6    A.    Yes.

7                MR. REIDENBERG:  Objection.

8                THE WITNESS: I'm sorry.

9                MR. REIDENBERG:  That's all right.

10   BY MR. LaROSA:

11   Q.    To the best of your recollection, was the

12   progressive discipline policy followed with regard to

13   her?

14   A.    Yes, sir.

15   Q.    To the best of your recollection, was the

16   progressive discipline policy followed with regard to

17   Sabrina Jenkins?

18   A.    Yes, sir.

19   Q.    With regard to your second tenure with Midway,

20   did you submit a resignation?

21   A.    Yes, I did.

22   Q.    Did anyone ask you to submit a resignation?

23   A.    No, sir.

24   Q.    Before you terminated Mr. Showell, did you

Beverly Pope

Page 118

1

I N D E X

2    DEPONENT:  BEVERLY POPE                           PAGE

3        Examination by Mr. Reidenberg              2
         Examination by Mr. LaRosa                  84
4        Examination by Mr. Reidenberg              112
         Examination by Mr. LaRosa                  115

5

E X H I B I T S

6                                                   MARKED
     POPE DEPOSITION EXHIBITS

7
     1 Memo to All Midway Slots and Simulcast
8       Slot Dept. Supervisors and Leads from
        Beverly Pope dated 4 March 2004              66
9
     2 Three-page document captioned "Midway Slots
10      and Simulcast Employee Disciplinary Report"
        dated January 13, 2004                       72
11
     3 Three-page memorandum to Beverly Pope from
12      Len Tranchitella dated 3/12/04               77
13   4 Five-page document captioned "Progressive
        Counseling/Termination - Midway"             112

14   ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 119

15   CERTIFICATE OF REPORTER               PAGE 120

16

17

18

19

20

21

22

23

24                                                   **A43**

Beverly Pope

Page 120

```
 1   State of Delaware    )
                          )
 2   New Castle County    )

 3

 4                  CERTIFICATE OF REPORTER

 5

 6           I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
 7   there came before me on Monday, November 20, 2006, the
     deponent herein, BEVERLY POPE, who was duly sworn by
 8   me and thereafter examined by counsel for the
     respective parties; that the questions asked of said
 9   deponent and the answers given were taken down by me
     in Stenotype notes and thereafter transcribed by use
10   of computer-aided transcription and computer printer
     under my direction.

11           I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13           I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17                    Kurt A. Fetzer, RDR, CRR
                      Certification No. 100-RPR
18                    (Expires January 31, 2008)

19
     DATED:
20

21

22

23

24                                              A44
```



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Showell

## v.

# Gaming Entertainment L.L.C., et al.

### C.A. # 05-462 JJF

---

### Transcript of:

### Clifton J. Showell, Jr.

### November 2, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.,          )
                                  )
          Plaintiff,              )
                                  )   Civil Action
v.                                )   No. 05-462 JJF
                                  )
GAMING ENTERTAINMENT (DELAWARE),  )
L.L.C., D/B/A MIDWAY SLOTS AND    )
SIMULCAST GAMING ENTERTAINMENT,   )
a Delaware limited liability      )
company,                          )
                                  )
          Defendant.              )

     Deposition of CLIFTON J. SHOWELL, JR., taken
pursuant to notice at the law offices of
Young Conaway Stargatt & Taylor, The Brandywine
Building, 1000 West Street, Wilmington, Delaware,
beginning at 10:05 a.m. on Thursday,
November 2, 2006, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          JOHN M. LaROSA, ESQ.
          Law Office of John M. LaRosa
            Two East 7th Street, Suite 302
            Wilmington, Delaware 19801-3707
            for the Plaintiff,

          SETH J. REIDENBERG, ESQ.
          Young Conaway Stargatt & Taylor, LLP
            The Brandywine Building
            1000 West Street, 17th Floor
            Wilmington, Delaware 19899-0391
            for the Defendant.

ALSO PRESENT:
SCOTT SAXON, DIRECTOR OF HUMAN RESOURCES, MIDWAY SLOTS
BOBBI J. SANDERS, CPA, DIRECTOR OF COMPLIANCE
- - - - - - - - - - - - - - - - - - - - - - - - - - - --
          WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
                  (302) 655-0477
                  www.wilfet.com                    **A46**

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 2

1              CLIFTON J. SHOWELL, JR.,

2      the witness herein, having first been

3      duly sworn on oath, was examined and

4      testified as follows:

5   BY MR. REIDENBERG:

6      Q.   Good morning, Mr. Showell.  My name is Seth

7   Reidenberg.  I'm an attorney at Young, Conaway,

8   Stargatt & Taylor, and I'm representing Gaming

9   Entertainment of Delaware.

10              Have you ever had your deposition taken

11  before?

12     A.   No.

13     Q.   Well, I am going to be asking you questions

14  throughout the day, and there is a few rules that I

15  would ask you to follow.  First is, all of your

16  answers need to be verbal.  Shakes of the head, nods

17  of the head the court reporter can't take down.  Okay.

18  If you don't understand a question that I ask, please

19  let me know, and I will do my best to rephrase that

20  question.  Okay?

21     A.   Good.

22     Q.   Also, let me finish a question before you

23  answer so, again, we have a clean record and clean

24  transcript.  All right?                        A47

Page 28

1    correct?

2      A.    July 18th, 1998.

3      Q.    What was your position at that point?  What

4    position were you hired into?

5      A.    I was hired as a slot attendant.

6      Q.    What type of training were you provided when

7    you were hired as a slot attendant?

8      A.    Training started with knowing the ins and outs

9    of a machine, knowing how to properly do a hand-pay,

10   the employee manual, what you can and what you could

11   not do.

12     Q.    What responsibilities did you have as a slot

13   attendant when you first started with Midway?

14     A.    Making sure that the games are up and running,

15   hopper-fills, jackpot payoffs, your area nice and

16   clean and neat, giving out good customer service.

17     Q.    What is a hopper-fill?

18     A.    A hopper-fill is when you take a bag of coins

19   and open them and dump them in the hopper.  The hopper

20   holds the coins, and it has gears that kicks the coins

21   out and a counter that counts the coins.

22     Q.    Within the machine?  This is all within the

23   machine?

24     A.    That's correct.

**A48**

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 29

1  Q.   Did you as a slot attendant supervise any

2  employees?

3  A.   I helped train some employees if they had

4  problems.

5  Q.   How long were you a slot attendant at -- for

6  Gaming Entertainment?

7  A.   That's a good question.  About a year and a

8  half.

9  Q.   Did you change positions within GED?

10  A.   No, I never changed positions; I was promoted a

11  position.

12  Q.   What were you promoted to from slot attendant?

13  A.   To lead attendant.

14  Q.   How did your responsibilities differ as a lead

15  attendant from slot attendant?

16  A.   Because you became more responsible for

17  jackpots, customer service, working directly under a

18  supervisor, filling in the gaps when -- if a slot

19  attendant went on lunch hours or had to fill in the

20  vacancies, if somebody called out, you filled in the

21  spot.

22  Q.   Did you receive additional training when you

23  became a lead attendant from -- when you were promoted

24  to lead attendant from slot attendant?

A49

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 30

1    A.    Not as much as the training but you had to be

2  more aware of your surroundings because then you

3  became a part of a -- looking out for the welfare of

4  Midway slots.

5    Q.    As opposed to as a slot attendant you didn't

6  have to look out for the welfare of --

7    A.    You looked out for it, but you were more aware

8  because then all of a sudden you start to see things

9  from a different angle or prospect where you would be

10  able to pay out a jackpot, learn more about machines

11  because you are dealing with techs on a one-on-one

12  basis and they would show you lot more than you would

13  know as a slot attendant.

14    Q.    Did you have any supervisory responsibilities

15  as a lead attendant?

16    A.    Yes, yes, because you was responsible for an

17  area and the people in that area to make sure that

18  everybody is doing their work according to the manuals

19  and the policies that was written by Midway.

20    Q.    Within that lead attendant role, did you have

21  to -- strike that.  What type of supervisory

22  responsibility did you have with respect to slot

23  attendants?

**A50**

24    A.    A lead attendant is only a step above a slot

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 38

1    Q.    You don't recall who approached you?

2    A.    It had to be -- I am just -- I'm speculating

3    that it was Ms. Pope or -- she was -- she did ask due

4    to my attendance record and job performance and the

5    initiative that I took.  She was part of it.  And also

6    Mike Vautrin.

7    Q.    Mike Vautrin?

8    A.    Yes.

9    Q.    Do you recall what title Vautrin had at the

10   time you were promoted from slot attendant to lead

11   attendant?

12   A.    He was a GM.

13   Q.    Do you recall approximately how old Mr. Vautrin

14   was at the time you were promoted?

15   A.    He was, I would say, in his mid 50s.

16   Q.    What was his gender?

17   A.    Caucasian.

18   Q.    Was there a salary increase --

19   A.    Yes.

20   Q.    -- associated with -- let me finish my

21   question.

22   A.    Excuse me.

23   Q.    That's okay.  -- associated with your promotion

24   from slot attendant to lead attendant?

A51

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 44

1    director.  So Gary Glocker.  Rich Jeffries.

2      Q.    That was the vice-president's name?

3      A.    Yes.

4      Q.    Mr. Jefferies approached you about becoming a

5    supervisor?

6      A.    Yes.  Due to the point -- the only way that

7    certain individuals could have the nights off is if

8    they had to up the amount of money that could be paid

9    off, and that was part of the promotion.

10      Q.    So -- let me ask you this.  We didn't talk

11    about it, but.  The slot attendant could only pay up

12    to $1999?

13      A.    That's correct.

14      Q.    What was the lead attendant's maximum that they

15    could pay out?

16      A.    At that time, the maximum for lead was 5,000.

17      Q.    What was your amount that you could pay out as

18    a jackpot when you became supervisor?

19      A.    Depending on -- as a shift manager?

20      Q.    I don't know.  You said supervisor, but you

21    couldn't recall what the title was.

22      A.    Well, see, that's the thing, every -- it was

23    just, you know, slot shift.  That was the last

24    position.  There was just a slot manager.                    A52

Page 45

1    Q.    When you became a supervisor, was there still a

2    slot shift manager?

3    A.    Oh, yes, there was always someone ahead of me.

4    Q.    Okay.  So what was your authority to pay out

5    jackpots as a supervisor?

6    A.    It became from five to 25,000.  I am just

7    giving you a guess at the amount.  It's been awhile.

8    Q.    Do you recall how old, approximately,

9    Mr. Jefferies was?

10   A.    Oh, he's a young man.  He was in his mid, late

11   20s.

12   Q.    What was his gender?

13   A.    Caucasian.

14   Q.    You also stated that Ms. Pope had left?

15   A.    Yes.

16   Q.    What does that mean?

17   A.    She was terminated -- I am giving you an

18   estimate -- right around 2000.

19   Q.    She was terminated in 2000?

20   A.    Yes, right before Mike -- before the incident

21   with Mike the next year, the game with Mike, Big Mike.

22   Q.    Was she ever brought back?

23   A.    Yes.

24   Q.    Do you recall when she returned?                A53

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 46

1    A.    2002.

2    Q.    Who did you report to when you were a

3    supervisor?

4    A.    Gary Glocker, GeorgeAnn, and Helena Wellings, I

5    can't pronounce her name, but she was a supervisor.

6    So it was Gary Glocker, director, Georgeanna, and

7    Helena.

8    Q.    Did you report to Helena?

9    A.    Yes, I did.  Whenever the shift was over with,

10   anything that went on that night, we reported directly

11   to her.

12   Q.    Do you recall approximately how old she was?

13   A.    She was in her mid 40s.

14   Q.    What was her gender?  I'm sorry.  What was her

15   race?

16   A.    Caucasian.

17   Q.    While you were lead attendant, did you receive

18   performance evaluations?

19   A.    Yes.

20   Q.    Do you recall who prepared your performance

21   evaluations?

22   A.    I can't recall at this time.

23   Q.    Do you recall if you received favorable

24   performance evaluations?

A54

Page 47

```
1     A.   It was fair.

2     Q.   When you became supervisor, did you receive a

3  performance evaluation?

4     A.   Yes, I did.

5     Q.   Do you recall who prepared that performance

6  evaluation?

7     A.   Helena prepared one, I know.  Darrell and

8  Beverly prepared one.  And that's all I can recall at

9  this present time.

10    Q.   After your position as supervisor, what was the

11 next position you had at GED?

12    A.   Slot shift manager.

13    Q.   Do you recall when you became slot shift

14 manager?

15    A.   Not at this present time I can't.

16    Q.   How did you become slot shift manager?

17    A.   That was:  Gary Glocker got fired; GeorgeAnn

18 and Helena was fired; and they left three openings.

19 Beverly Pope came back; Darrell Nashold got promoted;

20 and I filled in the next slot down there.

21    Q.   When you say Beverly Pope came back, do you

22 recall what position she came back into?

23    A.   As director of slots.

24    Q.   Darrell Nashold was promoted to what position?
```

A55

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 48

1    A.    He took Gary Glocker's old position prior to

2    him being the director, which was a technical -- I

3    can't recall the position at this present time, but it

4    was a technical position slash that put him right

5    under the director.

6    Q.    Did Mr. Nashold supervise you at that point?

7    A.    We never worked on the same shift.  He was

8    days, I was nights.

9    Q.    At one point you said Darrell Nashold and

10    Beverly Pope did a performance evaluation for you?

11    A.    Yes, at the end.  That was my, I think the last

12    two evaluations that I had.

13    Q.    Why did Mr. Nashold do your performance

14    evaluations, do you know?

15    A.    Because she had just came back, and it was

16    nowhere -- when she -- excuse me.  She had not been

17    there long enough.  There was two years had passed

18    before I had an evaluation, so it was based upon, I

19    guess Darrell Nashold's and I don't know who else, but

20    what they saw my performance for those two years that

21    I was -- missed the evaluation.

22    Q.    Mr. Nashold -- I don't think I asked you these

23    questions -- do you know approximately how old he is?

24    A.    I didn't know.  I took a guess.  Ballpark.

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 49

1    He's a couple years older than I am.

2        Q.    And what is his race?

3        A.    Caucasian.

4        Q.    The evaluations that Mr. Nashold gave you --

5    we'll get into them in a little bit more detail -- but

6    did you receive positive performance evaluations, or?

7        A.    The first one was negative, a negative

8    evaluation.

9        Q.    How about the second one?

10       A.    The second one, it showed positive due to the

11   point that I complained about the first one to HR.

12       Q.    What does that mean?

13       A.    I didn't agree with it.  It was kind of hard

14   for someone that does not work with you on a

15   one-on-one basis or day-to-day basis to give you an

16   evaluation.  And I would like to know how could he

17   come to a conclusion on an evaluation if we don't work

18   together.

19       Q.    Do you recall what year when you say the first

20   one?

21       A.    2002.

22       Q.    You said there was a second one.  Were you

23   talking about --

24       A.    2003.

A57

Page 52

1   slot attendants worked hard, they deserve more than

2   this, tore mine's up and redid it.

3       Q.   Tore your evaluation that you did of

4   Mr. Ingram?

5       A.   That's correct.

6       Q.   Who is Mr. Ingram?

7       A.   He was a slot attendant.

8       Q.   What was his race?

9       A.   He was a white male.

10      Q.   Do you know how old approximately Mr. Ingram

11  was?

12      A.   I would say John had to be in his late 20s,

13  early 30s.

14      Q.   What was your position at the time you did a

15  review on Mr. Ingram?

16      A.   I was slot shift manager.

17      Q.   This was after you became slot shift manager?

18      A.   That's correct.

19      Q.   So what makes -- what about that incident makes

20  you think that Mr. Nashold's evaluation of you was

21  based upon your race?

22      A.   Because it was the same year that they changed

23  the bonus status.  Your bonus prior was based upon you

24  come into work, doing your job, and putting Midway

Page 53

1    first.  And I did that.

2      Q.   But was there anything specific that led you to

3    believe that Mr. Nashold was treating you differently

4    because of your race?

5      A.   Anything different?

6      Q.   No, is there anything that he did?

7      A.   It is if I put you in a different environment

8    where you deal with people that you know that dislikes

9    you but had to tolerate you, you will know the

10   difference.  That's how I know the difference.  He

11   would avoid conversations, cut it short, snappy

12   responses.  And so it's better for you not to say

13   something if you dislike a person than say anything.

14     Q.   Do you believe he just disliked you

15   individually?

16     A.   I can't answer that.  I just take it as a it

17   could be an environment thing.

18     Q.   But what about his attitude or what you

19   perceived to be a dislike toward you do you believe is

20   based on your race?

21     A.   That's the only thing I could come up with.  It

22   can't be because I am a male, you know, I thought it

23   was gender.

24     Q.   Could it be he just didn't like you, Clifton

Page 54

1    Showell?

2      A.    I couldn't answer that.   I am not Daryl -- I

3    couldn't answer that.

4      Q.    But you still didn't -- maybe there is no

5    answer to this question, but I am going to ask it

6    again.   What about what actions did Mr. Nashold took

7    any statements he took, anything led you to believe he

8    disliked you because you were black?

9      A.    And, again, I cannot go inside of Daryl

10   Nashold's head.   I can only go by how he treated me,

11   how he evaluated, gave me evaluations, and he worked

12   daytime.   When Darrell would go home, we would pass

13   each other in passing, you know.   Whether we spoke to

14   each other didn't make a difference because it was at

15   a point where it was two men.   We're not talking about

16   color.   We're talking about two gender.   If you

17   dislike me and you show me that you dislike me, I

18   don't have conversation for you.   That's the way we

19   were.

20     Q.    Did you ever hear Mr. Nashold make any racial

21   jokes during the time that you worked at GED?

22     A.    As a slot attendant, yes.

23     Q.    You heard Mr. Nashold make --

24     A.    Oh, I heard a lot of them.

**A60**

Page 55

1    Q.   Specifically, I'm asking from Mr. Nashold.

2    A.   Yes, yes, as a slot attendant.  But as we was

3    trained and got promoted, he was very cautious of what

4    he said.

5    Q.   Were the jokes that Mr. -- did you participate

6    in the jokes?

7    A.   No.

8    Q.   When you said he made jokes, did he make --

9    were they black jokes?

10   A.   Ethnic.

11   Q.   Ethnic jokes.  But ethnic towards black people

12   or just ethnic in general?

13   A.   Ethnic in general.

14   Q.   Did you ever hear him make any or say any jokes

15   that were directed or derogatory towards black people?

16   A.   If he did, I can't recall at this present time

17   I cannot recall.

18   Q.   So you don't know if he did or did not?

19   A.   No, I am saying I cannot recall at this time.

20   Q.   What type of jokes do you recall him making?

21   What type of ethnic jokes do you recall him making?

22   A.   Mother's Day.  Do you know what Mother's Day

23   means in the casino business?

24   Q.   No.                                    **A61**

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 59

1    A.    Yes.

2    Q.    Of the other individuals who would make these

3    jokes, were there any African-American individuals

4    that would join in on these jokes?

5    A.    I would say, no, because there was, at that

6    time, one, two ... there was four African-Americans

7    that worked there.  That means two on night shift and

8    the other two worked the day shift.  And we had our

9    hands full trying to do our job, you know, because

10   it's tough when you are laying down the foundations so

11   somebody else can get a job behind you based upon your

12   job performance.

13   Q.    How many slot attendants do you recall total

14   were employed by GED when you started?

15   A.    I would say, no more than 20.

16   Q.    Of the 20 you recall there being approximately

17   four or five African-American individuals?

18   A.    In that ballpark.  It might be a little more

19   slot attendants, but it was no more than four or five

20   at that time.

21   Q.    And were you and Mr. Nashold on the same shift

22   as slot attendants?

23   A.    When I first started, we both worked days.

24   Q.    After the Mother's Day jokes went on for a

**A62**

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 60

1    little bit, you reported that to HR and you had these

2    meetings.  Is that what I understand correctly?

3        A.    Ms. Pope had a meeting and with the assistance

4    of human -- HR, and said that it must stop and must

5    stop now.  So what they did is slowly but surely

6    eliminated a lot of slot attendants that had that

7    attitude.

8        Q.    Other than this situation when Mr. Nashold was

9    a slot attendant and allegedly made these jokes, is

10   there anything else, did he make any other comments to

11   you about being African-American that was in any sort

12   of derogatory nature?

13       A.    I can't recall at this time.

14       Q.    Can you recall any actions either towards you

15   or other individuals that could be considered

16   derogatory towards African-Americans?

17       A.    You are talking about Daryl?

18       Q.    Yes.

19       A.    We're still on Daryl?

20       Q.    Yes.  With respect to Mr. Nashold, yes.

21       A.    I can't recall at this time.  All I can say is

22   that when we're in the business, the business is

23   fairness across the board.  We have guidelines.  And

24   that's the bottom line is our guidelines, Midway's

**A63**

Page 74

```
 1    Did someone approach you about becoming a slot shift

 2    manager?  I know you said a lot of people had been let

 3    go so there were positions open.  Did you apply for

 4    the position or did someone approach you about the

 5    position?

 6       A.    They approached me about it.

 7       Q.    Who approached you?

 8       A.    The first was Gary -- slot shift manager would

 9    have been Gary Glocker.  Let's see.  The

10    vice-president I told you prior, Rich Jeffries, and

11    the information was sent to Scott Saxon.

12       Q.    For approval?

13       A.    Yes.

14       Q.    The time that you were made slot shift manager,

15    do you recall how many slot shift manager positions

16    there were?

17       A.    They made four.  They made four positions

18    available, which gave everybody the capability to pay

19    jackpots over $50,000.  And that was the reason why,

20    is that the business had grew and when you only got a

21    couple people, it wears and tears on them.

22       Q.    I want to make sure I understand.  There were

23    two slot shift managers?

24       A.    That's correct.
```

A64

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 158

1    A.    I couldn't answer that question.  I wasn't

2    there.

3    Q.    It looks like you worked every night, according

4    to this, from January 7th, 2004, to Saturday,

5    January 10th, 2004?

6    A.    That's correct.

7    Q.    But you were sick on January 11th?

8    A.    That's a lot of hours.

9    Q.    So you were tired, not necessarily sick?

10    A.    Exhausted.

11    Q.    So you decided because you were tired you

12    weren't going to attend the meeting?

13    A.    I left that night at quarter to 3:00 that

14    morning.

15    Q.    What time was the meeting supposed to start?

16    A.    11:00.

17    Q.    11:15 it looks like?

18    A.    11:00.  Okay.

19    Q.    So you took it upon yourself to say I'm not

20    going to make the meeting?

21    A.    No.  Mother nature took it upon and made me

22    sleep a little longer.

23    Q.    So you weren't sick, you were tired?  Earlier

24    you said you were sick.

A65

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 172

1    Q.    -- I guess determined --

2    A.    They let her do it.  Instead of -- surveillance

3   is probably in the next room and they saw that she had

4   a mistake, and they allowed her to do this.

5    Q.    Let me ask you this:  slot attendants had IGS

6   passwords, correct?

7    A.    Correct.

8    Q.    Could a slot attendant use his or her password

9   in order to do a jackpot override?

10    A.    I couldn't answer you, but I doubt it.  I doubt

11   it.  Because if the game itself has not -- has a

12   jackpot and they put in the correct information, it is

13   going to kick out the money that it said it's going to

14   kick out.

15    Q.    Do you recall being interviewed by Jay Lewis?

16    A.    Very much so.

17    Q.    Do you recall when that interview took place?

18    A.    Let me see here.  They suspended me and -- I

19   would say, I am going to take a guess because it's

20   been awhile, the 2nd, March 2nd.

21    Q.    And I have -- I don't have copies of the report

22   for you, but according to this, there were interviews

23   conducted on March 4th, 2004 of you and Ms. Jenkins

24   and a number of other individuals.  At the time you

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 173

1   were interviewed by Mr. Lewis, did you admit you had

2   given Ms. Kimball your IGS password?

3      A.    Yes, sir, I did.

4      Q.    When did you give Ms. Kimball your IGS

5   password?

6      A.    I don't recall exactly the date at the time I

7   gave it to her.  It was on a weekend.  She came to me

8   with a hopper-fill slip.  I had a tax form in my hand.

9   I wrote down my password and I slashed it out.  I told

10  Mr. Lewis the same thing because I couldn't leave the

11  money unattended.

12     Q.    The taxable?

13     A.    Yeah.

14     Q.    Why did she need -- let me ask you this:  Why

15  did she need the supervisor for the hopper fill?

16     A.    Because our system itself, when they purchased

17  the system, they left out the software.  They didn't

18  purchase the software to complete the system.

19     Q.    What does that -- what software do you think

20  they didn't purchase to complete the system?

21     A.    Oh.  Well, Delaware Park and Dover Downs have a

22  similar system.  But their software and components

23  that goes with the system that as soon as you punch in

24  the information from the game, it automatically prints

Showell                                v.                    Gaming Entertainment L.L.C., et al.
Clifton J. Showell, Jr.            C.A. # 05-462 JJF              November 2, 2006

Page 174

1    the slip in a cage.

2      Q.    Okay.  What happens at GED or what happened, I

3    guess, at GED when they went to the IGS System?

4      A.    The system became manual.  No better than the

5    one we had prior other than it held more information.

6    You're able to punch in information with this system.

7      Q.    The IGS System?

8      A.    That's correct.

9      Q.    But I guess I'm still confused a little bit.

10   Why did -- could a slot attendant input a hopper-fill,

11   hopper-fill information into the TDN machine with his

12   or her password?

13     A.    Yes, yes.

14     Q.    Why then would they need -- would Ms. Kimball

15   have needed your password to do a hopper-fill?

16     A.    The system would only hold the information, as

17   I said earlier, for no more than 15 to 20 minutes.

18     Q.    Okay.

19     A.    And it would be just not there anymore.  So

20   what she needed to do was call a supervisor.  The

21   hopper-fill slips, as I stated, was a job from finance

22   that was handed down in this whole couple months that

23   all this stuff happened, was handed down to the slot

24   department.  But no policies was written of how or no

Page 175

1    procedures was written on how they wanted the job

2    done; if we have a problem, how do we correct the

3    problem.   None of this was put into play.

4        Q.   At some point, I assume you were told that if

5    the hopper-fills weren't done by the slot attendants

6    within this 15-to-20-minute-time window that a

7    supervisor had to complete that task; is that correct?

8        A.   That's correct.   That's correct.

9        Q.   In order to enter any information into the TDN

10   machine did you have to input your particular

11   password?

12       A.   Yeah -- yes, your employee number and your

13   password, yes, correct.

14       Q.   So by giving your password to Ms. Kimball, you

15   allowed her to do what only you were authorized to do

16   by GED?

17       A.   No, not necessarily.   What happened is that

18   when they implemented this program of us doing the

19   hopper-fill slips, Bob Schueler, Sabrina Jenkins had

20   already implemented giving out their password.   I

21   brought it to my director's attention because, you

22   know, I was staying in the IGS System or surveillance

23   would kick me off the system after 2:30, 3:00 o'clock

24   in the morning because the impressment team, which is

Page 176

 1    the count team has to take over, and they only gave me

 2    until 3:00 o'clock.   So from 2:00 -- from the time

 3    that we closed until they kick me off, I could only

 4    complete what I could complete.

 5        Q.    What time did the casino close?

 6        A.    At my time, they closed at 2:00 o'clock.

 7        Q.    So you had an hour to input the hopper-fill

 8    slips?

 9        A.    Yeah.   You know, you would -- on the average,

10    you would have five to a thousand.

11        Q.    Hopper-fill slips to --

12        A.    That's correct.

13        Q.    Why were you inputting, you as a supervisor,

14    inputting anywhere from five to a thousand hopper-fill

15    slips if it was the slot attendants -- if the slot

16    attendants could do the hopper-fill slips?

17        A.    Because it was more likely that they would run

18    hand-pays.   They do a hopper-fill, fill up a machine,

19    write the slip, run to the next customer, help the

20    next customer, might be a hand-pay, and by the time

21    they got back to this hopper-fill slip, it had expired

22    out of the system.   So instead of them doing it, they

23    would take the slip and put it in a box.

24        Q.    Because they couldn't do it at that point;

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 177

1    correct?

2      A.    That's correct.

3      Q.    If they had tried and put their password in, it

4    would not allow them to input the hopper-fill slip?

5      A.    It would say "expired," yes.

6      Q.    So they couldn't go any further?

7      A.    That's correct.

8      Q.    They needed a supervisor, someone with higher

9    authority to override the system and allow these

10   hopper-fill slips to be input?

11     A.    They needed a supervisor to put in his number

12   to get a printout and make a slip, to generate a slip.

13   The system -- not only for hopper-fill slips, but for

14   hand-pays, too.  It didn't just stop at hopper-fill

15   slips.  What would happen is at the time span from

16   time they open up in the morning until 4:00 -- well,

17   4:45 when I came in, so after 4:45 in that afternoon,

18   if day shift didn't complete their hopper-fill slips,

19   that means they're left.  They go home.  They don't

20   have to complete them.  That whole shift, they're

21   gone.  There is thousands of them that never got

22   completed and never got processed.  And that was my

23   complaint, is that if you can't process a hopper-fill

24   slip or produce a hopper-fill slip, that's money

Page 178

```
 1   that's not accounted for.

 2       Q.    So when did you tell Beverly Pope that Sabrina

 3   Jenkins and --

 4       A.    And Bob Schueler.

 5       Q.    -- Bob Schueler --

 6       A.    There you go.

 7       Q.    -- gave out their password?  When did you tell

 8   her that?

 9       A.    It had to be -- her write-up for me, as they

10   said, was January -- it was --

11       Q.    For the attendance policy you are talking

12   about?

13       A.    Yeah.  It was in that December-January, right

14   when they started.  There was only like a month.  And

15   there was nothing said, nothing.  So I assumed that if

16   she said it's okay for them, then it should have been

17   okay for me.

18       Q.    What did --

19       A.    She didn't.

20       Q.    What did she say when you brought it to her

21   attention that Mr. Schueler and Ms. Jenkins had given

22   out their IGS password?

23       A.    I didn't get too much feedback from her.

24       Q.    Did she say you're not allowed to do that,
```

Page 179

1    that's against policy?

2        A.    She mentioned something in regards to, "I hope

3    they don't get caught."

4        Q.    Did she say anything else?

5        A.    No.    That was it.    That was -- and up until the

6    investigation, the hopper-fill slips and password was

7    not only given out on the night shift, but also the

8    day shift.    Because you had -- you had employees in

9    the office punching in slips during the daytime.    And

10    these slips are being brought from different locations

11    to the office to be processed.    You cannot process it

12    without them having a supervisor's password.

13        Q.    Why did you bring it to the attention of

14    Beverly Pope that Bob Schueler and Sabrina Jenkins had

15    given out their passwords?

16        A.    Because they was going home at a reasonable

17    time.    I was there until 3:00 o'clock in the morning.

18        Q.    Why did you report them?    Did you think it was

19    a violation at that point to give out the password?

20        A.    There was no policy.    This is all new to

21    everybody.    It was new to her because we have never

22    been able -- I mean, to do hopper-fill slips, that's a

23    different department.    That's finance.    So now all of

24    a sudden, that's an extra burden that was put on

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 180

```
 1   slots.  So they had -- they didn't sit down and
 2   evaluate it and wrote up policies or procedure that
 3   could complete this task.  It was just, this is what's
 4   got to be done, let's get it done.
 5      Q.    But did you think it was a violation of some
 6   policy or procedure for Sabrina Jenkins and Bob
 7   Schueler to give out their IGS password?
 8      A.    I know what you are trying to say and what you
 9   are trying to get at.  But be more specific for me or
10   re -- you know, just redirect this question, but be
11   more specific.
12      Q.    I don't know that I can other than to say that
13   you knew it was a violation to give out an IGS
14   password.  That's why you brought it to Beverly Pope's
15   attention.
16      A.    Okay.
17      Q.    Is that a fair statement?
18      A.    I would say that was fair, but it wouldn't be
19   right because it had already occurred.
20      Q.    I understand that.  They had already given out
21   their passwords?
22      A.    Yes.
23      Q.    You learned that they had already given out
24   their passwords to slot attendants?
```

A74

Page 181

1    A.    That's correct.

2    Q.    You knew that was wrong, that was in violation

3    of some policy or procedure and as a result you wanted

4    to bring to it your supervisor's attention.

5    A.    I did that.

6    Q.    Would you agree with that statement?  You knew

7    it was wrong, so you brought it to director -- to

8    Beverly Pope's attention?

9    A.    I brought it to her attention because I was

10   being called at home 8:00 o'clock in the morning and

11   asking the question how come you are not completing

12   this task?  And I could not complete the task of

13   completing that many hopper-fill slips in an hour's

14   time solo.

15   Q.    But you are jumping ahead a little bit.

16   A.    Okay.  Back up some.

17   Q.    Maybe if we can get this question answered, we

18   can move to the next step.

19   A.    Go ahead.

20   Q.    You brought it to Beverly Pope's attention that

21   Bob Schueler and Sabrina Jenkins gave out their IGS

22   password because you knew it was a violation of the

23   policies of GED and you wanted her to be aware that

24   they were in violation of the policies; is that a fair

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 182

1    statement?

2    A.    No, it's not a fair statement because there was

3    no policy.    There was no policy, there was no design

4    or procedure because if it was, that means the finance

5    department would have did the job themselves as they

6    was doing for the last five-and-a-half years.

7    Q.    When you were interviewed by Mr. Lewis, you

8    told him that you were aware that providing a password

9    was a system security breach and that the no-signal

10   inputs are a supervisory-only function?

11   A.    Negative.    That's incorrect.

12   Q.    You didn't tell him that?

13   A.    There is no way I told him that.

14   Q.    What did you take it to mean when Ms. Pope

15   said, "I hope they don't get caught"?

16   A.    Just like it sounds.    But they didn't get

17   caught.

18   Q.    But -- what did you take that to mean?

19   A.    I couldn't because she never -- she -- she knew

20   something that we didn't know.    And I still say that

21   if somebody had sat down and broke it down to let us

22   know that VLC, Video Lottery, would write policies and

23   procedures.    I still have not seen this policy and

24   procedure.                              A76

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 209

```
 1    A.    It was a neutral -- it was neutral.  They told

 2  me that you are not going to work on the floor without

 3  teeth.

 4    Q.    Did you want to work on the floor without

 5  teeth?

 6    A.    I wanted to work.

 7    Q.    That's not what I'm asking.  Did you want to

 8  work on the floor without teeth?

 9    A.    If they would have allowed me, yes, I would not

10  have had a problem with that.

11    Q.    You never went to Scott Saxon and told him I

12  don't want to work on the floor without teeth?

13    A.    No.

14    Q.    So why did you take the leave of absence?

15    A.    Why?  Because I was told I am not going to work

16  on the slot floor from Beverly Pope without teeth.

17    Q.    Did they offer to put you in a different

18  position during the time that you didn't have your

19  teeth?

20    A.    No.

21    Q.    Did they assist you in getting FMLA benefits as

22  a result of this leave of absence?

23    A.    No benefits.  I paid my own way.

24    Q.    Did you receive any benefits through the Family
```

A77

Showell
Clifton J. Showell, Jr.

v.
C.A. # 05-462 JJF

Gaming Entertainment L.L.C., et al.
November 2, 2006

Page 211

1    6/6/02."

2       Q.    So you believe because of that -- those

3    mistakes this is not your evaluation?

4       A.    I believe that this evaluation has been

5    altered.

6       Q.    Do you recall receiving a 5 percent raise as a

7    result of your 2003 evaluation?

8       A.    No.

9       Q.    What did you think your raise was in 2003?

10      A.    It really didn't make a difference.  After

11   2002, from that point on, it really didn't make a

12   whole lot of difference.  I did read this part.

13   Daryl did write a comment, and he did -- I can

14   remember this comment.  I am just saying certain

15   things have been shifted.  My last raise was 5

16   percent.  But the year before was 3.

17      Q.    2002 it was 3, 3 percent?

18      A.    That's correct.

19      Q.    That's because your review wasn't as good in

20   2003, correct?

21      A.    But I would like to find out how could he

22   review and give me an evaluation based upon not

23   working with me.

24      Q.    So you disagreed --

**A78**

Page 284

1    A.    Do I -- could you repeat that?

2    Q.    Sure.   Do you recall receiving a right-to-sue

3  letter from the EEOC as opposed to the Delaware

4  Department of Labor that we were discussing earlier?

5    A.    I can't recall.

6              MR. REIDENBERG:   I think that's all the

7  questions that I have.   Thank you.

8              MR. LaROSA:   Thanks.

9              (Deposition concluded at 6:25 p.m.)

10                -- -- -- --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**A79**

Showell                                    v.                    Gaming Entertainment L.L.C., et al.
Clifton J. Showell, Jr.              C.A. # 05-462 JJF                      November 2, 2006

Page 285

```
 1                    I N D E X

 2   WITNESS:  CLIFTON J. SHOWELL, JR.        PAGE

 3     EXAMINATION BY MR. REIDENBERG            2

 4                DEPOSITION EXHIBITS

 5   NO.                                      MARKED

 6    1    1/12/00 memo to C Showell from       92
          T. Gillis
 7
      2    Acknowledgment of receipt of         92
 8        handbook

 9    3    Acknowledgment of harassment         92
          awareness seminar
10
      4    Harrington Raceway's Midway Slots    94
11        Policy & Procedure Education Booklet

12    5    Demotion Policy                     107

13    6    Progressive Counseling/Termination  110
          Policy
14
      7    3/14/01 memo re: Signing of jackpot 115
15        and hopper fill slips

16    8    3/14/01 memo re:  Hopper Fill       115
          Policies/Procedures
17
      9    9/2/98 memo to C. Showell from      118
18        R. Schueler; 9/23/98 memo to
          C. Showell from R. Schueler;
19        10/12/98 to C. Showell from R. Schueler;
          10/15/98 memo to C. Showell from
20        H. Ellingsworth; 11/9/98 memo
          to B. Pope from M. Vautrin; 11/10/98
21        memo to C. Showell from G. Glocker;
          12/8/98 memo to C. Showell
22        from G. Propiano

23   10    1/12/99 disciplinary action to      130
          C. Showell; 1/18/99 memo to
24          B. Pope from M. Vautrin
```

A80

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Showell                           v.                           Gaming Entertainment L.L.C., et al.
Clifton J. Showell, Jr.            C.A. # 05-462 JJF                        November 2, 2006

Page 286

```
                    DEPOSITION EXHIBITS
 1

 2   NO.                                          MARKED

 3   11    3/23/01 memo to G. Glocker from         137
           R. McKee; 3/26/01 memo to
 4         S. Showell; 11/23/01 memo
           to C. Showell from B. Pope
 5
     12    1/12/02 disciplinary action to          139
 6         C. Showell; 9/1/02 finance exception
           report to B. Pope; 10/23/02 employee
 7         procedural violation; 11/21/02
           employee procedural violation
 8
     13    4/24/03 finance exception report to     144
 9         B. Pope; 8/20/03 employee procedural
           violation; 9/4/03 employee procedural
10         violation; handwritten memo to Cliff
           from Daryl; 9/17/03 employee procedural
11         violation with attached fill receipt;
           10/8/03 employee disciplinary report;
12         11/1/03 finance exception report to
           B. Pope with three pages of documentation,
13         stamped D493 - D496; 12/3/03 employee
           procedural violation and 12/4/03 memo
14         to C. Showell from D. Nashold; 11/1/03
           memo to C. Showell from D. Nashold
15
     14    1/13/04 employee disciplinary           155
16         report

17   15    3/5/04 memo to C. Showell from          167
           S. Saxon
18
     16    Final determination and right-to-sue    199
19         notice

20   17    6/6/03 peformance evaluation            205

21   18    Payroll Status Authorization (PSA)      205

22   19    8/23/00 note of Dr. Sharman             257

23

24                                                 A81
```

Showell                                    v.                    Gaming Entertainment L.L.C., et al.
Clifton J. Showell, Jr.               C.A. # 05-462 JJF                      November 2, 2006

Page 287

1

2                         REPLACE THIS PAGE

3                         WITH THE ERRATA SHEET

4                         AFTER IT HAS BEEN

5                         COMPLETED AND SIGNED

6                         BY THE DEPONENT.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                                              A82

Page 288

1    State of Delaware    )
                          )
2    New Castle County    )

3

4                    CERTIFICATE OF REPORTER

5

6         I, Lucinda M. Reeder, Registered Diplomate
     Reporter, Certified Real-time Reporter and Notary
7    Public, do hereby certify that there came before me
     on November 2, 2006, the witness herein,
8    CLIFTON J. SHOWELL, JR., who was first duly sworn by
     me and thereafter examined by counsel for the
9    respective parties; that the questions asked of said
     witness and the answers given were taken down by me in
10   Stenotype notes and thereafter transcribed by use of
     computer-aided transcription and computer printer
11   under my direction.

12        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
13   examination of said witness.

14        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.

16

17

18                         Lucinda M. Reeder, RDR, CRR
                           Certification No. 132-RPR
19                         (Expires January 31, 2008)

20

21   DATED:   11-20-06

22

23

24                                            A83



# PAYROLL STATUS AUTHORIZATION (PSA)

**CHECK PERSONNEL ACTION TO BE INITIATED BY THIS FORM**

| | | |
|---|---|---|
| ☒ New Hire | ☐ Personal Data Change | ☐ Leave of Absence-Depart |
| ☐ Job Change | ☐ Suspension | ☐ Leave of Absence-Return |
| ☐ Rate Change | ☐ Termination | ☐ Other (Explain in Remarks) |
|  | ☐ Rehire | |
|  | ☐ Reinstate | |

| DEPT. NO. | SOCIAL SECURITY NO. | LAST NAME Showell | FIRST Clifton | MIDDLE J. |
|---|---|---|---|---|

☒ FULL TIME   ☐ EXEMPT
☐ PART TIME   ☐ NON-EXEMPT
☐ SEASONAL

*ACTION EFFECTIVE ON → 7/18/98

*SALARY CHANGES EFFECTIVE ONLY ON FIRST DAY OF PAY WEEK

☐ FULL TIME   ☐ EXEMPT
☐ PART TIME   ☐ NON-EXEMPT
☐ SEASONAL

**FROM** COMPLETE BELOW ON ALL ACTIONS

**TO** ENTER ONLY INFORMATION TO BE CHANGED

| DEPARTMENT Slot Operations | DEPARTMENT | DEPT. NO. |
|---|---|---|
| POSITION TITLE Slot Floor Attendant | POSITION TITLE | |
| IMMEDIATE SUPERVISOR Beverly Pope | IMMEDIATE SUPERVISOR | |

| PAYROLL INITIALS/DATE | | HOURLY NON-EXEMPT | ANNUAL/EXEMPT | LAST INCREASE | REASON FOR CHANGE | IF MERIT, INDICATE PERFORMANCE LEVEL | |
|---|---|---|---|---|---|---|---|
| CP 7-17-98 | PRESENT SALARY | $ 8.50 | $ | Date: | ☐ Merit ☐ Promotion ☐ Reclassification | ☐ Meets Expectations ☐ Above Expectations ☐ Exceptional | % Increase |
| SALARY STATUS | CHANGE+– | $ | $ | Amount: | | ☐ Other | |
| | NEW SALARY | $ 8.50 | | Reason: | ☐ Other | | |

| EMPLOYMENT | Date of Birth 10-29-56 | Date of Hire 7-18-98 | Telephone (Area Code and Number) (302) 436-0388 | Sex M | EEO DESIGNATION ☐ Caucasian ☒ Black ☐ Hispanic | ☐ Asian or Pacific Islander ☐ Amer. Indian/Alaskan Native ☐ Vietnam Vet ☐ Handicap |
|---|---|---|---|---|---|---|
| EMPLOYMENT TRANSFER PROMOTION | Name of Person Replaced Benalee Foraker | | Last Salary 9.23 | Date Left Position Transfer | | |

| SEPARATION | LAYOFF ☐ Lack of Work ☐ Reorganization ☐ Position Eliminated | ☐ Shift/Dept. Eliminated ☐ Temp. Employment ☐ Other (Explain) | RESIGNED AS PER EMPLOYEE STATEMENT ☐ No Reason Given ☐ Other Employment ☐ Dissatisfied (see Remarks) | ☐ Leaving Locality ☐ Illness ☐ Retired | ☐ Personal Business ☐ To Attend School ☐ Other (see Remarks) |
|---|---|---|---|---|---|
| | DISCHARGED ☐ Violation of Company Rules (see Remarks) ☐ Insubordination (see Remarks) ☐ Other (see Remarks) | | LAST DAY WORKED | | |
| | | | ELIGIBLE FOR REHIRE    ☐ Yes    ☐ No | | |

| RATING BY SUPERVISOR | EXCEPTIONAL | ABOVE EXPECTATIONS | MEETS EXPECTATIONS | BELOW EXPECTATIONS | UNSATISFACTORY |
|---|---|---|---|---|---|
| Quality of Work | | | | | |
| Dependability | | | | | |
| Cooperation | | | | | |
| Attendance | | | | | |

**REMARKS**

P.O. Box 875 Rt 17 House 56 Selbyville Del 19975     ID# 0903

Costume Deposit

S-1

| APPROVAL | EMPLOYEE SIGNATURE Clifton J. Showell Jr. | | |
|---|---|---|---|
| | DEPARTMENT MANAGER BPope | VICE PRESIDENT/GM | HUMAN RESOURCES JFG | DIRECTOR OF FINANCE |
| DATE | 7/16/98 | | 7/17/98 | 7/17/98 |

SHADED AREAS MUST BE COMPLETED ON ALL ACTIONS

White Copy - HUMAN RESOURCES    Canary Copy - DEPARTMENT HEAD    Pink - PAYROLL

CONFIDENTIAL DOCUMENT

A84

D00534



# PAYROLL STATUS AUTHORIZATION (PSA)

**Midway**
SLOTS & SIMULCAST
AT THE
DELAWARE STATE FAIR

**CHECK PERSONNEL ACTION TO BE INITIATED BY THIS FORM**

| | | |
|---|---|---|
| ☐ New Hire | ☐ Personal Data Change | ☐ Leave of Absence-Depart |
| ☑ Job Change | ☐ Suspension | ☐ Rehire | ☐ Leave of Absence-Return |
| ☑ Role Change | ☐ Termination | ☐ Reinstate | ☐ Other (Explain in Remarks) |

| DEPT NO. | SOCIAL SECURITY NO. | LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|
| | ~~███████~~ | SHowell | Clifton | |

| | | *ACTION EFFECTIVE ON → 12/14/99 | *SALARY CHANGES EFFECTIVE ONLY ON FIRST DAY OF PAY WEEK | ☑ FULL TIME ☐ EXEMPT |
|---|---|---|---|---|
| ☑ FULL TIME ☐ PART TIME ☐ SEASONAL | ☐ EXEMPT ☐ NON-EXEMPT | | | ☐ PART TIME ☐ SEASONAL ☑ NON-EXEMPT |

| FROM COMPLETE BELOW ON ALL ACTIONS | TO ENTER ONLY INFORMATION TO BE CHANGED |
|---|---|

| DEPARTMENT | Slots | DEPARTMENT | SloTS | DEPT. NO. |
|---|---|---|---|---|
| POSITION TITLE | SloT Floor Attendant | POSITION TITLE | Lead Slot Floor Attendant | |
| IMMEDIATE SUPERVISOR | GARY Glocker | IMMEDIATE SUPERVISOR | Beverly Pope | |

| PAYROLL INITIALS/DATE | | HOURLY NON-EXEMPT | ANNUAL/EXEMPT | LAST INCREASE | REASON FOR CHANGE | IF MERIT, INDICATE PERFORMANCE LEVEL | |
|---|---|---|---|---|---|---|---|
| | PRESENT SALARY | $ 8.93 | $ | Date: 7/18/99 | ☐ Merit ☑ Promotion ☐ Reclassification | ☐ Meets Expectations ☑ Above Expectations ☐ Exceptional ☐ Other | 20% % Increase |
| SALARY STATUS | CHANGE+− | $ | $ .4926 | Amount: .43 | | | |
| | NEW SALARY | $ 1857/14 | $ 23500 | Reason: MeRiT | | | |

| EMPLOYMENT | Date of Birth | Date of Hire | Telephone (Area Code and Number) | Sex | EEO DESIGNATION |
|---|---|---|---|---|---|

EEO DESIGNATION:
☐ Caucasian  ☐ Asian or Pacific Islander
☐ Black  ☐ Amer. Indian/Alaskan Native
☐ Hispanic  ☐ Vietnam Vet  ☐ Handicap

| EMPLOYMENT TRANSFER PROMOTION | Name of Person Replaced Ed DusA | Last Salary 23500 | Date Left Position |
|---|---|---|---|

| SEPARATION | **LAYOFF** | | | **RESIGNED AS PER EMPLOYEE STATEMENT** | | |
|---|---|---|---|---|---|---|
| | ☐ Lack of Work | ☐ Shift/Dept. Eliminated | | ☐ No Reason Given | ☐ Leaving Locality | ☐ Personal Business |
| | ☐ Reorganization | ☐ Temp. Employment | | ☐ Other Employment | ☐ Illness | ☐ To Attend School |
| | ☐ Position Eliminated | ☐ Other (Explain) | | ☐ Dissatisfied (see Remarks) | ☐ Retired | ☐ Other (see Remarks) |

**DISCHARGED**
☐ Violation of Company Rules (see Remarks)
☐ Insubordination (see Remarks)
☐ Other (see Remarks)

**LAST DAY WORKED**

**ELIGIBLE FOR REHIRE**  ☐ Yes  ☐ No

| RATING BY SUPERVISOR | EXCEPTIONAL | ABOVE EXPECTATIONS | MEETS EXPECTATIONS | BELOW EXPECTATIONS | UNSATISFACTORY |
|---|---|---|---|---|---|
| Quality of Work | | | | | |
| Dependability | | | | | |
| Cooperation | | | | | |
| Attendance | | | | | |

| REMARKS | (Retro 10) |
|---|---|

EMPLOYEE SIGNATURE *Clifford Howell*

| APPROVAL | DEPARTMENT MANAGER | VICE PRESIDENT/GM | HUMAN RESOURCES | DIRECTOR OF FINANCE |
|---|---|---|---|---|
| DATE | 12/8/99 | | 12/20/99 | 12/23/99 |

SHADED AREAS MUST BE COMPLETED ON ALL ACTIONS

White Copy - HUMAN RESOURCES    Canary Copy - DEPARTMENT HEAD    Pink - PAYROLL

CONFIDENTIAL DOCUMENT

A85

D00549



# PAYROLL STATUS AUTHORIZATION (PSA)

**HARRINGTON RACEWAY'S MIDWAY SLOTS**

CHECK PERSONNEL ACTION TO BE INITIATED BY THIS FORM
☐ New Hire   ☐ Personal Data Change   ☐ Leave of Absence Depart
☐ Part Time   ☐ Job Change   ☐ Suspension   ☐ Leave of Absence Return
☐ Seasonal   ☐ Rate Change   ☐ Termination   ☐ Transfer   ☐ Other (Explain in Remarks)

| DEPT. NO. | SOCIAL SECURITY NO. | LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|
| | | Showell | Clifton | |

☐ FULL TIME  ☐ EXEMPT   ACTION EFFECTIVE ON 6/6/00   *SALARY CHANGES EFFECTIVE ONLY ON FIRST DAY OF PAY WEEK   ☐ FULL TIME ☐ EXEMPT
☐ PART TIME  ☐ NON-EXEMPT                                                                                  ☐ PART TIME ☐ NON-EXEMPT
☐ SEASONAL  ☐ NON-EXEMPT                                                                                 ☐ SEASONAL

FROM — COMPLETE BELOW ON ALL ACTIONS

| | TO — ENTER ONLY INFORMATION TO BE CHANGED | |
|---|---|---|
| DEPARTMENT: Slots | DEPARTMENT: Slots | DEPT. NO. |
| POSITION TITLE: Lead Slot Attd | POSITION TITLE: Slot Shift Mgr | |
| IMMEDIATE SUPERVISOR: Gary Glocker | IMMEDIATE SUPERVISOR: Gary Glocker | |

| PAYROLL INITIALS/DATE | | HOURLY NON-EXEMPT | ANNUAL/EXEMPT | LAST INCREASE | REASON FOR CHANGE | IF MERIT, INDICATE PERFORMANCE LEVEL | |
|---|---|---|---|---|---|---|---|
| | PRESENT SALARY | $ | $23500 | Date: | ☐ Merit ☐ Promotion ☐ Reclassification ☐ Other | ☐ Meets Expectations ☐ Above Expectations ☐ Exceptional ☐ Other | 6 % Increase |
| ☐ SALARY STATUS | CHANGE +– | $ | $1500 | Amount: | | | |
| | NEW SALARY | $ | $25000 | Reason: | | | |

| EMPLOYMENT | Date of Birth | Date of Hire | Telephone (Area Code and Number) | Sex | EEO DESIGNATION |
|---|---|---|---|---|---|
| | | | | | ☐ Caucasian  ☐ Asian or Pacific Islander ☐ Black  ☐ Amer. Indian/Alaskan Native ☐ Hispanic  ☐ Vietnam Vet  ☐ Handicap |

| EMPLOYMENT TRANSFER PROMOTION | Name of Person Replaced | | Last Salary | Date Left Position | |
|---|---|---|---|---|---|

| SEPARATION | LAYOFF ☐ Lack of Work ☐ Reorganization ☐ Position Eliminated ☐ Shift/Dept. Eliminated ☐ Temp. Employment ☐ Other (Explain) | RESIGNED AS PER EMPLOYEE STATEMENT ☐ No Reason Given ☐ Leaving Locality ☐ Personal Business ☐ Other Employment ☐ Illness ☐ To Attend School ☐ Dissatisfied (see Remarks) ☐ Retired ☐ Other (see Remarks) |
|---|---|---|

DISCHARGED
☐ Violation of Company Rules (see Remarks)
☐ Insubordination (see Remarks)
☐ Other (see Remarks)

LAST DAY WORKED

ELIGIBLE FOR REHIRE   ☐ Yes   ☐ No

| RATING BY SUPERVISOR | EXCEPTIONAL | ABOVE EXPECTATIONS | MEETS EXPECTATIONS | BELOW EXPECTATIONS | UNSATISFACTORY |
|---|---|---|---|---|---|
| Quality of Work | | | | | |
| Dependability | | | | | |
| Cooperation | | | | | |
| Attendance | | | | | |

REMARKS

| APPROVAL | EMPLOYEE SIGNATURE/DATE | DEPARTMENT MANAGER | VICE PRESIDENT/GM | HUMAN RESOURCES | DIRECTOR OF FINANCE |
|---|---|---|---|---|---|

SHADED AREAS MUST BE COMPLETED ON ALL ACTIONS

White Copy - HUMAN RESOURCES    Canary Copy - DEPARTMENT HEAD    Pink - PAYROLL

A86

D00554



# PAYROLL STATUS AUTHORIZATION (PSA)

**HARRINGTON RACEWAY'S MIDWAY SLOTS**

CHECK PERSONNEL ACTION TO BE INITIATED BY THIS FORM

DEPT NO. | SOCIAL SECURITY NO. | LAST NAME S.Howell | FIRST Clifton | MIDDLE

*SALARY CHANGES EFFECTIVE ONLY ON FIRST DAY OF PAY WEEK
☑ FULL TIME ☐ PART TIME ☐ SEASONAL   ☐ EXEMPT ☐ NON-EXEMPT

Date effective 9/4/01

**ENTER ONLY INFORMATION TO BE CHANGED**

| FROM COMPLETE BELOW ON ALL ACTIONS | TO |
|---|---|
| DEPARTMENT Slot Operations | DEPARTMENT | DEPT. NO. |
| POSITION TITLE Slot Shift Mgr | POSITION TITLE | |
| IMMEDIATE SUPERVISOR Bunny Pope | IMMEDIATE SUPERVISOR | |

| PAYROLL INITIALS/DATE | | HOURLY NON-EXEMPT | ANNUAL/EXEMPT | LAST INCREASE | REASON FOR CHANGE | IF MERIT, INDICATE PERFORMANCE LEVEL |
|---|---|---|---|---|---|---|
| | PRESENT SALARY | $ | $25,000 | Date: 6/6/00 | ☑ Merit ☐ Promotion ☐ Reclassification | ☑ Meets Expectations ☐ Above Expectations ☐ Exceptional ☐ Other |
| SALARY STATUS | CHANGE+– | $ | $750. | Amount: 1800 | | % Increase |
| | NEW SALARY | $ | $25,750 | Reason: Promotion | | |

| EMPLOYMENT | Date of Birth | Date of Hire | Telephone (Area Code and Number) | Sex | EEO DESIGNATION |
|---|---|---|---|---|---|
| | | | | | ☐ Caucasian   ☐ Asian or Pacific Islander |
| EMPLOYMENT TRANSFER PROMOTION | Name of Person Replaced | | Last Salary | Date Left Position | ☐ Black   ☐ Amer. Indian/Alaskan Native ☐ Hispanic   ☐ Vietnam Vet   ☐ Handicap |

**SEPARATION**

LAYOFF
☐ Lack of Work   ☐ Shift/Dept. Eliminated
☐ Reorganization   ☐ Temp. Employment
☐ Position Eliminated   ☐ Other (Explain)

RESIGNED AS PER EMPLOYEE STATEMENT
☐ No Reason Given   ☐ Leaving Locality   ☐ Personal Business
☐ Other Employment   ☐ Illness   ☐ To Attend School
☐ Dissatisfied (see Remarks)   ☐ Retired   ☐ Other (see Remarks)

DISCHARGED
☐ Violation of Company Rules (see Remarks)
☐ Insubordination (see Remarks)
☐ Other (see Remarks)

LAST DAY WORKED

ELIGIBLE FOR REHIRE   ☐ Yes   ☐ No

| RATING BY SUPERVISOR | EXCEPTIONAL | ABOVE EXPECTATIONS | MEETS EXPECTATIONS | BELOW EXPECTATIONS | UNSATISFACTORY |
|---|---|---|---|---|---|
| Quality of Work | | | | | |
| Dependability | | | | | |
| Cooperation | | | | | |
| Attendance | | | | | |

**REMARKS** — Yearly Evaluation

EMPLOYEE SIGNATURE Clifton J Showell

| APPROVAL | DEPARTMENT MANAGER | VICE PRESIDENT/GM | HUMAN RESOURCES | DIRECTOR OF FINANCE |
|---|---|---|---|---|
| | BPope | | Maria Petrucca | |
| DATE | 9/4/01 | 10/1 | 10/3/01 | 10/4 |

SHADED AREAS MUST BE COMPLETED ON ALL ACTIONS

White Copy - HUMAN RESOURCES   Canary Copy - DEPARTMENT HEAD   Pink - PAYROLL

Confidential

A87

D00560



# PAYROLL STATUS AUTHORIZATION (PSA)

**HARRINGTON RACEWAY'S MIDWAY SLOTS**

| CHECK PERSONNEL ACTION TO BE INITIATED BY THIS FORM | | |
|---|---|---|
| ☐ New Hire | ☐ Termination/Date | ☐ Leave of Absence/Date |
| ☐ Rehire | ☐ Suspension | ☐ Return from Leave |
| ☐ Status Change | ☐ Retired | ☐ Other (see Remarks) |
| ☐ Wage Change | ☐ Promotion/Increase | |

| DEPT. NO. | SOCIAL SECURITY NO. | LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|
| | ~~●●●●●●●~~ | SHOWELL | CLIFF | |

| | | *SALARY CHANGES EFFECTIVE ONLY ON FIRST DAY OF PAY WEEK | ☐ FULL TIME ☐ PART TIME ☐ SEASONAL | ☐ EXEMPT ☐ NON-EXEMPT |
|---|---|---|---|---|
| ☐ FULL-TIME ☐ PART-TIME ☐ SEASONAL | ☐ PERMANENT/TEMP ☐ NON-EXEMPT | ACTION EFFECTIVE ON 6/6/0? | | |

**FROM – COMPLETE BELOW ON ALL ACTIONS**

| | TO – ENTER ONLY INFORMATION TO BE CHANGED | |
|---|---|---|
| DEPARTMENT *Slots* | DEPARTMENT | DEPT. NO. |
| POSITION TITLE *Slot Shift Mgr* | POSITION TITLE | |
| IMMEDIATE SUPERVISOR *Daly Nathan* | IMMEDIATE SUPERVISOR | |

| PAYROLL INITIALS/DATE | | HOURLY NON-EXEMPT | ANNUAL/EXEMPT | LAST INCREASE | REASON FOR CHANGE | IF MERIT, INDICATE PERFORMANCE LEVEL | |
|---|---|---|---|---|---|---|---|
| | PRESENT SALARY | $12.38 | $25,750 | Date: 6/6/01 | ☒ Merit ☐ Promotion ☐ Reclassification | ☒ Meets Expectations ☐ Above Expectations ☐ Exceptional ☐ Other | % Increase |
| | CHANGE +– | $ .37 | $ 772.50 | Amount: 756.00 | | | 3% s3 |
| SALARY STATUS | NEW SALARY | $12.75 | $26,522.? | Reason: *Yevy Eval* | ☐ Other | | |

| EMPLOYMENT | Date of Birth | Date of Hire | Telephone (Area Code and Number) | Sex | EEO DESIGNATION | |
|---|---|---|---|---|---|---|
| | | | | | ☐ Caucasian ☐ Black ☐ Hispanic | ☐ Asian or Pacific Islander ☐ Amer. Indian/Alaskan Native ☐ Vietnam Vet ☐ Handicap |

| EMPLOYMENT TRANSFER PROMOTION | Name of Person Replaced | | Last Salary | Date Left Position | |
|---|---|---|---|---|---|

| SEPARATION | LAYOFF | | RESIGNED AS PER EMPLOYEE STATEMENT | | |
|---|---|---|---|---|---|
| | ☐ Lack of Work ☐ Reorganization ☐ Position Eliminated | ☐ Shift/Dept. Eliminated ☐ Temp. Employment ☐ Other (Explain) | ☐ No Reason Given ☐ Other Employment ☐ Dissatisfied (see Remarks) | ☐ Leaving Locality ☐ Illness ☐ Retired | ☐ Personal Business ☐ To Attend School ☐ Other (see Remarks) |
| | DISCHARGED ☐ Violation of Company Rules (see Remarks) ☐ Insubordination (see Remarks) ☐ Other (see Remarks) | | LAST DAY WORKED | | |
| | | | LAST DAY WORKED | | |
| | RATING BY SUPERVISOR | | ELIGIBLE FOR REHIRE ☐ Yes ☐ No | | |

| RATING BY SUPERVISOR | EXCEPTIONAL | ABOVE EXPECTATIONS | MEETS EXPECTATIONS | BELOW EXPECTATIONS | UNSATISFACTORY |
|---|---|---|---|---|---|
| Quality of Work | | | | | |
| Dependability | | | | | |
| Cooperation | | | | | |
| Attendance | | | | | |

**REMARKS**

*2 nd YEAR EVALUATION — Retro due.*

*Employee delayed signing eval until he did his own self-eval which is attached.*

| | EMPLOYEE SIGNATURE *Clifford Showell Jr* | 9/8/02 | |
|---|---|---|---|
| APPROVAL | DEPARTMENT MANAGER *B Fox* | VICE PRESIDENT/GM *R.B. McKee* | HUMAN RESOURCES *Elaine Petrucci* | DIRECTOR OF FINANCE |
| DATE | 7/31/02 | 7/1/02   9/1/02 | 9/1/02 | 9/15/? |

SHADED AREAS MUST BE COMPLETED ON ALL ACTIONS

White Copy – HUMAN RESOURCES    Canary Copy – DEPARTMENT HEAD    Pink – PAYROLL

A88

VOID/NOT DETAIL (watermark)
Confidential
D00572

# PAYROLL STATUS AUTHORIZATION (PSA)

**HARRINGTON RACEWAY'S MIDWAY SLOTS**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | *SALARY CHANGES EFFECTIVE ONLY ON FIRST DAY OF PAY WEEK | ☐ FULL TIME ☐ PART TIME ☐ SEASONAL | ☐ EXEMPT ☐ NON-EXEMPT |

ENTER ONLY INFORMATION TO BE CHANGED

DEPARTMENT                                    DEPT. NO.

POSITION TITLE

IMMEDIATE SUPERVISOR

| PAYROLL INITIALS/DATE | | HOURLY NON-EXEMPT | ANNUAL/EXEMPT | LAST INCREASE | REASON FOR CHANGE | IF MERIT, INDICATE PERFORMANCE LEVEL | |
|---|---|---|---|---|---|---|---|
| | PRESENT SALARY | $ 12.88 | $ | Date: 7-30-02 | ☒ Merit ☐ Promotion ☐ Reclassification | ☒ Meets Expectations ☐ Above Expectations ☐ Exceptional ☐ Other | % Increase |
| SALARY STATUS | CHANGE+ | .64 | $ | Amount: .50¢/hr | | | |
| | NEW SALARY | $ 13.52 | $ | Reason: Reclass | | | 5% |

| EMPLOYMENT | Date of Birth | Date of Hire | Telephone (Area Code and Number) | | Sex | EEO DESIGNATION | |
|---|---|---|---|---|---|---|---|
| EMPLOYMENT TRANSFER PROMOTION | Name of Person Replaced | | Last Salary | Date Left Position | | ☐ Caucasian      ☐ Asian or Pacific Islander ☐ Black           ☐ Amer. Indian/Alaskan Native ☐ Hispanic       ☐ Vietnam Vet ☐ Handicap | |

| SEPARATION | LAYOFF ☐ Lack of Work         ☐ Shift/Dept. Eliminated ☐ Reorganization      ☐ Temp. Employment ☐ Position Eliminated  ☐ Other (Explain) | RESIGNED AS PER EMPLOYEE STATEMENT ☐ No Reason Given    ☐ Leaving Locality     ☐ Personal Business ☐ Other Employment   ☐ Illness            ☐ To Attend School ☐ Dissatisfied (see Remarks) ☐ Retired      ☐ Other (see Remarks) |
|---|---|---|
| | DISCHARGED ☐ Violation of Company Rules (see Remarks) ☐ Insubordination (see Remarks) ☐ Other (see Remarks) | LAST DAY WORKED

ELIGIBLE FOR REHIRE     ☐ Yes          ☐ No |

| RATING BY SUPERVISOR | EXCEPTIONAL | ABOVE EXPECTATIONS | MEETS EXPECTATIONS | BELOW EXPECTATIONS | UNSATISFACTORY |
|---|---|---|---|---|---|
| Quality of Work | | | | | |
| Dependability | | | | | |
| Cooperation | | | | | |
| Attendance | | | | | |

**REMARKS**

Late due to LOA                     Range #12 - 16 /hour

EXHIBIT
Showell 18
11-2-06  cr

| APPROVAL | DEPARTMENT MANAGER | VICE PRESIDENT/GM | HUMAN RESOURCES | DIRECTOR OF FINANCE |
|---|---|---|---|---|

SHADED AREAS MUST BE COMPLETED ON ALL ACTIONS

White Copy - HUMAN RESOURCES      Canary Copy - DEPARTMENT HEAD       Pink - PAYROLL

A89



## Midway Slots & Simulcast
## Hourly Team Member Performance Evaluation

Date: 6/6/03

Name: CLIFFTON SHOWELL

Position: SHIFT MANAGER

Department: SLOTS

Evaluator's Name: D NASTASO

Hire Date: 6/6/00

Date Starting Present Job: 6/6/00

Last Evaluation Date: 6/4/02

**General Instructions:**
Complete this entire form, being objective and constructive in the appraisal of the team member's performance.
The evaluation is based on a weighted system of earned performance points. There are a total of eight (8) performance categories. Each category is divided into five (5) sub-factors. Each sub-factor is worth anywhere between 0-2 points depending on the performance level as indicated in the Performance Rating Key.

Distribute the total of 100 points, using the predetermined point key for the position. This weighted point system by position ensures that the categories which are more important by position are weighted with higher possible points.

Answer each question or sub-factor in the category and assign the appropriate performance point. Please be aware of the natural tendency to rate a team member "normal and expected" on every question. If appropriate, both ends of the scale should be used.
For the two Higher Rated Categories by position (i.e. 20 possible points, rather than 10 possible points) you must multiply the subtotal by 2.
As you rate the team member and determine that a sub-factor does not apply, indicate under the N/A column.
Next you must subtotal all of the points within the category and record this in the subtotal line.
If N/A is selected for a question, take the average of the questions answered. This average is added to the points for that category. See example below.
Once you have completed all eight categories and the bonus question, compile the points and put this number in the total block.

Finally, answer the written section, Management Development Objectives. This section is designed to allow both the team member and supervisor evaluate past performance and establish goals and objectives for the next evaluation review. Also, it is intended to assist in recognizing areas in which the team member has excelled and improved, and to help identify areas where additional improvement is required.

·Refer to Performance Appraisals - Policy No. 17 for additional information

| 2 | 1.5 | 1 | 0.5 | 0 | NA |
|---|-----|---|-----|---|-----|
| x |     |   |     |   |     |
|   | x   |   |     |   |     |
|   |     | x |     |   |     |
|   |     |   | x   |   |     |
|   |     |   |     |   | x · |

| 5/4=1.25  5pts+1.25 or 6.25 Total pts |
|---|

Rounding guide per question based on 2 decimals

1.) 0 to .25 = 13 > equals .25
   12 < equals 0

2.) .26 to .49 = 38 > equals .50
   37 < equals .25

3.) .51 to .74 = 63 > equals .75
   62 < equals .50

4.) .76 to .99 = 83 > equals 1
   82 < equals .75



EXHIBIT

Shawell 17

11-2-06

A90



# Non-Exempt
## Team Member Appraisal

### Performance Rating Key

| | |
|---|---|
| 0 | N/A= Not applicable or too early to rate |
| 0 | Unsatisfactory = Consistently fails to meet the expected performance standards |
| 1.25 | Needs Improvement = Inconsistent in meeting the performance standards |
| 1.5 | Normal and Expected = Consistently meets the performance standards |
| 1.75 | Commendable = Consistently meets the acceptable standards and frequently exceeds the expected requirements |
| 2 | Outstanding = Consistently exceeds the expected performance standards |

Rating from 0 to 2, with 2 being the highest score

**1  Job Knowledge - _10_ Possible Points**

a. Possesses the knowledge, skills and information required to perform all aspects of the job.

b. Takes an active interest in learning all aspects of the job.

c. Stays informed of, supports and promotes company and department events, programs and meetings.

d. Knows and follows company and department policies and procedures.

e. Accepts coaching to improve performance with a positive attitude.

Subtotal **9.25**

**2  Productivity/Work Standards - _20_ Possible Points**

a. Ability to perform at high volume times.

b. Meets established goals set by the supervisor.

c. Ensures departmental activities and duties are performed according to internal controls, policies and procedures and established department standards.

d. Works a different schedule or overtime without hesitation when business demands it.

e. Accepts work assignments without complaints.

Subtotal **9 x 2**

**3  Initiative - _10_ Possible Points**

a. Able to take action without direction. (Little supervision required).

b. Initiates and completes routine and/or complex duties.

c. Maintains self confidence and demonstrates a positive attitude while performing job duties.

d. Demonstrate high activity level in assigned areas and promptly reacts to the supervisors request.

e. Drives to excel in current job and undertakes duties of greater responsibility.

Subtotal **9**

1

A91

4  Accuracy - _10_ Possible Points

| | 2 | 1.75 | 1.5 | 1.25 | 0 |
|---|---|---|---|---|---|

a. Has sufficient job knowledge and completes task in a timely manner.

b. Completes paperwork accurately and in a timely manner.

c. Does not hesitate to ask questions (to ensure correctness and accuracy) if they're not
   sure of the specific job task.

d. Ability to maintain accurate paperwork during high volume activity.

e. Works with minimal mistakes, exudes attention to detail.

Subtotal    **8.5**

5  Teamwork - _10_ Possible Points

| | 2 | 1.75 | 1.5 | 1.25 | |
|---|---|---|---|---|---|

a. Demonstrates a positive attitude by supporting team members during meetings.

b. Goes out of the way to get along well - sets an example.

c. Highly flexible, can effectively and enthusiastically perform other functions within the department.

d. Enhances teamwork by communicating between or within departments.

e. Is able to communicate respectfully with both co-workers and supervisors.

Subtotal    **9.25**

6  Service- _20_ Possible Points

| | 2 | 1.75 | 1.5 | 1.25 |
|---|---|---|---|---|

a. Able to address and resolve patron concerns in a fair, positive and timely manner.

b. Greets guests in a positive manner with appropriate body language, uses guests' name when known

c. Ability to perform with an enthusiastic attitude.

d. Takes the initiative to ask for help when resolving problems with a guest when unsure.
   (Does not just give the wrong answer or guess the answer)

e. Practices and stresses the importance of 100% satisfaction regardless of age, sex or ethnic background.

Subtotal    **9.5 b2 - 1**

7  Attendance/Dependability- _10_ Possible Points

| | 2 | 1.75 | 1.5 | 1.25 |
|---|---|---|---|---|

a. Accomplishes all tasks within the proper time frame.

b. Completes work with little or no need for follow up from supervisor.

c. More than willing to perform additional tasks during busier times.

d. Is reliable for arriving to work and returning from breaks on time.

e. Does not abuse attendance policy.

Subtotal    **8.75**

8  Rules & Regulations/Procedures - _10_ Possible Points

| | 2 | 1.75 | 1.5 | 1.25 |
|---|---|---|---|---|

a. Follows the proper call out procedure by calling three hours in advance to their supervisor.

b. Follows the Company appearance standards.

2

c. Demonstrates competence and knowledge of company/department policies, procedures and standards.

d. Follows posted work schedule including lunch and break schedule (times).

e. Follows clock in/out policy, including the beginning of shift, end of shift and breaks.

Subtotal                                                                                                    9.5

**Bonus**                    **4 Possible Points**

                   **2 Examples = 1 Point per volunteer subject**
                   **Less than 2 Examples = 0 Points**                                    **1 Point**

Volunteers for team member committees:

Volunteers for marketing/special events:                                                    **1 Point**

Training; Company provided:  BU. TRAINING                                       **1 Point**
CUSTOMER SERVICE                                                                          1

Training, individual initiative:                                                              **1 Point**

**Total Points Including Bonus**                                                      92.2
                                                                                                    5%

**Development Objectives-Goals**

A. List overall strengths (special skills, knowledge)          Needs job improvement
GOOD CUSTOMER SERVICE. GOOD          CLIFF NEEDS TO IMPROVE ON PAPER
KNOWLEDGE OF GAMES                              WORK - CHECK WITH SUPERVISON WHEN
                                                                    UNSURE OF POLICY - DO NOT MAKE
                                                                    PROMISES TO CUSTOMERS UNLESS AUTHOR

B. Training Objectives(Please give specific educational, personal or job recommendations and action plan that the
individual can follow in order to improve performance) include specific activities and target dates for accomplishing these object
MORE TECHNICAL INFORMATION -
TRAIN ON PROPER WAY TO DO REPORTS AND OTHER OFFICE
DUTIES

C. To what extent has the team member accomplished set development objectives-Goals (refer to previous review)?

3

A93

*CLIFF HAS MADE GREAT IMPROVEMENTS FROM LAST YEAR*

## Team Member's Comments

A.  What were your most important job related accomplishments over the past year or since your last review?

_____

_____

_____

B.  What steps could you take to improve your performance?  Is there anything Midway can do to help you improve?

_____

_____

_____

C.  Please mention any accomplishments, awards or activities over the past year, or since your last review that might give management a more complete picture of your strengths and abilities.

_____

_____

_____

## Acknowledgements:

_____          _____
Manager's Signature & Date          Director's Signature & Date

Note: Team member's signature does not necessarily indicate agreement with this appraisal, but acknowledges that the contents of have been reviewed and discussed with the team member.

_____          _____ 8/21/03
Vice-President/General Manager's Signature & Date          Team Member's Signature & Date

Has the performance standards been reviewed with the team member?          YES          NO

Are the team members performance standards up to date?          YES          NO

(If no, submit revised standards with appraisal to dept. head)

_____  6/18/03
Grader's Signature Attesting to Review of Points & Date

4



# PAYROLL STATUS AUTHORIZATION (PSA)

| | | | | |
|---|---|---|---|---|
| | *SALARY CHANGES EFFECTIVE ONLY ON FIRST DAY OF PAY WEEK | ❑ FULL TIME ❑ PART TIME ❑ SEASONAL | ❑ EXEMPT ❑ NON-EXEMPT | |

**TO ENTER ONLY INFORMATION TO BE CHANGED**

| DEPARTMENT | | DEPT. NO. |
|---|---|---|
| POSITION TITLE | | |
| IMMEDIATE SUPERVISOR | | |

| PAYROLL INITIALS/DATE | | HOURLY NON-EXEMPT | ANNUAL/EXEMPT | LAST INCREASE | REASON FOR CHANGE | IF MERIT, INDICATE PERFORMANCE LEVEL | |
|---|---|---|---|---|---|---|---|
| **SALARY STATUS** | PRESENT SALARY | $ 12.88 | $ | Date: 7-30-02 | ☒ Merit ❑ Promotion ❑ Reclassification | ☒ Meets Expectations ❑ Above Expectations ❑ Exceptional ❑ Other | % Increase |
| | CHANGE± | .64 | $ | Amount: .50¢/hr | | | |
| | NEW SALARY | $ 13.52 | $ | Reason: Reclass | | | 5% |

| EMPLOYMENT | Date of Birth | | Date of Hire | Telephone (Area Code and Number) | | Sex | EEO DESIGNATION | |
|---|---|---|---|---|---|---|---|---|
| EMPLOYMENT TRANSFER PROMOTION | Name of Person Replaced | | | Last Salary | Date Left Position | | ❑ Caucasian ❑ Black ❑ Hispanic | ❑ Asian or Pacific Islander ❑ Amer. Indian/Alaskan Native ❑ Vietnam Vet ❑ Handicap |

| SEPARATION | LAYOFF ❑ Lack of Work ❑ Reorganization ❑ Position Eliminated | ❑ Shift/Dept. Eliminated ❑ Temp. Employment ❑ Other (Explain) | RESIGNED AS PER EMPLOYEE STATEMENT ❑ No Reason Given ❑ Other Employment ❑ Dissatisfied (see Remarks) | ❑ Leaving Locality ❑ Illness ❑ Retired | ❑ Personal Business ❑ To Attend School ❑ Other (see Remarks) |
|---|---|---|---|---|---|
| | DISCHARGED ❑ Violation of Company Rules (see Remarks) ❑ Insubordination (see Remarks) ❑ Other (see Remarks) | | LAST DAY WORKED | | |
| | | | ELIGIBLE FOR REHIRE     ❑ Yes     ❑ No | | |

| RATING BY SUPERVISOR | EXCEPTIONAL | ABOVE EXPECTATIONS | MEETS EXPECTATIONS | BELOW EXPECTATIONS | UNSATISFACTORY |
|---|---|---|---|---|---|
| Quality of Work | | | | | |
| Dependability | | | | | |
| Cooperation | | | | | |
| Attendance | | | | | |

**REMARKS**

Late $ due to LOA          Range $12 - 16 /hour

EXHIBIT Showell 18 11-2-06 CR

| APPROVAL | DEPARTMENT MANAGER | VICE PRESIDENT/GM | HUMAN RESOURCES | DIRECTOR OF FINANCE |
|---|---|---|---|---|

**SHADED AREAS MUST BE COMPLETED ON ALL ACTIONS**

White Copy - HUMAN RESOURCES     Canary Copy - DEPARTMENT HEAD     Pink - PAYROLL

A95

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.,          )
                                  )
               Plaintiff,         )
                                  )   Civil Action
v.                                )   No. 05-462 JJF
                                  )
GAMING ENTERTAINMENT              )
(DELAWARE), L.L.C, d/b/a          )
MIDWAY SLOTS & SIMULCAST          )
GAMING ENTERTAINMENT, a           )
Delaware Limited Liability        )
Company,                          )
                                  )
               Defendant.         )

          Deposition of TRACY DORSEY taken pursuant to
notice at the Thurman P. Adams Paddock Building, Route
13, Fairgrounds Road, Harrington, Delaware, beginning at
3:00 p.m., on Tuesday, November 28, 2006, before Eleanor
J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:
          JOHN M. LAROSA, ESQ.
          LAW OFFICE OF JOHN M. LAROSA
             Two East 7th Street - Suite 302
             Wilmington, Delaware  19801
             for the Plaintiff

          SETH J. REIDENBERG, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR
             The Brandywine Building - 1000 West Street
             Wilmington, Delaware  19801
             for the Defendant

ALSO PRESENT:
BOBBI J. SANDERS, CPA, Director of Compliance
SCOTT A. SAXON, Director of Human Resources, Midway Slots


                    WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Tracy Dorsey

Page 19

1    Q.    Was there a point in time when the slot

2    department had what was called the IGS system?

3    A.    Yes.

4    Q.    And as part of the IGS system were certain slot

5    department employees issued an IGS password?

6    A.    Yes.

7    Q.    And was this in 2004?

8    A.    It was before then, if I'm not mistaken.    I'm not

9    sure exactly when.

10    Q.    The IGS system began before 2004?

11    A.    I think so.

12    Q.    Did it continue into 2004?

13    A.    Yes.

14    Q.    Did you possess an IGS password in 2004?

15    A.    Yes.

16    Q.    And did you ever receive a final warning memo in

17    2004 from Beverly Pope regarding IGS passwords?

18    A.    No.

19    Q.    Did you receive any kind of a memo that was sent

20    to all the slot department employees about the IGS

21    passwords and the use of them?

22    A.    I don't remember now.

23    Q.    Do you ever remember a time when all the slot

24    department employees were warned not to share their IGS

A97

Page 34

1              MR. LAROSA:  No follow-up.

2              You have the right to, as I said at the

3    beginning, read and sign your deposition or you can waive

4    that right.

5              MR. REIDENBERG:  We will read and sign.

6    Thank you.

7              (Proceedings conclude at 3:51 p.m.)

8

9                    I N D E X

10   DEPONENT:   TRACY DORSEY                    PAGE

11       Examination by Mr. LaRosa                2

12       Examination by Mr. Reidenberg            32

13

14   (There were no exhibits marked for identification.)

15   ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 35

16   CERTIFICATE OF REPORTER                 PAGE 36

17

18

19

20

21

22

23

24                                               **A98**

Page 35

1

2

3

4           REPLACE THIS PAGE

5           WITH THE ERRATA SHEET

6           AFTER IT HAS BEEN

7           COMPLETED AND SIGNED

8           BY THE DEPONENT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                              A99

Page 36

```
 1    State of Delaware )
                       )
 2    New Castle County )

 3

 4                  CERTIFICATE OF REPORTER

 5

 6              I, Eleanor J. Schwandt, Registered
      Professional Reporter and Notary Public, do hereby
 7    certify that there came before me on the 28th day of
      November, 2006, the deponent herein, TRACY DORSEY, who
 8    was duly sworn by me and thereafter examined by counsel
      for the respective parties; that the questions asked of
 9    said deponent and the answers given were taken down by me
      in Stenotype notes and thereafter transcribed by use of
10    computer-aided transcription and computer printer under
      my direction.

11              I further certify that the foregoing is a
      true and correct transcript of the testimony given at
12    said examination of said witness.

13              I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.

15

16

17                        Eleanor J. Schwandt

18                        Certification No. 125-RPR

19                        (Expires January 31, 2008)

20
      DATED:
21

22

23

24
                                             A100
```

Lee
**927-001-01**



# GS 101

## v 3.X.X
## System Configuration &
## Administration I
Training Guide



IGT GAMING SYSTEMS™

# Section 1 ■ Overview

IGT Gaming Systems (IGS) is a modular computer system that automates casino business requirements. It allows the casino to choose from Slot Accounting, Pit, Cage & Credit, Marketing, and Patron Management applications. IGS provides both real-time and historic data for casino operations, administration, and reporting. The menus are configurable to meet the requirements of the user. The flexibility of IGS is also demonstrated in its ability to export files to other applications, such as Excel.

IGS Slot Accounting allows for reconciliation and accurate reporting of hard count, soft count, vouchers, and tickets if in use at the property. IGS Slot Accounting lets you evaluate your slot revenue by theoretical, actual, or accrued, and evaluate machine performance from a variety of perspectives. Configuration of Slot accounting is mainly discussed in GS 140. Use of slot accounting is discussed in GS 145.

IGS also allows for divisional accounting. With divisional accounting, seperate accounting can be maintained by several divisions within the system. Configuration for divisional accounting is included in the appendix of this training guide (See page 131).

IGS Pit section allows for Reporting, analysis, flexible game calculations, patron high action alert, real-time reporting and pit accounting. Prevent overcomping by keeping player activity current and instantly available. Manage your table games with features that allow you to easily move tables and configure pits. When combined with the Patron Management module, you can register patrons at the pit without leaving the game, and markers and comps can be issued directly from the pit location.

The IGS Cage & Credit module provides flexible credit verification and authorization. The IGS Cage and Credit module supports credit, check cashing, and deposits (including operator-defined main and check bank accountability). IGS also provides real-time CTR tracking.

IGS Patron Management is a dynamic player tracking and marketing tool that provides centralized player information for your entire casino. Ratings from virtually any source may be stored and used to evaluate total player worth (aiding in informed decision making) and includes features to reward and encourage casino play. In addition, Patron Prospector lets you develop, query and evaluate marketing campaigns, promotions, and events.

This guide will discuss the configuration needed to set up some portions of IGS and perform some administrative tasks. More configuration and administration is discussed in GS 102 – System Configuration and Administration II and slot configuration is discussed in GS 140 – Slot Floor Configuration.

IGS allows for more than one company to be set up in the system. Divisions and departments are then set up and assigned to companies. Employees are also assigned companies that they are allowed to access. If employees are not assigned to the correct

Confidential

D03610

company, they will not be able to perform their duties within the system. Departments and divisions must also be assigned to the correct company in order to be accessible in the system.

IGS has several levels of security that can be instituted. Security groups are the primary way in which access to the system can be limited. Employees are assigned a security group which will allow them access only to certain objects and menus. Each object in IGS can also be assigned a security group, allowing the system to be specifically configured to your property. Another form of security is locking down options on the Option Bar within the program itself, preventing employees from using those options. Menus can be customized within IGS so that only necessary functions are featured.

It is crucial to correctly establish employee licenses and user permissions in the system. A worksheet is included in this book that can be used to record the employee information that must be entered in the system. If user permissions are not set up correctly, employees will not be able to perform necessary functions within the system. IGS provides a number of reports and inquiries that can be used to audit employee licenses and user permissions.

Hardware such as printers and workstations must be set up in the IGS system. Printers must be assigned to stations in order to print. Stations must also have locations assigned to them in order to carry out functions at specific locations.

IGS incorporates functions allowing for ease of maintenance by MIS. Purging and archiving programs remove old or obsolete information from the active database.

A103

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.,          )
                                  )
          Plaintiff,              )
                                  )   Civil Action
v.                                )   No. 05-462 JJF
                                  )
GAMING ENTERTAINMENT (DELAWARE),  )
L.L.C., D/B/A MIDWAY SLOTS AND    )
SIMULCAST GAMING ENTERTAINMENT,   )
a Delaware limited liability      )
company,                          )
                                  )
          Defendant.              )

     Deposition of SABRINA LYNN JENKINS taken pursuant
to notice at the Harrington Raceway, 15 West Rider
Road, the Thurman P. Adams Paddock Building,
Harrington, Delaware, beginning at 9:30 a.m. on
Wednesday, November 29, 2006, before
Lucinda M. Reeder, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

          JOHN M. LaROSA, ESQ.
          Law Office of John M. LaRosa
            Two East 7th Street, Suite 302
            Wilmington Delaware 19801-3707
            for the Plaintiff,

          SETH J. REIDENBERG, ESQ.
          Young Conaway Stargatt & Taylor, LLP
            The Brandywine Building
            1000 West Street, 17th Floor
            Wilmington Delaware 19899-0391
            for the Defendant.

ALSO PRESENT:

SCOTT SAXON, DIRECTOR OF HUMAN RESOURCES, MIDWAY SLOTS
BOBBI J. SANDERS, CPA, DIRECTOR OF COMPLIANCE
            WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477
                www.wilfet.com

**A104**

1                    SABRINA LYNN JENKINS,

2       the witness herein, having first been

3       duly sworn on oath, was examined and

4       testified as follows:

5    BY MR. LaROSA:

6       Q.    Good morning.  My name is John LaRosa, and I

7    represent Clifton Showell, who is a plaintiff in a

8    lawsuit against Midway Slots.  Will you state your

9    full name for the record?

10      A.    Sabrina Lynn Jenkins.

11      Q.    Ms. Jenkins, what is your current home address?

12      A.    29036 Golton Drive, Easton, Maryland 21601.

13      Q.    Spell Golton for us, please?

14      A.    G-O-L-T-O-N.

15      Q.    Are you married?

16      A.    No.

17      Q.    Have you ever had your deposition taken before?

18      A.    No.

19      Q.    Let me go over some ground rules for you.

20   After I ask the questions and you answer the questions

21   today, you'll have the opportunity to review the

22   transcript to see if the court reporter made any typos

23   or technical mistakes.  Do you understand that?

24      A.    Yes.

**A105**

Sabrina Lynn Jenkins

Page 13

1    A.    Yes.

2    Q.    Did she function in a supervisory capacity in

3    that role?

4    A.    In some aspects.

5    Q.    Can you explain what you mean by that?

6    A.    Her payout, her jackpot payout was a lot

7    different than ours was.  And if anything happened as

8    far as the slot attendants were concerned, any

9    problems or issues that she had, that she had to

10   report directly to us before she interacted with the

11   slot attendant.

12   Q.    What is Brandy Shahan's sex?

13   A.    Female.

14   Q.    What is her race?

15   A.    She's Caucasian.

16   Q.    And during the time that you worked with her,

17   approximately how old was she?

18   A.    I can't remember.

19   Q.    Was she over 40 or under 40?

20   A.    Under 40.

21   Q.    Do you know who was Midway's first

22   African-American supervisor in the Slot Department?

23   A.    No, I don't.

24   Q.    During the time that you worked on the night

1    evaluations while the two of you were employed at

2    Midway Slots?

3       A.    No.

4       Q.    Were you aware of whether or not Mr. Showell

5    ever received positive evaluations while he was

6    employed and you were employed at Midway Slots?

7       A.    No.

8       Q.    The fact that you don't know whether he

9    received negative evaluations isn't a function of you

10   knowing what his evaluations were, you just didn't

11   know either way?

12      A.    No, I didn't know either way.

13      Q.    Did you ever have any problems with Mr. Showell

14   as a supervisor when you worked for him?

15      A.    No.

16      Q.    Do you recall receiving any training on the

17   system that was in place when you had a password?

18      A.    Yes.

19      Q.    Do you recall how much training you received?

20   Number of hours or number of days.

21      A.    I believe it was about four days.

22      Q.    Do you recall any discussion during that

23   training related to the use of your IGS password?

24      A.    Yes.

1                       I N D E X

2   WITNESS:   SABRINA LYNN JENKINS              PAGE

3      EXAMINATION BY MR. LaROSA                    2
       EXAMINATION BY MR. REIDENBERG               29
4      EXAMINATION BY MR. LaROSA                   41

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                              **A108**

Page 44

```
 1   State of Delaware    )
                          )
 2   New Castle County    )

 3
                   CERTIFICATE OF REPORTER
 4

 5         I, Lucinda M. Reeder, Registered Diplomate
     Reporter, Certified Real-time Reporter and Notary
 6   Public, do hereby certify that there came before me on
     November 29, 2006, the witness herein, SABRINA LYNN
 7   JENKINS, who was first duly sworn and thereafter
     examined by counsel for the respective parties; that
 8   the questions asked of said witness and the answers
     given were taken down by me in Stenotype notes and
 9   thereafter transcribed by use of computer-aided
     transcription and computer printer under my direction.
10
           I further certify that the foregoing is a true
11   and correct transcript of the testimony given at said
     examination of said witness.
12
           I further certify that reading and signing of
13   the deposition were waived by the witness.

14         I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.

16

17                         Lucinda M. Reeder, RDR, CRR
                           Certification No. 132-RPR
18                         (Expires January 31, 2008)

19   DATED:    12-05-06

20

21

22

23

24                                          A109
```

**Midway Slots and Simulcast**
**Employee Disciplinary Report**

Name: <u>Clifford Showell</u>                Date: <u>January 13, 2004</u>

Position: <u>Shift Manager</u>        Department: <u>Slots</u>        Date in Position:

---

Action

____ 1st Warning                 __X__ Final Warning
                                 (Authorization from HR required)
                                 (HR presence required at meeting)

____ 2nd Warning                 ____ Suspension ____ days
                                 (HR presence required at meeting)

____ 3rd Warning                 ____ Termination
   (HR must be present)          (HR present at meeting)

---

Was this incident a violation of a company policy? [ X ]Yes [ ]No  If yes specify what policy.
H. R. P. & P. # 11 Attendance

---

Violation

Date/ Time of Violation: <u>January 11, 2004</u>

Nature of Violation:
(X ) Attendance         ( ) Policy Violation _____

( ) Performance         ( ) Other _____

( ) Safety

---

Previous Disciplinary Action  [ X ] No  [ ] Yes  If yes list previous action and date.



EXHIBIT
Showell 14

A110

Confidential

Department Statement (Use additional sheet if needed)

There was a mandatory meeting of all Slot Shift Managers and Lead Attendants on Sunday, January 11, 2004, at 11:15 a.m. in the Conference Room.

All Managers received a Memo in their mailboxes telling of this meeting on Tuesday, January 6, 2004 and one copy was taped to the monitor screen of your computer. You worked every night from Wednesday, January 7, 2004 to Saturday, January 10, 2004.

You are receiving a final written warning by not attending this mandatory meeting or following the proper call out procedure. You are now in violation of Policy # 11 – Attendance – Part 2. – Section 2.4 B - No Call – No Show. A No Call – No Show – after the 90 -day orientation period will result in a final written warning.

Please note that under our new Attendance Policy that started January 1, 2004, you had an unscheduled absence on January 6, 2004 and one on the meeting day of January 11, 2004. This makes two unscheduled absences. Three unscheduled absences are allowable in a 12 – month "rolling calendar". A fourth unscheduled absence will result in a written disciplinary action.

Any further infractions of Company Policy and Procedures will lead to more severe disciplinary actions.

Corrective Action Recommendations for Employee

Employee Explanation/ Statement

_____
_____
_____
_____
_____
_____
_____
_____
_____

_____          _____
Department Signature                    Department Director Signature

I understand that my signature below acknowledges my receipt of the Disciplinary Action. It is not intended to indicate agreement with the statement above. I also

A111

Confidential

understand that I may discuss this issue with my Department Director and/or the Director of Human Resources.

_____
Employee Signature

Original – Human Resources        Copy – Department Director        Copy – Employee

HR FORM 12/01

Employee Refused to Sign 1/14/04

A112



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Showell

### v.

# Gaming Entertainment L.L.C., et al.

## C.A. # 05-462 JJF

---

## Transcript of:

## Georgia Kimball

## November 3, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A113

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.,        )
                               )
          Plaintiff,           )
                               )   Civil Action
v.                             )   No. 05-462 JJF
                               )
GAMING ENTERTAINMENT (DELAWARE),)
L.L.C., D/B/A MIDWAY SLOTS AND )
SIMULCAST GAMING ENTERTAINMENT, )
a Delaware limited liability   )
company,                       )
                               )
          Defendant.           )

     Deposition of GEORGIA KIMBALL taken pursuant to
notice at the law offices of Young Conaway Stargatt &
Taylor, The Brandywine Building, 1000 West Street,
Wilmington, Delaware, beginning at 9:58 a.m. on
Friday, November 3, 2006, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          JOHN M. LaROSA, ESQ.
          Law Office of John M. LaRosa
            Two East 7th Street, Suite 302
            Wilmington, Delaware 19801-3707
            for the Plaintiff,

          SETH J. REIDENBERG, ESQ.
          Young Conaway Stargatt & Taylor, LLP
            The Brandywine Building
            1000 West Street, 17th Floor
            Wilmington, Delaware 19899-0391
            for the Defendant.

ALSO PRESENT:
SCOTT SAXON, DIRECTOR OF HUMAN RESOURCES, MIDWAY SLOTS
BOBBI J. SANDERS, CPA, DIRECTOR OF COMPLIANCE
- - - - - - - - - - - - - - - - - - - - - - - - - - --
               WILCOX & FETZER, LTD.
     1330 King Street - Wilmington, Delaware  19801
                  (302) 655-0477
                  www.wilfet.com

1          GEORGIA KIMBALL,

2    the witness herein, having first been

3    duly sworn on oath, was examined and

4    testified as follows:

5    BY MR. REIDENBERG:

6    Q.    Good morning, Ms. Kimball.

7    A.    Good morning.

8    Q.    My name is Seth Reidenberg, and I represent

9    Gaming Entertainment of Delaware.  As I understand it,

10   you are here in response to a subpoena that I sent to

11   you; correct?

12   A.    Right.

13   Q.    Ms. Kimball, I want to ask a few questions, but

14   before we do that, I want to ask you:  Have you ever

15   had your deposition taken?

16   A.    No.

17   Q.    Let me just explain a little bit about it to

18   you.  As you can see, myself on behalf of Gaming

19   Entertainment of Delaware will ask you some questions.

20   John LaRosa is here on behalf of the plaintiff in this

21   matter, Clifton Showell.  Once I'm done, he may have

22   some questions for you as well.

23          With respect to how the deposition will

24   proceed, all of your answers need to be verbalized.

Georgia Kimball

1    shift to enter.

2    Q.    What other slot attendants that you recall were

3    given passwords from --

4    A.    The majority of the people.  There were three

5    or four other people that had it.

6    Q.    Three or four other slot attendants?

7    A.    Three or four slot attendants, yeah.  I'm not

8    the only person that had the number.  I'm talking

9    about leads also.  We were trying to get these tickets

10   processed and not dump it all on one person.

11   Q.    Do you recall when the first time Mr. Showell

12   gave you his password?

13   A.    No.

14   Q.    But you know it was after Mr. Schueler passed

15   away?

16   A.    It was after Mr. Schueler passed away.

17   Q.    Do you recall when Mr. Schueler passed away?

18   A.    No.  I just know we came to work and found out

19   that night when we went on the floor that he had died

20   that day.

21   Q.    When Mr. Showell gave you his password, did he

22   say anything to you about:  don't tell anyone you have

23   this or keep this to yourself?

24   A.    No; because he knew that -- we had -- the other

Georgia Kimball

Page 20

```
 1   people plus me had told him that that's how we were

 2   getting this problem solved, by using that number.

 3      Q.    Did he ever say to you that that was against

 4   any policies or procedures, he shouldn't be giving out

 5   his password?

 6      A.    No.  We were just getting the job done.  That

 7   was the whole aspect of the thing.  He didn't think

 8   that he was doing anything wrong by getting this work

 9   done.  And that's the way it had been done for months

10   and months ahead of that.

11      Q.    Well, how long was the system in place?

12      A.    The system had been put in place -- it had been

13   awhile that we were working like that.  It had been a

14   long time.  I think even Bev was aware it was working

15   like that.

16      Q.    Why do you think that Beverly Pope was aware --

17      A.    She would have to know.

18      Q.    Let me finish my question.

19      A.    Okay.

20      Q.    Why do you think Beverly Pope was aware that

21   the passwords had been given out to get the work done?

22      A.    If you are manager, you need to know what's

23   going on in your area.  So you would have to know how

24   were these things getting processed.  So somebody
```

Georgia Kimball

1    people"?

2    A.    Yes.

3    Q.    What was that in reference to?

4    A.    The people that came on the -- that people that

5    came on the buses.

6    Q.    Were there derogatory comments made about the

7    people who came to Midway Slots on buses?

8    A.    No, not derogatory, but that's just what they

9    called them.

10    Q.    Did Mr. Showell ever discuss with you any

11    instances that he felt he was discriminated against by

12    any other GED employee?

13    A.    No.

14    Q.    I want to talk to you about the incident that

15    occurred on February 29th, 2003.  2003?  I'm sorry.

16    2004.  That was the night that you used Mr. Showell's

17    password to override a jackpot.  Do you recall that?

18    A.    Yup, I did it.

19    Q.    Tell me the circumstances surrounding --

20    A.    I had --

21    Q.    Let me finish.  I apologize.  I am not

22    trying -- we're trying to keep this record clean.  I

23    know you want to answer my question.  So just let me

24    finish.  Can you tell me the circumstances surrounding

Georgia Kimball

1    the events of February 29th, 2004?

2    A.    Yes.   I had zone 1 by myself, which is a very

3    large zone.   I went to do -- I put something in wrong,

4    thought I had a mistake and I over -- used his number

5    to override that.   I was wrong.   I know that.

6    Q.    What was the policy at the time if there was an

7    error in putting in jackpots?

8    A.    I would have to call him to come to the office.

9    We had one person on the floor.

10    Q.    That night, you mean?

11    A.    Yes.

12    Q.    Who was that person?

13    A.    I can't recall.

14    Q.    Do you recall if Mr. Showell was on the floor

15    that night?

16    A.    No, he wasn't there, I don't think.

17    Q.    Why did you not follow the policy that was in

18    effect after you had made the mistake and call a

19    supervisor?

20    A.    Because I was so slammed with customers and

21    pushed that I just didn't even think.

22    Q.    How did you know you could use Mr. Showell's

23    password to override the jackpot error?

24    A.    Because I could put in -- because I knew --

A119

Georgia Kimball

Page 29

1    Q.    As a result of the incident on February 29th,

2    you were placed on final warning?

3    A.    That's right.

4    Q.    Did you understand what that meant, to be

5    placed on final warning?

6    A.    Yes.

7    Q.    What was your understanding?

8    A.    That I would be terminated from my employment.

9    Q.    If?

10   A.    If I did any -- anything else wrong.

11   Q.    Was that explained to you, that if you did

12   anything else wrong, you would be terminated?

13   A.    That's right.

14   Q.    Who explained that to you?

15   A.    I can't remember.

16   Q.    Do you recall if it was someone from human

17   resources or --

18   A.    No, it was nobody from human resources.

19   Q.    Do you know if it was Ms. Burrell?

20   A.    I can't remember.

21         (Kimball Deposition Exhibit No. 2 was

22   marked for identification.)

23   BY MR. REIDENBERG:

24   Q.    Ms. Kimball, would you just take a look at

Page 60

1    wrong or you can waive, you can do what's waive read

2    and sign, in which case what she has typed in now is

3    what the testimony will be and that will be it.

4                    THE WITNESS:  Okay.  That's okay.  I'll

5    waive it.

6                    MR. REIDENBERG:  You'll waive it?

7                    THE WITNESS:  Mm-hmm.

8                    MR. REIDENBERG:  Okay.  Thank you.

9            (Deposition concluded at 11:25 a.m.)

10                    --  --  --  --
                        I N D E X
11
     WITNESS:  GEORGIA KIMBALL                    PAGE
12
       EXAMINATION BY MR. REIDENBERG               2
13     EXAMINATION BY MR. LaROSA                   42
       EXAMINATION BY MR. REIDENBERG              58
14
                KIMBALL DEPOSITION EXHIBITS
15
     NO.                                        MARKED
16
       1   3/1/04 Employee Disciplinary Report    27
17
       2   3/26/04 Employee Disciplinary Report   29
18
       3   3/15/04 Surveillance Department        33
19         Supplemental Report

20

21

22

23

24                                              **A121**

Page 61

```
 1    State of Delaware    )
                           )
 2    New Castle County    )

 3
                      CERTIFICATE OF REPORTER
 4

 5         I, Lucinda M. Reeder, Registered Diplomate
      Reporter, Certified Real-time Reporter and Notary
 6    Public, do hereby certify that there came before me on
      November 3, 2006, the witness herein, GEORGIA KIMBALL,
 7    who was first duly sworn and thereafter examined by
      counsel for the respective parties; that the questions
 8    asked of said witness and the answers given were taken
      down by me in Stenotype notes and thereafter
 9    transcribed by use of computer-aided transcription and
      computer printer under my direction.
10
           I further certify that the foregoing is a true
11    and correct transcript of the testimony given at said
      examination of said witness.
12
           I further certify that reading and signing of
13    the deposition were waived by the witness.

14         I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
15    interested in the event of this suit.

16

17                         Lucinda M. Reeder, RDR, CRR
                           Certification No. 132-RPR
18                         (Expires January 31, 2008)

19    DATED:   11-27-06

20

21

22

23

24                                                A122
```

Page 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.,    )
                       )
        Plaintiff,     )
                       )  Civil Action
v.                       )  No. 05-462 JJF
                       )
GAMING ENTERTAINMENT (DELAWARE),)
L.L.C., D/B/A MIDWAY SLOTS AND  )
SIMULCAST GAMING ENTERTAINMENT, )
a Delaware limited liability    )
company,                   )
                       )
        Defendant.     )

    Deposition of JAY ALLEN LEWIS taken pursuant to notice at Harrington Raceway, 15 West Rider Road, Thurman P. Adams Paddock Building, Harrington, Delaware, beginning at 10:52 a.m. on Wednesday, November 29, 2006, before Lucinda M. Reeder, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        JOHN M. LaROSA, ESQ.
        Law Office of John M. LaRosa
          Two East 7th Street, Suite 302
          Wilmington Delaware 19801-3707
          for the Plaintiff,

        SETH J. REIDENBERG, ESQ.
        Young Conaway Stargatt & Taylor, LLP
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington Delaware 19899-0391
          for the Defendant.
               ALSO PRESENT:

SCOTT SAXON, DIRECTOR OF HUMAN RESOURCES, MIDWAY SLOTS
BOBBI J. SANDERS, CPA, DIRECTOR OF COMPLIANCE

- - - - - - - - - - - - - - - - - - - - - - - - - - - --
             WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
             (302) 655-0477
            www.wilfet.com

A123

1              JAY ALLEN LEWIS,

2      the witness herein, having first been

3      duly sworn on oath, was examined and

4      testified as follows:

5    BY MR. LaROSA:

6      Q.    Good morning.  My name is John LaRosa, and I

7    represent the plaintiff Clifton Showell, who is the

8    plaintiff in a lawsuit against Midway Slots.  Will you

9    state your full name for the record, please?

10     A.    Jay Allen Lewis.

11     Q.    What is your current home address, Mr. Lewis?

12     A.    30039 Fortune Circle, Milton, Delaware 19968.

13     Q.    Have you ever had your deposition taken before?

14     A.    Have I ever had a deposition?  Yes.

15     Q.    Let me review some ground rules for you.  After

16   I ask the questions and you answer them today, you

17   have the opportunity to review the answers on the

18   written transcript to see if the court reporter made

19   any typos or technical mistakes.  Do you understand

20   that?

21     A.    Yes, sir.

22     Q.    You have taken an oath to tell the truth and

23   you understand that the significance of that, correct?

24     A.    Yes, sir.

**A124**

Jay Allen Lewis

1    A.    Yes, sir.   Which is a Slot Marketing,

2    Accounting Tracking System.

3    Q.    Okay.   And can you describe the IGS System?

4    A.    It's just that.   It's a -- all I have is a

5    working knowledge of it -- it's a system that reports

6    transactions at the game to various entities by a

7    computer system.

8    Q.    Are the various entities internal entities

9    within Midway Slots or outside?

10   A.    Yes, sir, Accounting Department, Slot

11   Department, Surveillance Department.

12   Q.    Any other departments?

13   A.    Marketing.

14   Q.    Any other departments?

15   A.    I don't believe so.

16   Q.    Was there ever a point in time in late 2003 or

17   the first quarter of 2004 when it was learned that

18   certain Slot Department employees or supervisors had

19   been sharing their IGS passwords?

20   A.    Yes, sir.

21   Q.    How did that come to your attention?

22   A.    It was brought to the attention of the

23   surveillance manager, David Zerbe, that a jackpot

24   override had occurred through the system, and the

Jay Allen Lewis

1    paperwork trail did not accompany the system

2    indication that a jackpot override had been conducted.

3        Q.    And so what did the Security & Surveillance

4    Department conclude from that?

5        A.    It was concluded -- we were notified by the

6    Accounting Department that a jackpot override had been

7    conducted at the TDN in the security office location

8    and that the individual that had conducted the

9    override was a normal slot attendant, not a

10   supervisor.  Midway policy, internal controls and

11   procedures for the Slot Department is only supervisors

12   can conduct overrides on jackpots and it's done

13   through the cages, through the Finance Department.

14       Q.    So was any action taken in response to this by

15   the Security & Surveillance Department?

16       A.    Surveillance manager Dave Zerbe, once being

17   made aware an override had occurred at a location, the

18   paperwork was not attached through the system, he

19   conducted a surveillance review at that location and

20   it was ascertained that a slot attendant, Georgia

21   Kimball, had conducted the override.  The system

22   indicated that the -- or the system indicated that

23   individual doing that function was Cliff Showell.

24   Obviously, per the surveillance review, it wasn't

Page 23

1    State of Delaware    )
                          )
2    New Castle County    )

3

4                    CERTIFICATE OF REPORTER

5

6         I, Lucinda M. Reeder, Registered Diplomate
     Reporter, Certified Real-time Reporter and Notary
     Public, do hereby certify that there came before me on
7    November 29, 2006, the witness herein,
     JAY ALLEN LEWIS, who was first duly sworn by me and
8    thereafter examined by counsel for the respective
     parties; that the questions asked of said witness and
9    the answers given were taken down by me in Stenotype
     notes and thereafter transcribed by use of
10   computer-aided transcription and computer printer
     under my direction.

11
          I further certify that the foregoing is a true
12   and correct transcript of the testimony given at said
     examination of said witness.

13
          I further certify that I am not counsel,
14   attorney, or relative of either party, or otherwise
     interested in the event of this suit.

15

16

17
                         Lucinda M. Reeder, RDR, CRR
18                       Certification No. 132-RPR
                         (Expires January 31, 2008)
19

20

21   DATED:      11-29-06

22

23

24
                                             A127