

**WILCOX & FETZER LTD.**

## In the Matter Of:

# Showell

## v.

# Gaming Entertainment L.L.C., et al.

## C.A. # 05-462 JJF

_____

## Transcript of:

### Scott A. Saxon

## November 28, 2006

_____

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A128

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CLIFTON J. SHOWELL, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | No. 05-462 JJF |
| | ) | |
| GAMING ENTERTAINMENT | ) | |
| (DELAWARE), L.L.C, d/b/a | ) | |
| MIDWAY SLOTS & SIMULCAST | ) | |
| GAMING ENTERTAINMENT, a | ) | |
| Delaware Limited Liability | ) | |
| Company, | ) | |
| | ) | |
| Defendant. | ) | |

Deposition of SCOTT A. SAXON taken pursuant to notice at the Thurman P. Adams Paddock Building, Route 13, Fairgrounds Road, Harrington, Delaware, beginning at 9:33 a.m., on Tuesday, November 28, 2006, before Eleanor J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

      JOHN M. LAROSA, ESQ.
      LAW OFFICE OF JOHN M. LAROSA
        Two East 7th Street - Suite 302
        Wilmington, Delaware 19801
        for the Plaintiff

      SETH J. REIDENBERG, ESQ.
      YOUNG, CONAWAY, STARGATT & TAYLOR
        The Brandywine Building - 1000 West Street
        Wilmington, Delaware 19801
        for the Defendant

ALSO PRESENT:

      BOBBI J. SANDERS, CPA, Director of Compliance

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Page 2

```
 1                        SCOTT A. SAXON,

 2            the witness herein, having first been

 3            duly sworn on oath, was examined and

 4            testified as follows:

 5                        EXAMINATION

 6   BY MR. LAROSA:

 7       Q.   Good morning.  Will you state your full name,

 8   please.

 9       A.   My name is Scott Albert Saxon.

10       Q.   What is your current home address, Mr. Saxon?

11       A.   619 Meadowbrook Lane, Milford, Delaware, 19963.

12       Q.   Are you married?

13       A.   Yes.

14       Q.   Have you ever had your deposition taken before?

15       A.   No.

16       Q.   Let me go over some ground rules with you.  After

17   I ask the questions and you answer them today, you will

18   have the opportunity to review the answers you gave to

19   see if the court reporter made any typos or technical

20   mistakes.  Do you understand that?

21       A.   Yes.

22       Q.   And you have taken an oath to tell the truth and

23   you understand the significance of that, correct?

24       A.   Yes.
```

A130

Scott A. Saxon

1    a form of involvement.

2              But the opportunity I don't see would be any

3    different for me to have to physically be present.  So in

4    terms -- I guess the answer to your question about

5    involvement, yes, there can be and there is, there are

6    times when we are the advocate on behalf of the employee,

7    but we take those steps.  There are many write-ups that

8    come to us from a supervisor to which we will flat-out

9    tell them, "You are not writing this employee up.  This

10   is baseless.  You are not going to do it."  And it does

11   not get there.  So there is that form of involvement in

12   the advocacy for the employee.

13             So I don't know -- in Mr. Showell's case, he

14   never had an issue or difficulty in speaking with me,

15   because I make myself quite available to -- I made myself

16   quite available to him and I still do to every other

17   employee in the gaming floor.

18   BY MR. LAROSA:

19       Q.   Okay.  And you were aware that at some point in

20   2004 Beverly Pope issued Mr. Showell a final warning?

21       A.   Yes.

22       Q.   And that final warning was issued by her alone;

23   is that correct?

24       A.   Yes.

**A131**

1      Q.    And no human resources personnel was present when

2   Beverly Pope issued that final warning to Mr. Showell; is

3   that correct?

4      A.    Not to my knowledge, there wasn't.

5      Q.    And you did not sign Clifton Showell's final

6   warning; is that correct?

7      A.    Correct.

8      Q.    And no other human resources representative

9   signed Clifton Showell's final warning; is that correct?

10     A.    That's correct.

11     Q.    Only Beverly Pope signed Clifton Showell's final

12  warning; is that correct?

13     A.    Correct.

14     Q.    Who was Clifton Showell's boss or direct

15  supervisor in 2004?

16     A.    I believe it was Beverly Pope.

17     Q.    So did she make the decision to issue him a final

18  warning?

19     A.    Yes, she did.

20     Q.    Previously, in November of 2003, Mr. Showell had

21  to undergo dental surgery to have his teeth removed.

22  Were you aware of that?

23     A.    Yes.                                A132

24     Q.    How does Midway normally handle a situation where

Page 52

1    a casino floor personnel who deals with the public has

2    his teeth missing?

3       A.   Whether they have teeth or not is not of any

4    issue to us.

5       Q.   Would Midway allow such an employee to work on

6    the casino floor?

7       A.   Yes, and we do.

8       Q.   Would Midway provide any accommodation to

9    employees with medical issues, such as office work or

10   duties away from the casino floor?

11              MR. REIDENBERG:  Objection.  You can answer.

12      A.   If they request it, I guess we would.  We have

13   never had that request.

14      Q.   So if a casino floor personnel or employee

15   working in the Slot Department has a medical issue and

16   were to request an accommodation where they would be

17   allowed to work off the floor for a temporary period of

18   time, such as office work or work in the cage or duties

19   away from the casino floor and the public, all they would

20   have to do is request it and that would likely be

21   granted?

22              MR. REIDENBERG:  Objection.  You can answer.

23      A.   We would not create a position.  We would allow

24   an individual to work in an existing position, if they

Scott A. Saxon

1    requested it, if it existed.

2        Q.   And the only thing the employee would have to do,

3    assuming the position existed, the only thing the

4    employee would have to do is request it?

5            MR. REIDENBERG:  Objection.  You can answer.

6        A.   Yes, they could request it.  I wouldn't have any

7    issue with helping anybody in that.

8        Q.   Isn't it true that in November of 2003 Midway

9    asked Clifton Showell to take an unpaid leave of absence

10   because they did not want him to work on the casino floor

11   with his teeth missing?

12       A.   That is untrue.

13       Q.   Isn't it true that Mr. Showell requested that he

14   be allowed to take a demotion to a non-management

15   position, away from the casino floor?

16       A.   No, that's not true.

17            Can I further answer that?  I think you just

18   said "away from the casino floor."

19       Q.   Yes.

20       A.   No.  He did request a demotion to the position on

21   the floor.

22       Q.   What position did he request?

23       A.   Slot floor attendant.

24       Q.   Mr. Showell was never made a slot floor

A134

Scott A. Saxon

1    attendant; is that correct?

2              MR. REIDENBERG:  Objection.  You can answer.

3    And my objection is "he was never made a slot floor

4    attendant."  That's what he started out as.

5         Q.   Your attorney has made a good objection so let me

6    rephrase the question.  During the time that Mr. Showell

7    worked as a slot shift supervisor or slot shift manager,

8    was his title ever changed back to slot floor attendant?

9         A.   No.

10        Q.   What was Regina Burrell's title in 2002?

11        A.   I don't recall 2002.  I can make an assumption if

12   you want.

13        Q.   Well, to the best of your recollection, what do

14   you believe her title was in 2002?

15        A.   You know what, I can't make an assumption because

16   I can't recall that far back.  I know she had been

17   promoted up.  But as a matter of fact, I can't recall

18   exactly in 2002.

19        Q.   At some point Regina Burrell was promoted?

20        A.   Correct.

21        Q.   What was her original position?

22        A.   Her original position was slot floor attendant.

23        Q.   At some point she was promoted to another

24   position?

**A135**

Scott A. Saxon

Page 55

1    A.    Yes, she was.

2    Q.    And what was the promoted position?

3    A.    She was promoted to a lead attendant.

4    Q.    Did she receive any other promotions?

5    A.    She was subsequently promoted to slot shift

6    supervisor.  That title might have been manager.  Like I

7    said before, it flip-flopped.

8    Q.    Did she ever wear two hats at once, such as slot

9    attendant some days, lead attendant other days?

10   A.    Yes.  However, I don't believe -- that would be

11   what we would have considered a dual-rate employee, but I

12   don't think she was in a dual-rate capacity until she --

13   until her second term of employment with us.

14   Q.    Do you remember when her second term of

15   employment was?

16   A.    I don't recall exactly when it began.

17   Q.    If she was working at Midway in 2002 would that

18   have been her first term of employment or during her

19   first term of employment?

20   A.    Yes, if she was working then.

21   Q.    And at that time she was not a dual-rate

22   employee?

23   A.    She may -- again, maybe in 2002 she was a slot

24   shift manager.

**A136**

Scott A. Saxon

1    attendant?

2        A.    Yes.

3        Q.    And sometimes she did the function of a slot

4    floor attendant?

5        A.    Correct.

6        Q.    Was she ever promoted beyond the capacity of

7    dual-rate lead?

8        A.    Yes.

9        Q.    What was she promoted to?

10       A.    She was promoted to full-time lead and then

11   subsequently promoted to slot shift supervisor.

12       Q.    When she was slot shift supervisor did she have a

13   medical issue?

14       A.    Not that I am aware of.  Not as a supervisor.

15       Q.    Did she ever have a medical issue during her

16   employment at Midway Slots that you can recall?

17       A.    Yes, she did.

18       Q.    And do you recall approximately when that was?

19       A.    No, I don't.

20       Q.    Do you recall what her role was at that time that

21   she had a medical issue?

22       A.    No, I don't.

23       Q.    She may have been a slot shift supervisor or she

24   may have been a dual-rate lead?

A137

Scott A. Saxon

1    A.    Correct, she may be either one.  I, if I had to

2  say approximate, my guess would be it was prior to her

3  being a slot shift supervisor.

4    Q.    Okay.  It might have been around the time she was

5  a dual-rate lead?

6    A.    Yes.

7    Q.    And as a result of her medical issue did she go

8  out on FMLA leave?

9    A.    I believe she did.

10    Q.    And did she exhaust her FMLA leave?

11    A.    Not that I am aware of.

12    Q.    Was she able to return to work before her FMLA

13  leave was exhausted?

14    A.    Yes.  Again, I'm guessing, but I don't recall her

15  getting to a point where we had to send her the letter

16  that you got to get back to work.  So I don't think she

17  even came close to exhausting her FMLA time.

18    Q.    So it is your understanding that, unlike Regina

19  Burrell, Sonya Clendaniel she did not need to resign

20  because she did not exhaust her FMLA leave; is that your

21  understanding?

22    A.    Yes.

23    Q.    And when Sonya Clendaniel returned from FMLA

24  leave, did she return to the role of dual-rate lead?

Page 60

1        MR. REIDENBERG:  Objection.  You can answer.

2      A.    Assuming that that is the role she was in.  She

3    returned to what her role was.  No term or condition

4    changed in her employment as a result of being on leave.

5      Q.    And so you can't recall what specific title she

6    was when she went out or what specific title she was when

7    she returned, but it is your understanding that it was

8    either slot shift supervisor or dual-rate lead?

9      A.    Correct.  Whatever she was when she left is what

10   she returned to.

11     Q.    And are those roles of slot shift supervisor and

12   dual-rate lead, are they supervisory roles?

13     A.    For a lead attendant, it is almost a pseudo

14   supervisory function in that a lead wouldn't have the

15   capacity to hire, fire, evaluate, those types of things.

16   They didn't have that authority.  They couldn't schedule

17   people.

18            What they would do is essentially, but on

19   the floor, they would, again, they would be the lead

20   person that would observe the business demands on the

21   gaming floor, and where there may be a greater need, they

22   would direct the slot attendants into those areas.

23            And then additionally, they would have a

24   little bit greater authority with regards to say

Scott A. Saxon

1    jackpots, where they -- to sign off on the paperwork when

2    paying a customer.

3        Q.    Would a dual-rate lead have the authority to

4    discipline a slot attendant?

5        A.    No.

6        Q.    Would a dual-rate lead have access to personnel

7    files?

8        A.    No.

9        Q.    Would a slot shift supervisor have access to

10   personnel files?

11       A.    Yes.

12       Q.    And would a slot shift supervisor have the

13   ability to discipline slot attendants?

14       A.    Yes.

15       Q.    Is it fair to say Midway tried to accommodate

16   Regina Burrell and Sonya Clendaniel with respect to their

17   medical issues?

18              MR. REIDENBERG:    Objection.    You can answer.

19       A.    Within the parameters of Family Medical Leave

20   Act, yes.

21       Q.    Who was Regina Burrell's direct supervisor at the

22   time she returned from medical leave?

23       A.    I don't know who -- she returned -- well, she

24   didn't return from Family Medical Leave.    She --

Scott A. Saxon

1    Q.    I'm sorry.  When she returned to Midway after her

2    FMLA leave was exhausted and she resigned?

3    A.    When she was rehired, I don't know who the slot

4    shift supervisor was at the time that would have been her

5    direct report.

6    Q.    And the slot shift supervisor would have either

7    been Beverly Pope or Daryl Nashold?

8                MR. REIDENBERG:  Objection.

9    A.    Well, Beverly was the director.

10               MR. REIDENBERG:  You can answer.

11   A.    Beverly was the director, but the direct report

12   would have been a front-line supervisor.

13   Q.    So you don't recall who Regina Burrell's direct

14   supervisor was when she rejoined Midway?

15   A.    No, I don't know exactly.

16   Q.    And with regard to Sonya Clendaniel, when she

17   returned from FMLA leave, do you know, do you recall who

18   her direct supervisor was?

19   A.    I don't recall.

20   Q.    Do you recall what the person's title would have

21   been?

22   A.    The person would have been a slot shift

23   supervisor or slot shift manager.  Again, at that year I

24   don't recall, but whoever it was at that time.

Page 69

```
 1              MR. REIDENBERG:  Objection.  You can answer.

 2       A.   Beverly Pope made the decision to terminate

 3   Cliff.

 4       Q.   Did the reason involve something with his IGS

 5   password?

 6       A.   Yes.

 7       Q.   What was the reason he was terminated?

 8       A.   Mr. Showell had received several corrective

 9   counselings in his employment at Midway, and at this

10   point he was found, this, what was presumably giving his

11   password out, and his expression was "to improve customer

12   service."

13              When he was interviewed, when this was found

14   that somebody else was using his password, he admitted

15   that he had given it to Miss Georgia Kimball.  He

16   admitted that he had written it down on a piece of paper,

17   after his previous password had expired, and then he

18   admitted scratching it out.

19              I asked him, "Why didn't you leave it there

20   for everybody?  Why did you scratch it out?"

21              "Because I knew we weren't supposed to give

22   it out."

23              "So if you knew you weren't supposed to give

24   it out, then why did you do it?"
```

Scott A. Saxon

Page 70

1        To which he continually expressed, "You

2    don't know what it is like, customer service.  We got to

3    do it.  You got to get all these things done.  You are

4    not supposed to have overtime.  You got to get these

5    things done."

6        I asked him, "Why didn't you tell Beverly

7    Pope if there was a flaw in the system?"  He had no

8    answer for me.  He admitted he knew it was wrong, and

9    under our code of conduct one of things that it has on

10   there that he will have to maintain the accuracy of

11   records, and one of the reasons that he was given a

12   secured password was that we could, through accounting,

13   address which individual had done what with what funds.

14   That's an accountability factor.  And it was a violation

15   of our code of conduct.  It was basically a breach of

16   security.  The integrity of the system was all undermined

17   when he gave out his password.

18   Q.    And he should have known that that was a

19   violation of policy to give out the password?  He should

20   have known that policy, correct?

21   A.    He should have known that.

22   Q.    How would he have known that policy, to not give

23   out the password?  Is that told to slot shift

24   supervisors?

                                            **A143**

Page 82

1                    (Proceedings conclude at 11:45 a.m.)

2

3                              I N D E X

4

DEPONENT:    SCOTT A. SAXON                    PAGE

5          Examination by Mr. LaRosa                2

6

7    (There were no exhibits marked for identification.)

8    ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 83

9    CERTIFICATE OF REPORTER              PAGE 84

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A144

Page 83

1

2

3

4          REPLACE THIS PAGE

5          WITH THE ERRATA SHEET

6          AFTER IT HAS BEEN

7          COMPLETED AND SIGNED

8          BY THE DEPONENT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                                A145

Page 84

```
 1    State of Delaware )
                       )
 2    New Castle County )

 3

 4                    CERTIFICATE OF REPORTER

 5

 6             I, Eleanor J. Schwandt, Registered
      Professional Reporter and Notary Public, do hereby
 7    certify that there came before me on the 28th day of
      November, 2006, the deponent herein, SCOTT A. SAXON, who
 8    was duly sworn by me and thereafter examined by counsel
      for the respective parties; that the questions asked of
 9    said deponent and the answers given were taken down by me
      in Stenotype notes and thereafter transcribed by use of
10    computer-aided transcription and computer printer under
      my direction.

11             I further certify that the foregoing is a
      true and correct transcript of the testimony given at
12    said examination of said witness.

13             I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.

15

16

17                         Eleanor J. Schwandt

18                         Certification No. 125-RPR

19                         (Expires January 31, 2008)

20
      DATED:
21

22

23

24
                                              A146
```

# INTEROFFICE MEMORANDUM

**TO:**       CLIFTON SHOWELL

**FROM:**     SCOTT SAXON

**SUBJECT:**  IMPROPER USE OF IGS PASSWORD

**DATE:**     3/5/2004

**CC:**       FILE

On Thursday, March 4, 2004, an investigation was conducted regarding a $100 variance at the Security TDN that had occurred from Sunday evening, February 29, 2004, into the gaming day of Monday, March 1, 2004. The investigation revealed that you had given your IGS password to Slot Attendant Georgia Kimball. Ms Kimball used your IGS password to do an override during a shift that you were not present, which ultimately lead to the variance.

Through Ms Kimball's statement, and your own admission in the course of the investigation, you gave your IGS password to her knowing that your actions were a policy violation. Ms Kimball stated that you had given her your new IGS password after your old password expired, by writing the password down, and then crossing it out to eliminate any evidence you had done so. This violation of the procedures was a serious breach of security and undermined the integrity of the system.

Your explanation that you had given your IGS password to a Slot Attendant to improve service is unsatisfactory. If you felt there were deficiencies in Company policies or procedures, as a Manager you should have informed your Director. You did not communicate what you perceived to be a service issue to your Director.

You were issued a Final Warning on January 14, 2004, which you refused to sign. That warning advised you "Any further infractions of Company Policy and Procedure will lead to more severe disciplinary actions". As a result of giving a Slot Attendant your IGS password that she was not authorized to use, per internal controls, you are considered to have violated Company Policies/Procedures. Since you have already received a Final Warning, we are left with no alternative but to terminate your employment effective immediately.

_____ 3/5/04       _____ 3/5/04
Signature        Date          Signature        Date

                              _____ 3-5-04
                              Witness          Date

**EXHIBIT**
Showell 15
11-2-06

A147

# MIDWAY SLOTS & SIMULCAST
## Surveillance Department Incident Report



| Date | Time | Case Number |
|------|------|-------------|
| 3/1/04 | 0015 hours | 04-03-218 |

**Type of Incident**
**Falsifying Jackpot Override**

**Location of Incident**
**Security TDN**

**Subject #1 and address**
**Georgia Kimball (Midway Slots and Simulcast Employee – Slot Attendant)**

| Was Employee Procedure Violation Issued | Photo Taken | What Tapes Were Reviewed or Saved in Evidence |
|------|------|------|
| **YES** | **NO** | **B-069 and B-138 in evidence** |

**Narrative:**

After receive a request from Income Auditor Maxine Foy in reference to SL/A Georgia Kimball processing a jackpot for $100.00 and that no slip was accounted for, a tape review was conducted and the following was observed:

At 0013 hours, SL/A G. Kimball is observed processing a jackpot, counts $150.65, prints the receipt, and signs the receipt verifying it. (MIS report stated $150.65 jackpot processed at 0012 hours)

At 0014 hours, SL/A G. Kimball processes another jackpot, counts $112.50, prints the receipt, and signs the receipt verifying it. (MIS report stated $212.50 jackpot processed at 0013 hours)

At 0015 hours, SL/A G. Kimball processes another jackpot, counts $100.40, prints the receipt, and signs the receipt verifying it. (MIS report stated $100.00 jackpot processed at 0019 hours)

At 0016 hours, SL/A G. Kimball puts the written request and computer slip in the drop box for the 3rd jackpot processed.

At 0017 hours, SL/A G. Kimball picks up all the money and exits the Security TDN>

At 0020 hours, SL/A G. Kimball enters the Security TDN removes a written request with computer slip from the drop box and goes to the TDN. SL/A G. Kimball is also observed with 40-cents in her hand as she is working on the keyboard to the TDN computer.

At 0021 hours, SL/A G. Kimball counts out $100.00.

At 0021 hours, SL/A G. Kimball removes the computer generated slip from the printer, folds it in half, puts the original written and computer slip back in the drop box, and puts the folded computer slip in her pouch.

A check of the records for this 0021 hours computer slip was noted to be an override by SL/S Cliff Showell who was not observed at the Security TDN during any of these transactions.

Director of Slots Beverly Pope and SL/M Daryl Nashold viewed the video footage of these transactions.

| Signature | | Date and Prepared By: |
|------|------|------|
| Dave Zerbe | | 3/4/04    Dave Zerbe |
| Reviewed By | | |

A148

D02826

# MIDWAY SLOTS & SIMULCAST
## Surveillance Department Supplemental Report



| Date | Time | Case Number |
|---|---|---|
| 03-05-04 | 1000 hrs. | 04-03-218 |

Type of Incident
**Falsifying Jackpot Override**

Location of Incident
**Security TDN**

Subject #1 and address
**Georgia Kimball (Midway Slots and Simulcast –Slots Dept.)**

| Was Employee Procedure Violation Issued | Photo | What Tapes Were Reviewed or Saved in Evidence |
|---|---|---|
| **Yes** | **N/A** | **B-069 and B-138 Evidence** |

Narrative:

See Master Rpt. 04-03-218 for additional details.

On 03/04/04, this writer was contacted by Slot Manager D. Nashold to initiate an investigation per his discussion with E/Dir., of Operations L. Tranchitella and Slot Dir. B. Pope in regards to a report of S-1 conducting an unauthorized jackpot payout override. This override was conducted and possibly involved an IGS system security password breech, involving S-1 and Slot Shift Supr. Clifford Showell.

On 03/04/04 S-1 was interviewed by this writer and admitted to conducting an override in the system on 03/01. S-1 advised she was able to do the override, as she possessed Slot Suprv. Showell's password which he had provided to her. S-1 stated Showell also provided his password to Slot Att. Nicole Maker. S-1 advised it was a common practice for Showell to give out his password to her and others so they could complete (no-signal hopperfill system inputs). This function per internal procedures is to only be completed by Slot supervisory personnel. S1 advised on the override that no funds were appropriated for her use. This statement is confirmed per the IGS report attached to the master report. (Disciplinary action pending)

On 03/04/04 this writer interviewed Slot Att. Nicole Maker. Maker advised that she possessed Slot Supervisors Showell and Jenkin's passwords for the IGS system. Maker advised these two supervisors gave her their passwords so she could enter the IGS system to complete (no-signal hopperfill inputs).

On 03/04/04 this writer interviewed Slot Supervisors Showell and Jenkins. Both admitted to providing various attendants on their shift their passwords to access the system to complete the no-signal inputs. Both supervisors advised they were aware that providing the passwords were a system security breech and that the no signal inputs are a supervisory only function. Both admitted that no Slot Dept. management official authorized this activity. Due to the fact that Showell is under a final termination warning through Human Resources he was suspended pending a termination hearing on 03/05 with H/R Dir. Saxon. On 03/05 Showell's employment with Midway was terminated. Disciplinary action pending with Jenkins.

On 03/05/04 Slot Supervisors W. Bata, D. Nashold, R. Burrell, B. Shahan, C. Perry and S. Clendaniel were interviewed by either this writer or Dir. Pope. The preceding supervisors all denied furnishing their password to any other Midway employee, except for Shahan. Shahan admitted to providing Slot Att. P. Robinson with her password. Robinson is on light duty and is tasked with entering no-signal inputs. Shahan was advised that Robinson is not authorized to have her password. Disciplinary action pending with Shahan. As of 03/05 only Slot Supervisor B. Kelly remains to be interviewed. If any problems are evidenced it will be documented and disciplinary action initiated.



A149

Confidential

D02827



Per this investigation all supervisors' passwords have been changed per MIS. All supervisors have signed an acknowledgment document that under no circumstances are they to divulge their new password for the IGS system to any other employee for any reason. Failure to comply shall result in immediate termination of employment. Det Parseghian VLEU has been notified of this Surveillance/Slot Dept's. investigation and final outcome. If any additional irregularities are located it will be forwarded to Parseghian's attention. IGS Tech's will be notified to respond to Midway per the request of MIS Dir. Hornsby to correct the security deficiencies in the system as soon as possible. As stated earlier no monetary loss to Midway has been experienced or has any violations of the DE Criminal Code or Lottery Regulations been experienced. The deficiencies in the system and the security breach by the above named supervisors has been addressed through either termination or final warning termination proceedings per Slots and H/Resources. Surveillance to maintain the taped recordings and IGS documentation pending further review.

| Signature | Date and Prepared By: |
|---|---|
| Exec. Dir. Jay Lewis 3267 | 03-05-04 J. Lewis |

| Reviewed By |
|---|
| Exec. Dir. Jay Lewis 3267 |

A150

Confidential

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR.,    )
                            )
          Plaintiff,    )
                            )   Civil Action
v.                        )   No. 05-462 JJF
                            )
GAMING ENTERTAINMENT    )
(DELAWARE), L.L.C, d/b/a    )
MIDWAY SLOTS & SIMULCAST    )
GAMING ENTERTAINMENT, a    )
Delaware Limited Liability    )
Company,                )
                            )
          Defendant.    )

       Deposition of DARYL B. NASHOLD, SR., taken
pursuant to notice at the Thurman P. Adams Paddock
Building, Route 13, Fairgrounds Road, Harrington,
Delaware, beginning at 1:03 p.m., on Tuesday, November
28, 2006, before Eleanor J. Schwandt, Registered Merit
Reporter and Notary Public.

APPEARANCES:
        JOHN M. LAROSA, ESQ.
        LAW OFFICE OF JOHN M. LAROSA
          Two East 7th Street - Suite 302
          Wilmington, Delaware  19801
          for the Plaintiff

        SETH J. REIDENBERG, ESQ.
        YOUNG, CONAWAY, STARGATT & TAYLOR
          The Brandywine Building - 1000 West Street
          Wilmington, Delaware  19801
          for the Defendant

ALSO PRESENT:
SCOTT A. SAXON, Director of Human Resources, Midway Slots
BOBBI J. SANDERS, CPA, Director of Compliance

WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

1                          DARYL B. NASHOLD, SR.,

2                 the witness herein, having first been

3                 duly sworn on oath, was examined and

4                 testified as follows:

5                               EXAMINATION

6    BY MR. LAROSA:

7        Q.    Good afternoon.  Will you state your full name,

8    please.

9        A.    My name is Daryl Blaine Nashold, Senior.

10       Q.    And what is your current home address?

11       A.    It is Frederico, 856, Post Office Box 34,

12   Frederico, Delaware.

13       Q.    What is the zip code there?

14       A.    19946.

15       Q.    Are you married?

16       A.    No.

17       Q.    Have you ever had your deposition taken before?

18       A.    Yes, mm-hmm.

19       Q.    Let me review some ground rules with you.  After

20   I ask the questions and you answer them today, you will

21   have the opportunity to review the transcript to see if

22   the court reporter made any typos or technical mistakes.

23   Do you understand that?

24       A.    Yes.

Daryl B. Nashold, Sr.

Page 45

1    Q.    Is it fair to say that one of the steps she did

2    to try and eliminate the problem was to distribute this

3    final warning memo to all the Slot Department employees?

4    A.    It was to make everyone aware, yes.

5    Q.    And not just to make them aware but to hopefully

6    prevent future unauthorized disclosures of the IGS

7    passwords?

8    A.    Yes.

9    Q.    Did Brandy Shahan eventually leave Midway Slots?

10   A.    Yes, she did.

11   Q.    Did she go into the military, if you know?

12   A.    Yes, she went in the military.

13   Q.    Is that the reason why she left Midway Slots?

14   A.    I believe it was, yes.

15   Q.    So she was never fired from Midway Slots, is that

16   correct, to the best of your knowledge?

17   A.    To the best of my knowledge, I don't believe so,

18   no.

19   Q.    You did not fire Clifton Showell, correct?

20   A.    No.

21   Q.    Beverly Pope made that decision, correct?

22   A.    I didn't make that decision.

23   Q.    Okay.  You don't know who made the decision?

24   A.    Not a hundred percent sure, no.

Page 51

1    A.    Yes.

2    Q.    And one of the reasons that is wrong is because I

3  could be stealing from the game without anyone being able

4  to track who I am; is that correct?

5    A.    It is to keep track of who goes in and out of the

6  games, yes.

7    Q.    Would you consider that type of a violation a

8  breach of security?

9    A.    I don't know.  I'm not sure.

10    Q.    Are there any other disciplinary violations that

11  Tracy Dorsey has committed that you are aware of?

12    A.    I wouldn't know without looking at her file.

13            MR. LAROSA:  I have no further questions.

14            MR. REIDENBERG:  I have no questions.  We

15  will read and sign.

16            (Proceedings conclude at 2:20 p.m.)

17

18            I N D E X

19

20  DEPONENT:    DARYL B. NASHOLD, SR.            PAGE

       Examination by Mr. LaRosa                    2
21

22  (There were no exhibits marked for identification.)

23  ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 52

24  CERTIFICATE OF REPORTER                  PAGE 53

A154

Page 52

1

2

3

4          REPLACE THIS PAGE

5          WITH THE ERRATA SHEET

6          AFTER IT HAS BEEN

7          COMPLETED AND SIGNED

8          BY THE DEPONENT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 53

```
 1   State of Delaware )
                      )
 2   New Castle County )

 3

 4                  CERTIFICATE OF REPORTER

 5

 6              I, Eleanor J. Schwandt, Registered
     Professional Reporter and Notary Public, do hereby
 7   certify that there came before me on the 28th day of
     November, 2006, the deponent herein, DARYL B. NASHOLD,
 8   SR., who was duly sworn by me and thereafter examined by
     counsel for the respective parties; that the questions
 9   asked of said deponent and the answers given were taken
     down by me in Stenotype notes and thereafter transcribed
10   by use of computer-aided transcription and computer
     printer under my direction.

11              I further certify that the foregoing is a
     true and correct transcript of the testimony given at
12   said examination of said witness.

13              I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17                       Eleanor J. Schwandt

18                       Certification No. 125-RPR

19                       (Expires January 31, 2008)

20
     DATED:
21

22

23

24
```

**A156**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CLIFTON J. SHOWELL, JR. :
        :
   Plaintiff,   :  **CIVIL ACTION NO.** 05-462 JJF
        :
   v.     :
        :
**GAMING ENTERTAINMENT** :
**(DELAWARE), L.L.C.,** d/b/a :
**MIDWAY SLOTS & SIMULCAST** :
**GAMING ENTERTAINMENT,** :
a Delaware Limited Liability Company, :
        :
   Defendant.  :

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' FIRST SET OF INTERROGATORIES DIRECTED TO PLAINTIFF**

  Plaintiff, by his attorney, hereby objects to Defendants' First Set of Interrogatories Directed to Plaintiff ("Discovery") in accordance with the numbered paragraphs as set forth below. Plaintiff reserves the right to amend or supplement the responses contained herein as may be necessary or appropriate in the future.

**GENERAL OBJECTIONS**

  1.  Plaintiff objects generally to Discovery insofar as it requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product, or which are otherwise privileged or protected and not subject to discovery.

  2.  Plaintiff objects generally to Discovery to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

3.     Plaintiff objects generally to Discovery insofar as it requests information or documents which constitute or contain sensitive and non-public business, medical, personal, or other confidential information.  Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.     Plaintiff objects generally to Discovery insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Rule 34(b) of the Federal Rules of Civil Procedure.  Plaintiff will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

5.     Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Plaintiff objects to Defendants' definitions and instructions insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

2

## OBJECTIONS TO SPECIFIC INTERROGATORIES
## (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1.    *Identify each person who has knowledge of the facts alleged in the pleadings, stating for each person the facts about which each such person has knowledge.*

Answer:    No further objection. See Plaintiff's First Set of Self-Executing Disclosures

§ A.

2.    *Identify each person who has been interviewed on your behalf, state the date of the interview, and the identity of each person present for each such interview.*

Answer:    No further objection. No one has been interviewed on my behalf. By way of

further answer, see Response to Interrogatory No. 3 below.

3.    *Identify all persons from whom statements have been procured in regard to the facts alleged in the pleadings.*

Answer:    No further objection. Written statements have been made by

Yvonne Showell, John E. Ruffin, Jr., Rosetta Loper, and Beverly Pope. See P281-84.

4.    *Identify all persons, other than your attorneys, with whom you have discussed the matters that are the subject of this lawsuit, and supply the address and telephone number of each such person.*

Answer:    No further objection. See the following table:

5.    *Identify each document that you have, and each document of which you are aware, which refers or relates to any alleged wrongful act by Defendant, the claims made in the Complaint, or the facts of this case.*

Answer:    No further objection. See P1-116 and 281-491.

6.    *Identify each document you sent to, or received from, the Equal Employment Opportunity Commission ("EEOC"), the Delaware Department of Labor ("DDOL"), or any administrative agency concerning the claims made in the Complaint.*

Answer:    No further objection. See P106-116 and 285-491.

3

A159

7.    *State facts that you contend support your claim that you were discriminated against based on your (a) race; (b) sex; and (c) age.*

(a)    Answer:    No further objection.  See First Amended Complaint at ¶¶ 16-38.

(b)    Answer:    No further objection.  See First Amended Complaint at ¶¶ 17-26, 29-36, and 39-43.

(c)    Answer:    No further objection.  See First Amended Complaint at ¶¶ 17-21 and 29-36.

8.    *State all facts that you contend that your termination was based on your (a) race; (b) sex; and (c) age.*

(a)    Answer:    No further objection.  See First Amended Complaint at ¶¶ 17-38.

(b)    Answer:    No further objection.  See First Amended Complaint at ¶¶ 17-26, 29-36, and 39-43.

(c)    Answer:    No further objection.  See First Amended Complaint at ¶¶ 17-21 and 29-36.

9.    *With regard to any alleged statement made by Defendants or any agent of Defendants, whether oral or written, which you contend constitutes an admission and upon which you may rely at trial, please give a complete recitation thereof, state the date and place of its making and identify the person or persons who made it and who were present when it was made or written.*

Answer:    No further objection.  See P282 and 284.

| Person Who Made Admission | Recitation | Date | Place | Person(s) Present |
|---|---|---|---|---|
| John E. Ruffin, Jr. | See P282. | 4/8/06 | Unknown | Unknown |
| Beverly Pope | See P284. | Approx. 1-2 months after my discharge on 3/3/04 | Unknown | Unknown |

4

A160

10.    *Describe in detail each way in which you contend you were injured or have suffered damages as a result of the claims made in your Complaint including, but not limited to: (a) stating the total amount of damages claimed for pecuniary or financial losses of any kind; (b) itemizing the amount of each element of damages claimed; (c) stating all facts or grounds upon which you rely to support each element of damages claimed; (d) stating the methods, theories and calculations by which you arrived at the claimed dollar amounts of each element of damages claimed; (e) identifying any person (including expert witnesses) whom you know or whom you believe has knowledge of the basis for and calculation of such damages; and (f) identifying the person(s) who calculated the amount of each element of damages claimed.*

(a), (b) <u>Answer</u>:    Objection.  This request ignores the requirements of Rule

26(a)(2)(C) the Federal Rules of Civil Procedure.  The information and document(s) will be provided

within the time frame established in the Scheduling Order.  By way of further answer, <u>see</u> First

Amended Complaint, Wherefore Clause at §§ (b), (c), (d), (e), (h), and (j) and Plaintiff's First Set

of Self-Executing Disclosures at § (D).  Also, for a current list of damages claimed, <u>see</u> letter from

John M. LaRosa to Seth J. Reidenberg of 4/20/06 at page 6.  Plaintiff reserves the right to

supplement or amend that partial list through his expert witness(es) in accordance with the deadline

for expert reports set forth in the Scheduling Order.

(c)        <u>Answer</u>:    No further objection.  <u>See</u> First Amended Complaint at ¶¶ 1-

75 and letter from John M. LaRosa to Seth J. Reidenberg of 4/20/06 at pages 1-4.

(d), (e), (f)    <u>Answer</u>:    Objection.  This request ignores the requirements of Rule

26(a)(2)(C) the Federal Rules of Civil Procedure.  Expert witness(es) will be disclosed within the

time frame established in the Scheduling Order.  By way of further answer, the calculations are based

on estimates by my attorney, John M. LaRosa.  Plaintiff reserves the right to supplement or amend

the calculations through his expert witness(es) in accordance with the deadline for expert reports set

forth in the Scheduling Order.

5

11.     *Please identify all non-monetary relief you are seeking and the basis for your request for such relief.*

      <u>Answer</u>:    No further objection.  <u>See</u> the following:

| Non-monetary Relief | Basis |
|---|---|
| A declaratory judgment declaring the acts of Defendant to be a violation of Plaintiff's statutory rights. | <u>See</u> First Amended Complaint, Wherefore Clause at §§ 1-75. |
| A mandatory injunction directing Defendant to reinstate Plaintiff to the position of Slot Shift Manager or an equivalent position, or alternatively, a mandatory injunction directing the Defendant to place him in the position to which he would have normally progressed but for the illegal discrimination against him. | <u>See</u> First Amended Complaint, Wherefore Clause at §§ 1-75. |
| A mandatory injunction requiring Defendant to place Plaintiff in the next appropriate vacancy to which he normally would have been entitled. | <u>See</u> First Amended Complaint, Wherefore Clause at §§ 1-75. |
| A permanent injunction requiring Defendants to: (i) Notify everyone who learned of Defendant's treatment of Plaintiff that its conduct was illegal, (ii) Expunge Plaintiff's personnel files of any derogatory information relating to this matter | <u>See</u> First Amended Complaint, Wherefore Clause at §§ 1-75. |

12.     *Identify each physician, psychologist, psychiatrist or any other health care provider consulted by Plaintiff and any medical records or other documents concerning treatment or consultation for any physical or emotional injuries allegedly sustained as a result of the facts alleged in the Complaint.*

      <u>Answer</u>:    No further objection.  None.

6

*13.    Identify each doctor, psychiatrist, psychologist, therapist, or health care provider of any kind who treated you in the last ten years.*

<u>Answer:</u>    Objection. This request seeks information that does not appear reasonably calculated to lead to the discovery of admissible evidence; seeks information or documents which constitute or contain sensitive and non-public medical, personal, or other confidential information which Plaintiff only will produce, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality; poses an undue burden on Plaintiff and is overbroad.

*14.    Please state whether you intend to introduce statistical evidence in support of your claims. If so, please: (a) describe the statistical data and specify the particular statistics to be used; (b) identify the source of the statistical data; (c) name any witness whom you will call to testify with respect to the statistical data; (d) specify the fact or facts that you claim the statistical data prove and state how that fact or those facts relate to the establishment of each claim you make in this litigation; (e) describe the evidence or testimony which you intend to introduce in this litigation to establish that the statistics to be used establish or tend to establish any claim you make in this litigation.*

<u>Answer:</u>    Objection. This request seeks consultation with experts and also ignores the requirements of Rule 26 of the Federal Rules of Civil Procedure. Otherwise, the information and/or documents will be provided within the time frame established in the Scheduling Order. By way of further answer, Plaintiff currently does not seek to introduce statistical evidence in support of his claims of liability and damages. Regarding his claims for damages, Plaintiff reserves the right to supplement or amend this answer through his expert witness report(s) in accordance with the deadline for expert reports set forth in the Scheduling Order.

7

15.     *Identify each expert retained or employed by you in anticipation of this litigation or preparation for trial; whether or not you expect to call him/her as a witness at trial; and for each such person state the date of initial employment and identify any reports, letters, other documents or memoranda, photographs, models or other tangible objects prepared by such expert.*

Answer:     Objection. This request also ignores the requirements of Rule 26 of the

Federal Rules of Civil Procedure. Otherwise, the information and/or documents will be provided

within the time frame for expert discovery established in the Scheduling Order.

16.     *Identify any expert you expect to call as an expert witness at trial and; state the subject matter on which the expert is expected to testify; provide a summary of the facts and opinions to which the expert is expected to testify; and give a summary of the grounds for each opinion, as required under Court Rules.*

Answer:     Objection. Plaintiff objects on the grounds that this interrogatory requests

information that will be provided within the time frame for expert discovery established by the

Scheduling Order. By way of further answer, see Plaintiff's First Set of Self-Executing Disclosures

§ C.

17.     *Describe all efforts by you to obtain other employment during or after your employment with Defendant, stating the name and address of each employer for whom you have worked or to whom you have applied for employment, the position held or applied for, the dates you applied for and/or began employment, the annual compensation, the person to whom you applied and/or the person who supervises you or to whom you report.*

Answer:     No further objection. See the following table:

8

| Name and Address | Position | Date Applied | Date Began | Annual Compensation | Person to Whom Applied | Person to Whom Reports |
|---|---|---|---|---|---|---|
| Delaware Park Racetrack-Slots 777 Delaware Park Boulevard Wilmington, Delaware 19804 Human Resources | Slot Shift Manager | 3/04 (approx.) | N/A | N/A | Human Resources | N/A |
| The Olive Tree Italian Restaurant Northside Shopping Mall 126th St. & Coastal Highway Ocean City, MD 21842 | Slot Attendant Cook | early 2005 3/04 (approx.) | N/A | $10.00/hour | Gregory Poulos Co-Owner | N/A |
| Stanley's Asphalt Paving P.O. Box 652 Frederica, DE 19943 | Asphalt Paver | 3/04 (approx.) | N/A | N/A | Stanley Messhick Owner | N/A |
| DuPont Titanium Technologies Edge Moor Plant 104 Hay Road Edge Moor, DE 19809 | Chemical Process Operator | 4/04 (approx.) | N/A | N/A | John J. Pietrantonio, Site Services Manager | N/A |
| Wells Fargo 893 E Fort Ave Baltimore, Maryland 21230 | Account Representative | 4/04 (approx.) | N/A | N/A | Timothy W. Paret, Manager | N/A |

9

| Delaware Transit Corporation (DART) 900 Public Safety Boulevard Dover, DE 19901-4503 | Revenue Handling Specialist | 4/29/04 | N/A | Renee Pugh, Human Resources | N/A |
|---|---|---|---|---|---|
| Dover Downs Hotel & Casino 1131 North DuPont Highway Dover DE 19901 | Slot Attendant | 5/04 (approx.) | N/A | Human Resources | N/A |
| | Slot Attendant | early 2005 (approx.) | N/A | Human Resources | N/A |
| Walmart Distribution Center Smyrna, DE | Forklift Operator | 5/04 (approx.) | N/A | Human Resources | N/A |
| BBS A Human Resource Management Company 1058 South Governors Ave. Suite 102 Woodbrook Professional Center Dover, Delaware 19904 | Temporary Agency | 5/04 (approx.) | N/A | Unnamed Front Desk Manager | N/A |
| Food Consultant Caterer and Related Services 40 Meadowood Lane Peck Avenue Harrington, DE 19952 | Caterer | 5/04 (approx.) | N/A | Phillip Harris | N/A |
| Brasure's Body Shop, Inc. US 113 Box 118 Frankford, DE 19945 | Skilled Laborer | 5/04 (approx.) | N/A | Jim & Paulette, Owners | N/A |

| | | | | |
|---|---|---|---|---|
| Allstar Utility Company<br>5555 Branchville Road<br>College Park, MD 20740 | Skilled<br>Laborer | 6/04 (approx.) | N/A | Samuel Mingo,<br>Jr., President | N/A |
| Bennie Smith Funeral Homes<br>717 West Division Street<br>Dover, DE 19904 | Pre-pay Sales<br>Representative | 6/04-present | 6/04 | Bennie Smith<br>CEO/President | Rev.<br>William<br>Savage |
| A. & F. Management, Inc.<br>3102 Manson Place<br>Landover, Maryland 20785 | Facility<br>Manager for<br>University of<br>Maryland<br>Eastern Shore<br>College<br>Dormitory<br>Laundry<br>Rooms | 6/04 (approx.) | N/A | Larry A.<br>Fellow,<br>President | N/A |
| Prayer of Faith Temple<br>Route 1<br>Box 3560<br>Dillwyn, VA 23936 | Fundraiser | 6/04 or 7/04<br>(approx.) | N/A | Rev. Samuel<br>Brittingham | N/A |
| Brink's U.S.<br>1710 17th Street St., NE<br>Washington, DC 20002 | Driver | 7/04 (approx.) | N/A | Greg Johnson,<br>Branch<br>Manager | N/A |
| Jackson & Son Trucking<br>9408 Castle Drive<br>Upper Marlboro, MD 20772 | Driver | 7/04 (approx.) | N/A | Mike Jackson<br>Owner | N/A |

| | | | | |
|---|---|---|---|---|
| Commercial & Residential Clean-up 82 Ironmine Rd. Felton, DE 19943 | Salesperson | 7/04 (approx.) | N/A | N/A | Bobby Foreman, President | N/A |
| Blue Hen Auto Sales N. Walnut St. Milford, DE and Rt. 113 Lincoln, DE | Auto Salesperson | 8/04 (approx.) | N/A | N/A | Bill Finkbiner | N/A |
| The UniformStore.com P.O. Box 1324 Laurel, Maryland 20707 | Driver | 8/04 (approx.) | N/A | N/A | Bud Carter, President | N/A |
| J.R.'s Shop 8835 Walker Mill Rd. Capital Heights, MD 20743 | Auto Salesman | 8/04 (approx.) | N/A | N/A | James R. Owner | N/A |
| Heavenly Printing Co. 3425 Branch Avenue Temple Hills, MD | Printer Assistant | 8/04 (approx.) | N/A | N/A | Howard Andrews President of Marketing | N/A |
| Delaware State Housing Authority Housing Management Office 26 The Green Dover, Delaware 19901 | Building Maintenance Mechanic I | 8/04 (approx.) | N/A | N/A | Doris A. Hall, Housing Management Specialist | N/A |

12

| | | | | | |
|---|---|---|---|---|---|
| Delaware Solid Waste Authority 1128 S. Bradford Street P.O. Box 455 Dover, DE 19903-0455 | Curbside Recycling Technician | 9/04 (approx.) | N/A | N/A | Shelly A. Schmehl, Human Resource Technician | N/A |
| Delaware Solid Waste Authority 1128 S. Bradford Street P.O. Box 455 Dover, DE 19903-0455 | Recycling Technician | 12/04 (approx.) | N/A | N/A | Shelly A. Schmehl, Human Resource Technician | N/A |
| Dataguard Incorporated 11582 Sussex Highway Greenwood, DE 19950 | Production Worker and Driver | 1/05 | 1/05-6/05 | $9.00/hour X 40 hours/week X 52 weeks/year | Clint Phillips Owner | Clint Phillips Owner |
| Delaware Dep't of Natural Resources and Environmental Control Division of Parks & Recreation 89 Kings Highway Dover, DE 19901 | Conservation Technician II | 3/12/05 (approx.) | N/A | N/A (Paygrade 7 - $22,789) | Human Resources Office | N/A |
| Delaware State University 1200 N. DuPont Highway Dover, DE 19901 | Custodian | 5/05 | 5/06-present | $10.00/hour X 40 hours/week X 52 weeks/year | Ms. Karen Fair Director | Ms. Karen Fair Director |

13

18.    Identify any crime you have been convicted of including the original charges, the offense you were convicted of, the conviction, and each court that has a record of the conviction.

Answer:    No further objection. I have never been convicted of any crime.

19.    Identify any lawsuit, other than this action, in which you are or were a party including the names of all parties, the caption of the case, the court in which such lawsuit was filed.

Answer:    No further objection. I have never been a party to a lawsuit other than

this action.

**As to Objections and Reservations:**

LAW OFFICE OF JOHN M. LaROSA

/s/ John M. LaRosa
**JOHN M. LaROSA, ESQUIRE**
Delaware Bar No. 4275
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JLR@ LaRosaLaw.com

Attorney for Plaintiff Clifton J. Showell, Jr.

Dated: August 24, 2006

14

A170

## DECLARATION OF
## PLAINTIFF CLIFTON J. SHOWELL, JR. UNDER 28 U.S.C. § 1746

1.     I am the Plaintiff in this action.  I have personal knowledge of the facts contained in this declaration, and if called as a witness, I am competent to testify to those facts.

2.     I have read the Plaintiff's Response to Defendants' First Set of Interrogatories Directed to Plaintiff.  The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3.     Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

/s/ Clifton J. Showell, Jr.
**CLIFTON J. SHOWELL, JR.**

Dated: August 24, 2006

A171

<u>**CERTIFICATE OF SERVICE**</u>

I, John M. LaRosa, being a member of the Bar of this Court, do hereby certify that on August

24, 2006, I caused two (2) copies of **PLAINTIFF'S RESPONSE TO DEFENDANTS' FIRST**

**SET OF INTERROGATORIES DIRECTED TO PLAINTIFF** and **PLAINTIFF'S RESPONSE**

**TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED**

**TO PLAINTIFF**, and this **NOTICE OF SERVICE** to be sent via U.S. mail to the following:

> Seth J. Reidenberg, Esquire
> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> sreidenberg@ycst.com

/s/ John M. LaRosa
**JOHN M. LaROSA, ESQ. (#4275)**

cc:    Mr. Clifton J. Showell, Jr.

Attorney Files/John's Files/Client Files/JLR Clients/SHOWELL/Pleadings/Response to Interrogatories

AUG 25 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CLIFTON J. SHOWELL, JR.                    :
                                           :
              Plaintiff,                    :
                                           :
       v.                                   :          CIVIL ACTION NO. 05-462 JJF
                                           :
GAMING ENTERTAINMENT                        :
(DELAWARE), L.L.C., d/b/a                    :
MIDWAY SLOTS & SIMULCAST                    :
GAMING ENTERTAINMENT,                       :
a Delaware Limited Liability Company,       :
                                           :
              Defendant.                    :

## NOTICE OF SERVICE

I, John M. LaRosa, being a member of the Bar of this Court, do hereby certify that on

August 24, 2006, I caused two (2) copies of **PLAINTIFF'S RESPONSE TO DEFENDANTS'**

**FIRST SET OF INTERROGATORIES DIRECTED TO PLAINTIFF, PLAINTIFF'S**

**RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF**

**DOCUMENTS,** and this **NOTICE OF SERVICE** to be sent via U.S. mail, postage prepaid to

the following:

> Seth J. Reidenberg, Esquire
> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899-0391

_/s/ John M. LaRosa_
**JOHN M. LaROSA, ESQUIRE**

cc:    Mr. Clifton J. Showell, Jr.

A173

**Midway Slots and Simulcast**
**Employee Disciplinary Report**

Name: <u>Georgia Kimball</u>                    Date:  March 1st, 2004

Position:  <u>Slot Attendant</u> Department:  <u>Slots</u>    Date in Position: <u>March 2003</u>

<u>Action</u>

_____ 1st Warning                              __X__ Final Warning
                                               (Authorization from HR required)
                                               (HR presence required at meeting)

_____ 2nd Warning                              _____ Suspension ___ days
                                               (HR presence required at meeting)

_____ 3rd Warning                              _____ Termination
      (HR must be present)                      (HR present at meeting)

Was this incident a violation of a company policy? [ ] Yes [X] No If yes specify what policy.

_____

_____

_____

<u>Violation</u>

Date/ Time of Violation: <u>March 1st, 2004</u>

Nature of Violation:
( ) Attendance                    ( ) Policy Violation _____

( ) Performance                   ( X ) Other_____

( ) Safety

Previous Disciplinary Action  [  ] No  [ X ] Yes  If yes list previous action and date.
Verbal:  Failure to go to the machine and verify the information on a written taxable hand
pay slip June 28, 2003. Slot Policy # 17 Payout on August 29th, 2003.

_____

_____

A174

EXHIBIT

Kimball 1
11-3-06

Confidential

Department Statement (Use additional sheet if needed)

You are being issued a **Final Written Warning** for illegally using a Slot Shift Managers pass code to over ride the IGS System when you tried to reprocess a Jackpot. Even though the Slot Shift Manager knowingly states that he gave you the pass code your actions fall under a few of Midway Slots and Simulcast Code of Conduct Policies which are mentioned below:

**Personal Integrity:** Midway Slots must conduct its business in a truthful, honest and ethical manner at all times. Midway employees are expected to carry out the company's daily functions of operation with these same principles in mind. These standards must govern our conduct when making decisions, which affect Midway Slots and simulcast.

**Accuracy of Company Records: All business records Must accurately and completely reflect the transactions of the company in accordance with all applicable requirements. No false or misleading entries will be made in the records of the company under any circumstances.**

Your unauthorized use of a Managers pass code was not only an illegal entry into the IGS System, you also entered false information into company records because it was not entered into the system by the actual pass code user.

Corrective Action Recommendations for Employee

Any further infraction of any kind will result in your immediate termination.

Employee Explanation/ Statement

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_Leana Serrell_  3/10/04                    _Buney O Pne_  3/10/04
Department Signature                         Department Director Signature

I understand that my signature below acknowledges my receipt of the Disciplinary Action. It is not intended to indicate agreement with the statement above. I also understand that I may discuss this issue with my Department Director and/or the Director of Human Resources.

_Georgia C Kimball_
Employee Signature

Confidential

A175

Original – Human Resources     Copy – Department Director     Copy – Employee

HR FORM 12/01

Confidential



**Midway Slots and Simulcast**
**Employee Disciplinary Report**



EXHIBIT
Kimball 2
11-3-06

Name: <u>Georgia Kimball</u>                    Date: March 26th, 2004

Position: <u>Slot Attendant</u> Department: <u>Slots</u>  Date in Position: <u>March 25, 2003</u>

---

### Action

____ 1st Warning

____ 2nd Warning

____ 3rd Warning
(HR must be present)

____ Final Warning
(Authorization from HR required)
(HR presence required at meeting)

____ Suspension ___ days
(HR presence required at meeting)

__X__ Termination
(HR present at meeting)

---

Was this incident a violation of a company policy? [ X ]Yes [ ]No  If yes specify what policy.
Slot Policy # 17  Jackpot Payout

_____

_____

---

### Violation

Date/ Time of Violation: <u>March 25th, 2004</u>

Nature of Violation:
( ) Attendance                    ( X ) Policy Violation _____

( ) Performance                   ( ) Other _____

( ) Safety

---

Previous Disciplinary Action  [ ] No  [ X ] Yes  If yes list previous action and date.
Verbal: Failure to go to the machine and verify the information on a written taxable hand pay slip June 28th, 2003. Slot Policy# 17 Pay out on August 29th, 2003
Final Written Warning March 1st, 2004
_____

_____

A177

Department Statement (Use additional sheet if needed)

On Thursday night March 25th, 2004 you were in the process of paying out 2 jackpot to 2 different customers and locations. One jackpot was for $360.00 and your second jackpot was $210.20. During these jackpot you paid the customer at 7-92 $360.00 instead of the $210.00 he was entitled to receive resulting a variance of $150.00.

On March 1st, 2004 you received a Final Written Warning which stated that Any further infraction of any kind will result in your immediate termination. Your actions on March 25th, 2004 leaves us with no alternative but to terminate your employment effective immediately.

Employee Explanation/ Statement

_____

_____

_____

_____

_____

_____

_____

_____

_____

Department Signature _____        _____
                                                 Department Director Signature

I understand that my signature below acknowledges my receipt of the Disciplinary Action. It is not intended to indicate agreement with the statement above. I also understand that I may discuss this issue with my Department Director and/or the Director of Human Resources.

                                        _____
                                        Employee Signature

Original – Human Resources        Copy – Department Director        Copy – Employee

HR FORM 12/01

A178

**Midway Slots and Simulcast**
**Team Member Disciplinary Report**

Name    Sabrina Jenkins                          Date    November 24, 2004

Position    Shift Supervisor    Department    Slots            Date in Position    2/13/04

| Action | |
|---|---|
| _____ 1st Counseling | _____ Final Warning (Authorization from HR required) (HR presence required at meeting) |
| _____ 2nd Counseling | _____ Suspension _____ days (HR presence required at meeting) |
| _____ 3rd Counseling (HR presence required at meeting) | **X** Termination (HR presence required at meeting) |

Was this incident a violation of a company policy? [X]Yes [ ]No  If yes specify what policy.
Meal Book Policy #8

Workplace Conduct

_____

---

Violation

Date/ Time of Violation: Approximately midnight 11/24/04

Nature of Violation:
( ) Attendance                    ( ) Policy Violation _____

(X) Performance                  ( ) Other _____

( ) Safety

---

Previous Disciplinary Action  [ ] No  [X] Yes  If yes list previous action and date.

9/27/03 – Slot Policy #12 – Key Control Policy; 10/8/03 – Slot Policy #17 – Jackpot
Payout Violation; 4/10/04 – Failure to Verify a Taxable Jackpot
3/1/04 – Final Written Warning – Code of Conduct
6/11/04 – Final Written Warning – Workplace Conduct
9/15/04 - Final Written Warning - Attendance

A179

**Department Statement (Use additional sheet if needed)**
At approximately midnight, and shortly thereafter, on Wednesday, November 24, 2004, you were observed and recorded by Surveillance engaging in inappropriate physical conduct with your subordinate, Slot Attendant Christopher Brown. The appearance of your actions on the Surveillance videotape is that you initiated the inappropriate physical contact with Mr. Brown.

In the minutes following your inappropriate touching and holding of Mr. Brown, while doing TITO imprestments with Mr. Brown, you opened numerous slot machines and did not sign the MEAL books. Notably machines 4-16, 2-8, 2-12, 2-13 and 9A-22. This is a violation of Slots Policy #8 and Internal Controls III-B-2, for which you received a written warning on June 26, 2003.

While it is not the Company's intent to unreasonably delve into the personal lives of its employees, many problems including, but not limited to, conflicts of interest, charges of favoritism, difficulties in discipline and performance assessment exist where employees engage in the type of behavior you exhibited, especially with a subordinate. Your actions on Wednesday, November 24, 2004, were unbecoming of a member of management and adversely affected the Company's business, as well as, created an exposure to the Company for future liability.

In your Final Written Warning dated June 11, 2004, you were informed that serious accusations had been brought to the attention of management that you were perceived as showing favoritism to certain employees under your direct supervision. You were advised that any violations of policy that affect your credibility or interfere with your position as a Shift Supervisor or employee of Midway Slots & Simulcast would result in disciplinary action up to and including termination.

**Corrective Action Recommendations for Employee**
You were reminded on your Final Written Warning on September 15, 2004, that the infractions for which you had received disciplinary actions were a reflection of your attitude toward your supervisors, your co-workers and your position with the Company. As a Supervisor, you are entrusted to enforce Company Policies and Procedures and to act with integrity. Yet, you violated Company Policy by not signing the MEAL books, a Policy you have disciplined others for, bringing your own integrity into question.

You were warned on September 15, 2004 that that was the last warning you would receive and that any future violation of a Company/Departmental Policy or Procedure, or complaint by a Midway employee regarding your behavior, would result in your immediate termination.

Because of your actions on November 24, 2004 you are being terminated effective immediately.


Employee Explanation/ Statement:

_____

_____

_____

_____

_____

_____

_____          ~Dennie O-Pipe~
Department Signature                      Department Director Signature

I understand that my signature below acknowledges my receipt of the Disciplinary
Action. It is not intended to indicate agreement with the statement above. I also
understand that I may discuss this issue with my Department Director and/or the Director
of Human Resources.

                                    x  _Nathaniel Caldwell_
                                       Employee Signature

Original – Human Resources     Copy – Department Director     Copy – Employee

HR FORM 12/01

**A181**

| *M.E.A.L BOOK* | *POLICY NO. 8* | *OCT. 1, 2001* |

**PURPOSE: TO ENSURE PROPER RECORD KEEPING**

**POLICY:** Record machine problems

M.E.A.L stands for Machine Entry Authorization Log

- This written record is kept in all machines for door openings and problems
- The asset, location and the start date should be written on the front of all meal books
- Who, when, what and why the machine was entered should be written inside of the meal book
- The information must be <u>neat and legible</u> with only authorized abbreviations. Please use accepted abbreviations.
- If more than one line is needed for explanation then do so
- The space for your name and related information must still be filled out completely at all times.
- If a machine is taken **"Out of Service"** <u>please</u> write in the MEAL book who authorized you to take the machine out of service and write the reason why the machine is **"Out of Service"**
- If you should complete the last space of the MEAL book, inform you Slot Shift Manager immediately so a new book can be issued
- If you find a slot machine is missing this book, inform you Slot Shift Manager immediately
- The MEAL book should be placed **SPINE UP** in a location that will not interfere with the machine operation
- If you make the last entry in the M.E.A.L. book, you must replace the old one with a new one. Filling out the front of the book with the machine number, zone & location and the beginning date.
- <u>**Whenever a new page is started you must write the ZONE and MACHINE NUMBER at the top of the page.**</u>
- <u>**M.E.A.L. books do not belong inside the hoppers. If you put the log inside of the hopper disciplinary action will be taken**</u>
- Failure to complete this information will be followed by a disciplinary action up to and including termination

| MACHINE # 1692 (asset) ZONE & STAND # 6-117 (location) | | |
|---|---|---|
| First Initial & Last name | Date | Explanation Of Entry |
| J. Doe | 1/26/01 | HJ |
| Last 4 Digits of Badge | Time | |
| 9999 | 8:05 a.m. | |

III-B-2    Access to and keys

a.  Keys to each VLT which affect the operation of the VLT, with the exception of the key(s) to the compartment housing the drop bucket and the key(s) to the area where the VLT cash storage box is located, shall be maintained in a secure place and controlled by Security.  The key(s) to the compartment housing the drop bucket and the key(s) to the area where the VLT cash storage box is located shall be controlled by the security department or the accounting department.  Vendor keys shall be maintained in a secure place and controlled by the Unit.

b.  Whenever it is required that a VLT be opened, certain information shall be recorded on a form entitled "Machine Entry Authorization Log." The information shall include, at a minimum, the date, time, purpose of opening the machine or device, and signature of authorized employee opening the machine or device. The Machine Entry Authorization Log shall be maintained in the VLT and shall be accounted for by a location number and an asset number.

c.  At various times, a M.E.A.L. book may need to be removed from an active VLT for the purpose of making a copy of a page or pages.  The Agency, the Unit and Agent employees have immediate access to the MEAL book but vendor technicians must file a M.E.A.L. Book Copy Request Form with the Unit and obtain a written confirmation prior to removal and copying of a page or pages of the book.

The following procedure shall be followed:

1)   The requestor will notify the shift manager of the request.
2)   The requestor will provide the shift manager with an approved copy of the M.E.A.L. Book Copy Request Form.
3)   The shift manager or designee will place a "Game Out of Service" card on the game during gaming hours.  For mechanical reel games, the card shall be placed inside the main glass door, covering the reels.
4)   The requestor will remove the M.E.A.L book and proceed to make the necessary copies requested.
5)   The shift manager or designee will remain at the game to prevent any customer game play during gaming hours.
6)   The M.E.A.L. book will be returned to the game as soon as possible.
7)   The requestor and the shift manager or designee will complete and sign the M.E.A.L. book and place the book back inside the VLT.
8)   The shift manager or designee will place the VLT back in service.

**A183**

| PROGRESSIVE COUNSELING / TERMINATION - MIDWAY | Policy No:  43 | Issue Date:  April 3, 1997<br>Supersedes: July 31, 1996 |
|---|---|---|

**PURPOSE:**  To establish a uniform policy and procedure for all Team Members on progressive corrective counseling and/or termination.

**REVISED DATE: April 3, 1997**

**Policy:**

It is Midway Slots & Simulcast's policy to provide a work environment which encourages excellent guest service and productivity by providing Team Members with clear performance goals; by "catching people doing things right", and by rewarding Team Members on the basis of their efforts.  However, when work performance problems develop (other than gross or deliberate violations of Company policy which are in and of themselves terminable offenses), every effort will be made to correct the problem and improve performance.  The progressive steps outlined in this policy are intended to produce positive changes and are not to punish the Team Member.

**Procedure:**

1.  The supervisor may initiate one of the following actions depending upon the circumstances surrounding the performance problems, the frequency with which it has occurred and the Team Member's work history and length of service:

    1.1 Verbal Counseling: Minor, first-time offenses.

    1.2 Written Counseling Notice:  Repeat problems where the Team Member has received previous verbal warnings; problems of a more serious nature.

    1.3 Second Written Notice/Suspension:  Continued repetition of the problems despite prior verbal and written warnings.  Three (3) day suspension.

    1.4 Termination:  Progressive efforts to correct the problem have failed and the Team Member cannot or will not meet the required job standards; or the Team Member has engaged in gross misconduct or violation of company or departmental policy.

2.  Before taking any corrective action, the supervisor should investigate the facts surrounding the case.  This should always include interviewing the Team Member to ascertain his/her version of what happened and attempt to obtain witness statements if possible.

    2.1 For a suspected infraction of a gross misconduct, the Team Member may be immediately sent home and suspended from work pending a full and complete investigation of the facts (which must be completed within three (3) days).

43

A184



3. All corrective measures should be reviewed with the employee in private, and with another supervisor present to act as a witness where possible. The outcome of the discussion will be carefully documented for later reference and follow-up.

4. Verbal Counselings

4.1 In most instances, Team Members develop performance problems unknowingly rather than deliberately. Several reasons for this include unclear objectives, inadequate training, inconsistent enforcement of the rules, lack of feedback, etc. By calling the Team Member's attention to the problem and explaining what is expected, most problems can easily be cleared up. For verbal counselings to be effective the supervisor should:

a. Discuss the problem immediately before a minor incident becomes habitual.

b. Be specific, describing the unacceptable behavior without attacking the person.

c. Get feed back from the Team Player.

d. Redefine performance objectives so the Team Member knows what will be expected in the future.

e. End the meeting on a positive note.

f. Encourage the Team Member by offering positive reinforcement once the problem has been corrected.

4.2 After giving a verbal counseling, the discussion will be documented and signed by the supervisor and the Team Member (and the witness if present) on the Team member History sheet, which is kept by the supervisor.

5. Written Counseling Notices

5.1 The Director of Human Resources must be present at the issuance of all written disciplinary actions.

5.2 Written counseling notices will be issued for more serious violations or for continued violations of Company or departmental rules.

**A185**

Confidential

**43.1**

5.3 If, following an investigation, it is determined that a Team Member will be given a written counseling notice, the supervisor will fill out a Disciplinary Action form and include the following information:

    a.  Specific details surrounding the violation (i.e., date and nature of the violation).

    b.  State why the behavior is unacceptable; how it adversely affects the operations and/or fellow Team Members/department.

    c.  Dates of precious verbal or written counseling given to the Team Member.

    d.  Corrective action required, as well as consequences for continued violations.

5.4 Written counseling notices given must be reviewed by the Department Director and the Human Resource Director prior to being given to the Team Member.

5.5 Once the Written Warning form has been reviewed with the Team Member, he/she will be asked to sign the notice acknowledging that the matter was discussed and offered the opportunity to give written rebuttal on the warning notice.

    a.  Signing the notice will not be considered an admission of guilt by the Team Member; rather, it merely establishes that the discussion took place.

    b.  Refusal to sign will be in violation of the Required Acknowledgment Policy.

5.6 Team Members may be terminated for violation of a company gross misconduct (which are listed in the Team Member Handbook) without previous verbal or written warnings.

    a.  No Team member may be discharged on the spot. Should a Team Member be suspected of violation of a gross misconduct, the supervisor/manager may suspend the Team Member pending investigation.

    b.  Director of Human Resources is to be notified immediately.

    c.  The investigation is to include statements from the Team Member and each witness and any pertinent documents. Guidance for performing the investigation may be secured through the H.R. Director.

    d.  The length of the investigation should not exceed three (3) days.

**43.2**

Confidential

5.7 A Team Member will be subject to termination upon receiving three written warnings (1st written, 2nd written/suspension, 3rd written/termination) within a twelve (12) month period. Warning do not need to be for the same offense to warrant consideration for termination.

5.8 **PRIOR TO TERMINATING A TEAM MEMBER, THE SUPERVISOR MUST OBTAIN PROPER APPROVALS** from the Department Director and Human Resources Director:

   a. Before a Team Member may be informed of the termination, a Payroll Status Authorization (PSA) should be filled out and approved. Reasons for the termination and all supporting documentation should be attached to the Payroll Status Authorization form (PSA).

   b. The supervisor should inform the Team Member of the reason for the discharge. The supervisor should make every attempt to obtain gaming license and any company property the Team Member has been issued, such as keys, tools, name tag and I.D. badge and bring the individual and equipment to the Human Resource Department to complete an exit interview.

   c. Any supervisor who is unable to recover company property from a terminated Team Member should notify the Human Resource Department immediately so the items can be secured when the Team Member comes for the final paycheck.

A187

Confidential

**43.3**

Confidential

# FINANCE EXCEPTION REPORT

**TO:**    BEVERLY POPE

**FROM: DEREK BOWMAN**
| | |
|---|---|
| **CC:** | **JAY LEWIS** |
| **CC:** | **ELAINE PETRUCCI** |
| **CC:** | **MARIA MARINO** |
| **CC:** | **WANDA TRICE** |

**DATE SENT** _____ 4/24/03

**DATE OF INCIDENT** _____ 4/23/03

|   |   |   |   |
|---|---|---|---|
| _____ | COUNT TEAM | _____ | MARKETING |
| _____ | MAIN CAGE | _____ | SECURITY |
| _____ | AUX. CAGE | _____ | BUS MARKETING |
| _____ | SURVEILLANCE | _____ | FOOD & BEVERAGE |
| X | SLOTS | _____ | SIMULCAST |

## DESCRIPTION OF EXCEPTION

_____ PAPERWORK NOT RECEIVED BY OFFICE

_____ ADDITION ERROR

_____ MISSING FIGURES

_____ MISSING SIGNATURE

_____ MISSING PAPER WORK

_____ FIGURE JOURNALIZED INCORRECTLY

_____ MISSING INFORMATION

_____ CLOSING PAPERWORK NOT DONE
CORRECTLY

_____ CASH SHORTAGE/OVERAGE

_____ WRITING OVER/WHITE-OUT

_____ PROCEDURES NOT FOLLOWED

_____ YELLOW SLIPS FOR JPT/FILLS MISSING

_____ COUPON VARIANCES

_____ COUPONS NOT VOIDED

_____ COUPONS NOT SORTED

**X** MISCELLANEOUS

S/S Showell accepted incorrect second ID for taxable, resulting in an incorrect W2G
being issued to patron.

A189



*Spoke to
on this*

**MIDWAY SLOTS**

SURVEILLANCE DEPARTMENT

## EMPLOYEE PROCEDURAL VIOLATION

DATE ___8/20/03___                                TAPE # _____

NAME ___Cliff Showell___          EMPLOYEE # _____

DEPT. ___Slots___

ON ___8/19/03___ AT ___2149___ HOURS, AT ___See - TSN___

THE ABOVE EMPLOYEE:

Failed to notify Surveillance that S/A Instella
Taylor had left money at TSN machine after
processing jackpot for $53⁵⁰ machine #1059.

_Beverly Address_

SURV. INIT.                    Director of Surveillance                    SSUR (

SURV/MSS-EMP PROCEDURAL     WHITE - Casino Operations / Casino Controller / Slot Operations / Security     YELLOW - CCTV

Safeguard Business Systems LITHO USA
Form No. 852/L01CS000599  6/02  0D

A190



SURVEILLANCE DEPARTMENT

## EMPLOYEE PROCEDURAL VIOLATION

DATE _9/4/03_

TAPE # _B-592_

NAME _Cliff Showell_

EMPLOYEE # _Clifford Showell 0903_

DEPT. _Slots_

ON _9/3/03_ AT _____ HOURS, AT _Radio_

THE ABOVE EMPLOYEE:

Advised slot attendant to take $2.00 in change when TDN failed to pay correct amount of handpay. TDN only processed $90.00 on a $92.00 hand pay.

_Beverly Address_

SURV. MM

Director of Surveillance

SSUR 0

SURV-MS8-EMP PROCEDURAL

WHITE - Casino Operations / Casino Controller / Slot Operations / Security

YELLOW - CCTV

Safeguard Business Systems LITHO USA
Form No. 852/L01CS000599 6/02 00t

**A191**

CLIFF -                    _Clifford Marshall_ cc 3

I GUESS YOU WERE JUST TRYING TO GIVE CUST
SERVICE AND GET THE NAVOPAY OUT ON THE
FLOOR QUICKLY, BUT YOU JUST CAN'T DO THIS

IF THE TDN GIVES OUT THE WRONG MONEY WE
MUST GO TO THE TDN - CHECK IT - TURN THE
MONEY IN AND OVERRIDE THE TRANSACTION -
NO MATTER HOW BUSY THE FLOOR IS -

I AM NOT WRITING THIS UP, BUT PLEASE SIGN
THE TOP OF THE EPU SO THEY KNOW
WE DISCUSSED IT.

                    THANKS
                    DARYL

**SURVEILLANCE DEPARTMENT**

**MIDWAY SLOTS**

**EMPLOYEE PROCEDURAL VIOLATION**

DATE _9/17/03_                                    TAPE # _____

NAME _Cliff Schonell_              EMPLOYEE # _____

DEPT. _Slots_

ON _9/17/03_    AT _0304_    HOURS, AT _Main Cage_

THE ABOVE EMPLOYEE: Failed to properly verify written request with computer generated slip. Cliff signed slip for a $700.00 hopper fill instead of a $700.00 Jackpot.

This transaction was stopped by surveillance and curricle

SURV UNIT                          Director of Surveillance          _Beverly Address_

                                                                    SSUR 0:

SURV-MSS-EMP PROCEDURAL       WHITE - Casino Operations / Casino Controller / Slot Operations / Security       YELLOW - CCTV

Safeguard Business Systems LITHO USA
Form No. 652/L01CS000599  6/02  ODG-

A193



O|K Void Processed as a fill instead of jackpot

Midway Slots Fill Receipt

Fill Amount:
Written Amt:        $700.00
SEVEN HUNDRED AND 00/100 DOLLARS

Printer/Trans ID: 07-2541
Date/Time: 09/17/2003 02:04:59

Machine 652  Loc 4i 88-25

Dispatch Type:
Denomination: DOLLAR
Floor Person: SHOWELL
Dispatch Person: SCHAEFER
Signatures:
Cashier

Slot                                    ID# 147

Verifier: C Showell            ID#
                                         ID# 0303

Security:
                                         ID#

White –TDN / Drop Box / Cashier
Yellow – Accounting

A194

**Midway Slots and Simulcast**
**Employee Disciplinary Report**

Name: <u>Cliff Showell</u>                Date: <u>October 8, 2003</u>

Position: <u>Slot Shift Manager</u>  Department: <u>Slots</u>  Date in Position:

---

Action

<u>X</u> 1st Warning        ____ Final Warning
                                                      (Authorization from HR required)
                                                      (HR presence required at meeting)

____ 2nd Warning        ____ Suspension ___ days
                                                      (HR presence required at meeting)

____ 3rd Warning        ____ Termination
       (HR must be present)                                 (HR present at meeting)

---

Was this incident a violation of a company policy? [ X ]Yes [  ]No  If yes specify what policy.
Slot Policy # 17  Jackpot Payout _____

_____

_____

---

Violation

Date/ Time of Violation: <u>September 25, 2003</u>

Nature of Violation:
( ) Attendance            ( X ) Policy Violation _____

( ) Performance           ( ) Other _____

( ) Safety

---

Previous Disciplinary Action  [ X ] No  [  ] Yes  If yes list previous action and date.

_____

_____

_____

A195

Department Statement (Use additional sheet if needed)

On September 25, 2003, at 17:48 hours, you were called to a Bally's Betty Boop 25 cent game at location 1-106 to verify an override of 3 – 7's with 3 coins in that should of paid 1000 coins or $250.00. The hand written slip was written for $225.00 and you signed both the hand written jackpot request slip and the generated slip for $225.00. This caused a short pay of $25.00 to the customer. The customer notified us by e-mail and after the investigation we e-mailed the customer back to return to Midway for the corrected amount.

Any further infraction of Company/Departmental Policy and Procedures will lead to progressive disciplinary action.


Corrective Action Recommendations for Employee


Employee Explanation/ Statement

_____
_____
_____
_____
_____
_____
_____
_____
_____


_____          _____
Department Signature                              Department Director Signature

I understand that my signature below acknowledges my receipt of the Disciplinary Action. It is not intended to indicate agreement with the statement above. I also understand that I may discuss this issue with my Department Director and/or the Director of Human Resources.

_____
Employee Signature

Original – Human Resources        Copy – Department Director        Copy – Employee


HR FORM 12/01

A196



\* Midway Slots Jackpot Receipt

Jackpot Amount: $225.00
Written Amt:
TWO HUNDRED TWENTY FIVE AND

Jackpot Combo:

Printer/Trans ID: 07-3694
Date/Time: 09/25/2003 17:48:00
Mac Ir: 2374 Loc 11.00-06

Dispatch Type: ## OVERRIDE ##
Denomination: QUARTER
Floor Person: SHOWELL
Dispatch Person: BUTRICA
Signatures:
Cashier
Slots                          IDH
Verifier:                      IDH 0903

Security:                      IDH

White - TIN / Drop Box / Cashier
Yellow - Accounting

185



REQUEST FOR JACKPOT PAYOUT

DATE   TIME   AM/PM SHIFT   □ D  □ S  □ G

NAME                SS#

ADDRESS

CITY        STATE        ZIP CODE

LOC. NO.          MACHINE NO. 2374        LINE  3C-1
DENOMINATION  □ .05  □ .25  □ .50  □ 1.00  □ 5.00  □ 25.00  □ 100.J

COMBINATION

AMOUNT  225.00

WRITTEN AMOUNT

SLOT SERVICE REPRESENTATIVE        EMP. NO.

A197

## FINANCE EXCEPTION REPORT

TO:    BEVERLY POPE

FROM: DEREK BOWMAN
CC:    JAY LEWIS
CC:    SCOTT SAXON
CC:    MARIA MARINO

DATE SENT                11/1/03

DATE OF INCIDENT         10/31/03

|   | COUNT TEAM |   | MARKETING |
|---|---|---|---|
|   | MAIN CAGE |   | SECURITY |
|   | AUX. CAGE |   | BUS MARKETING |
|   | SURVEILLANCE |   | FOOD & BEVERAGE |
| X | SLOTS |   | SIMULCAST |

### DESCRIPTION OF EXCEPTION

_____ PAPERWORK NOT RECEIVED BY OFFICE

_____ ADDITION ERROR

_____ MISSING FIGURES

_____ MISSING SIGNATURE

_____ MISSING PAPER WORK

_____ FIGURE JOURNALIZED INCORRECTLY

_____ MISSING INFORMATION

_____ CLOSING PAPERWORK NOT DONE
      CORRECTLY

_____ CASH SHORTAGE/OVERAGE

_____ WRITING OVER/WHITE-OUT

_____ PROCEDURES NOT FOLLOWED

_____ YELLOW SLIPS FOR JPT/FILLS MISSING

_____ COUPON VARIANCES

_____ COUPONS NOT VOIDED

_____ COUPONS NOT SORTED

  X   MISCELLANEOUS          S/S Showell did not correctly verify patron's social security # for taxable jackpot.

A198

# EMPLOYEE PROCEDURAL VIOLATION EXPLANATION

## DUE WITHIN 72 HOURS OF RECEIPT OF

## FINANCE EXCEPTION REPORT

**WRITTEN EXPLANATION:** _____

_____

_____

_____

_____

_____

**SUGGESTED NEW POLICY PROCEDURE:** _____

_____

_____

_____

**DISCIPLINARY ACTION TAKEN :** *VERBAL*

_____

_____

_____

_____

_____

_____          _11/4/03_
**SUPERVISOR'S SIGNATURE**          **RESPONSE DATE**

PLEASE RETURN THIS EXCEPTION REPORT TO WANDA TRICE,  ACCOUNTING

**A199**



MDDL
K620676143694
XDate 9-6-04
DOB
9-6-39
(convels 093)

**REQUEST FOR JACKPOT PAYOUT**

No totes

| DATE | TIME | AM | SHIFT | | |
|------|------|-----|-------|---|---|
| 10/31 | 530 | PM | ☐ D / ☐ S | ☐ G | |

NAME
Panagiotis P. Kaouris    SS# 216560302

ADDRESS
9003 Chesapeake Dr

CITY  Ocean City  STATE M.D  ZIP CODE 21842

LOC. NO. 151    MACHINE NO. 3013

DENOMINATION
☐ .05  ☐ .25  ☐ .50  ☑ 1.00  ☐ 5.00  ☐ 25.00  ☐ 100.00

COMBINATION
WLWL WL    LINE 1-3

AMOUNT
1200 00

WRITTEN AMOUNT
One thousand two hundred

SLOT SERVICE REPRESENTATIVE    EMP. NO.
F. Flood    5827



A200

*NOTAxes OuT*

## Midway Slots Jackpot Receipt

Jackpot Amount: $1,200.00
Written Amt:
ONE THOUSAND TWO HUNDRED AND

Jackpot Combo:

---
Printer/Trans ID: 07-6271
Date/Time: 10/31/2003 17:42:04

Machine 3013 Loc 11 07-51

Dispatch Type:
Denomination: DOLLAR
Floor Person: SHOWELL
Dispatch Person: TATE
Signatures:
Cashier:

_____ ID# 1495

Slots: C. Showell ID# 0903

Verifier:

_____ ID# _____

Security:

_____ ID# _____

White - TDN / Drop Box / Cashier
Yellow - Accounting

---

☐ CORRECTED    D.O.B. 9/6/38

| | |
|---|---|
| OMB No. 1545-0238 | **2003** |

**Form W-2G**
**Certain Gambling Winnings**

For Privacy Act and Paperwork Reduction Act Notice, see the 2003 General Instructions for Forms 1099, 1098, 5498, and W-2G.

File with Form 1096.

**Copy A**
For Internal Revenue Service Center

| 1 Gross winnings $1,200.00 | 2 Federal income tax withheld 0 |
|---|---|
| 3 Type of wager $1,000 | 4 Date won 10/31/03 |
| 5 Transaction 3013 | 6 Race |
| 7 Winnings from identical wagers | 8 Cashier |
| 9 Winner's taxpayer identification no. 358-16-56-0302 | 10 Window M. Case |
| 11 First I.D. ID PC | 12 Second I.D. KG0676-43264 |
| 13 State/Payer's state identification no. | 14 State income tax withheld |
| | Date ▶ 10/31/03 |

PAYER'S name
HARRINGTON RACEWAY, INC.    D/B/A MIDWAY SLOTS
Street address
P.O. BOX 310
City, state, and ZIP code
HARRINGTON, DE 19952
Federal identification number     Telephone number
51-0106130                        1-888-88-SLOTS

3232

WINNER'S name
Panagiotis D. Knouris
Street address (including apt. no.)
9003 Chesapeak Bear
City, state, and ZIP code
Ocean City MD 21842

Under penalties of perjury, I declare that, to the best of my knowledge and belief, the name, address, and taxpayer identification number that I have furnished correctly identify me as the recipient of this payment and any payments from identical wagers, and that no other person is entitled to any part of these payments.

Signature ▶                         Date ▶ 10/31/03

PRINTED IN U.S.A.

Form W-2G

A201

SURVEILLANCE DEPARTMENT

# EMPLOYEE PROCEDURAL VIOLATION

DATE _____ 12/3/03 _____    TAPE # _____

NAME _____ Cliff Showell _____    EMPLOYEE # _____

DEPT. _____ Slots _____

ON _____ 12/5/03 _____ AT _____ 1811 _____ HOURS, AT ____ m/c ____

THE ABOVE EMPLOYEE:

Failed to properly verify taxable jackpot of $1250⁰⁰
Cliff only verified $1300⁰⁰ jackpot

Mistake was caught and patron was paid correct
amount.

_____    Beverly Address

SUPV. INIT                                Director of Surveillance

WHITE - Casino Operations / Casino Controller / Slot Operations / Security    YELLOW - CCTV

SURV-MSS-EMP PROCEDURAL                                    SSUR 01.

Safeguard Business Systems LITHO USA
Form No. 852/L01CS000599  10/03  0DG-2

A202

Confidential

To:    **Cliff Showell**          **Slot Shift Manager**

From:  **Daryl Nashold**         **Slot/Technical Manager**

Date:  **December 4, 2003**

cc: to File
cc: Beverly Pope, Slot Director


You are receiving a verbal counseling for failing to verify your money from the generated slip.

On December 2, 2003 at 18:11 hours at the main cage, you failed to properly verify a taxable jackpot of $1250.00 with your generated slip. When you went to the customer to pay them, you only had $1200.00. The mistake was caught at the game and the patron was paid the correct amount.

Any further infraction of Company/Departmental Policies and Procedures will lead to progressive disciplinary action.

_(signature)_ _____          12/4/03
Team Member Acknowledgment                     Date:

_(signature)_ _____          12/5/0?
Shift Manager's Signature                       Date:

_____

A203

Confidential

To:       **Cliff Showell**       **Slot Shift Manager**

From:     **Daryl Nashold**      **Slot/Tech Manager**

Date:     **November 1, 2003**

RE:  Memo to File – Slip Verification

This is a verbal counseling for failure to properly verify identification for a taxable jackpot.

On October 31, 2003 at 17:42 hours, at location 1-151, you verified a taxable jackpot and used the wrong Blue Cross Card for verification of the S.S. number. The card used belonged to the patron's wife. This caused the W-2G to have the wrong information on the paperwork.

It is important to always verify all information on the slip before you sign the slip.

Any further infraction of Company/Departmental Policies and Procedures will lead to progressive disciplinary action.

_____          Date: 11/1/03
Team Member Acknowledgment

_____          Date: 11/4/0
Shift Manager's Signature

A204

DRIVER'S LICENSE

PANAGIOTIS DIMITRIOS KAOURIS
9003 CHESAPEAKE DR
OCEAN CITY          MD 21842

**CareFirst** 410-654-9125
BlueCross BlueShield 800-806-5558

SEG0 PPN 90/70%          H&W 5117
B.E.F.G
DRUG $15/20/30 PCD          H&W 5117

EFF 07/01/03
XWL216560302
KAOURIS CHRISTINA P

---

DATE 10/31    TIME $30.    AM/PM SHIFT □ D □ S □ G    No Taxes

NAME Panagiotis P. Kaouris    SS# 216560302

ADDRESS 9003 Chesapeake Dr

CITY Ocean City    STATE MD    ZIP CODE 21842

LOC. NO. 1151    MACHINE NO. 3013

DENOMINATION □ .05 □ .25 □ .50 □ 1.00 □ 5.00 □ 25.00 □ 100.00

COMBINATION WLWL WL    LINE 1-3

AMOUNT 1200 00

WRITTEN AMOUNT One thousand two thousand

SLOT SERVICE REPRESENTATIVE    EMP. NO.
J Cocad 3827

---

3232
PAYER'S name
HARRINGTON RACEWAY, INC.
Street address          D/B/A MIDWAY SLOTS
P.O. BOX 310
City, state, and ZIP code
HARRINGTON, DE 19952
Federal identification number    Telephone number
51-0106130    1-888-88-SLOTS

WINNER'S name
Panagiotis D. Kaouris
Street address (including apt. no.)
9003 Chesapeake Dr
City, state, and ZIP code
Ocean City MD 21842

Under penalties of perjury, I declare that, to the best of my knowledge and belief, the name, address, and taxpayer identification number that I have furnished correctly identify me as the recipient of this payment and any payments from identical wagers, and that no other person is entitled to any part of these payments.

Signature ▶    Date ▶ 10/31/03

Form W-2G

☐ CORRECTED    D.O.B 9/6/38

1 Gross winnings $1200 00
2 Federal income tax withheld 0
3 Type of wager SLOTS
4 Date won 10/31 03
5 Transaction 3013
6 Race
7 Winnings from identical wagers
8 Cashier WEX
9 Winner's taxpayer identification no. SS 216 56 0302
10 Window M. Cacg
11 First I.D. MD PC K-620-676-143-264
12 Second I.D.
13 State/Payer's state identification no.
14 State income tax withheld

OMB No. 1545-0238
2003
Form W-2G
Certain Gambling Winnings

For Privacy Act and Paperwork Reduction Act Notice, see the 2003 General Instructions for Forms 1099, 1098, 5498, and W-2G.

File with Form 1096.
Copy A
For Internal Revenue Service Center
Department of the Treasury - Internal Revenue Service

FORM 213    PRINTED IN USA

---

NO Taxes Out

Midway Slots Jackpot Receipt

Jackpot Amount: $1,200.00
Written Amt:
ONE THOUSAND TWO HUNDRED AND

Jackpot Combo:

Printer/Trans ID: 07-6271
Date/Time: 10/31/2003 17:42:04
Machine 3013 Loc 11 07-51

Dispatch Type:
Denomination: DOLLAR
Floor Person: SHOWELL
Dispatch Person: TATE
Signatures:
Cashier:

Slots: C. Showell 0903    IDH
Verifier:    IDH
Security:    IDH

White - TDH / Drop Box / Cashier
Yellow - Accounting

A205

**Midway Slots and Simulcast**
**Employee Disciplinary Report**

Name: <u>Clifford Showell</u>          Date: <u>January 13, 2004</u>

Position: <u>Shift Manager</u>    Department: <u>Slots</u>          Date in Position:

---

<u>Action</u>

____ 1st Warning

__X__ Final Warning
(Authorization from HR required)
(HR presence required at meeting)

____ 2nd Warning

____ Suspension ____ days
(HR presence required at meeting)

____ 3rd Warning
(HR must be present)

____ Termination
(HR present at meeting)

---

Was this incident a violation of a company policy? [ X ] Yes [    ] No  If yes specify what policy.
H. R. P. & P. # 11 Attendance

_____

_____

---

<u>Violation</u>

Date/ Time of Violation: <u>January 11, 2004</u>

Nature of Violation:
(X ) Attendance                    ( ) Policy Violation _____,

( ) Performance                    ( ) Other _____

( ) Safety

---

Previous Disciplinary Action   [ X ] No   [    ] Yes  If yes list previous action and date.

_____

_____



EXHIBIT
Showell 14

A206

Confidential

Department Statement (Use additional sheet if needed)

There was a mandatory meeting of all Slot Shift Managers and Lead Attendants on Sunday, January 11, 2004, at 11:15 a.m. in the Conference Room.

All Managers received a Memo in their mailboxes telling of this meeting on Tuesday, January 6, 2004 and one copy was taped to the monitor screen of your computer. You worked every night from Wednesday, January 7, 2004 to Saturday, January 10, 2004.

You are receiving a final written warning by not attending this mandatory meeting or following the proper call out procedure. You are now in violation of Policy # 11 – Attendance – Part 2. – Section 2.4 B - No Call – No Show. A No Call – No Show – after the 90 -day orientation period will result in a final written warning.

Please note that under our new Attendance Policy that started January 1, 2004, you had an unscheduled absence on January 6, 2004 and one on the meeting day of January 11, 2004. This makes two unscheduled absences. Three unscheduled absences are allowable in a 12 – month "rolling calendar". A fourth unscheduled absence will result in a written disciplinary action.

Any further infractions of Company Policy and Procedures will lead to more severe disciplinary actions.

Corrective Action Recommendations for Employee

Employee Explanation/ Statement

_____
_____
_____
_____
_____
_____
_____
_____
_____

_____          *Benny D. Pope* 1/14/04
Department Signature                       Department Director Signature

I understand that my signature below acknowledges my receipt of the Disciplinary Action. It is not intended to indicate agreement with the statement above. I also

A207

Confidential

understand that I may discuss this issue with my Department Director and/or the Director of Human Resources.

_____
Employee Signature

Original – Human Resources        Copy – Department Director        Copy – Employee

HR FORM 12/01

Employee Refused to Sign 1/14/04

A208

# Memorandum

**To:**    Clifton Showell

        Lead Floor Attendant

**CC:**    Mike Vautrin

**From:**  Toni Gillis

**Date:**  January 12, 2000

**Re:**    Receipt of Policies & Procedures Manual

---

I acknowledge the receipt of the Midway Slots & Simulcast Policies & Procedures Manual and agree to comply with all policies and procedures while employed by Midway Slots & Simulcast. I will enforce these policies and procedures with all Team Members under my supervision and further agree to educate all Team Members under my supervision of all policies and procedures, as well as any changes thereto, specified within this manual. I understand my responsibility to maintain this Policies & Procedures manual in an up to date fashion.

I understand that the Midway Slots & Simulcast Policies & Procedures Manual is the property of Midway Slots & Simulcast and is not permitted to be removed from the premises. I will return the Policies & Procedures Manual upon conclusion of my employment with Midway Slots & Simulcast.


*Clifton Showell*

Lead Floor Attendant


*Signature of Witness*

EXHIBIT
Showell 1
11-2-06

1

**A209**

Confidential

## EMPLOYEE ACKNOWLEDGMENT

I acknowledge that I attended a Harassment Awareness Seminar on the date below. I also acknowledge that I understand the Company's policy against harassment and intend to abide by it.

*Clifton James Showell JR*

EMPLOYEE NAME (PRINT)

*Clifton James Showell Jr*                *6-7-00*

EMPLOYEE SIGNATURE                DATE



EXHIBIT

Showell 3
11-2-06



## ACKNOWLEDGMENT

I have received my copy of the Midway Slots & Simulcast Team Member Handbook, which outlines the policies, practices, and the benefits guidelines of the Company, and I have read and fully understand the information contained in the Handbook.

Since the information in this Handbook is necessarily subject to change as situations warrant, it is understood that changes in the Handbook may supersede, revise or eliminate one or more of the policies in this Handbook. These changes will be communicated to me by my supervisor or through official notices.    I accept responsibility for keeping informed of these changes.

Signature:      _Clifton J Showell Jr_

Name:          _Clifton J Showell JR_

Department:   _Slots Attendent_

Date Returned:   _7-17-98_



EXHIBIT

_Showell 2_
_11-2-06  CR_

A211



**1 (888) 88SLOTS**

# Policy
# &
# Procedure
# Education
# Booklet



EXHIBIT

Showell 4
11-2-06

A212

In accordance with applicable law and regulation, it is the policy of Midway Slots and Simulcast to provide equal opportunity to all Team Members and applicants for employment without regard to race, color, sex, age, religion, national origin, physical or mental handicap, status as a disabled veteran or veteran of the Vietnam era or sexual orientation. Midway Slots and Simulcast ensures that promotion decisions are in accord with principles of equal employment opportunity by imposing only valid requirements for promotional opportunities; and ensures that all personnel policies related to compensation, benefits, transfer, layoff, in-company sponsored training and, social and recreational programs are administered.

In accordance with the State of Delaware's "Employment at-will" provision, employment with Midway Slots & Simulcast is "at the will" of the organization and the employee. There is no employment contract nor is there any commitment that employment will be for a specific period of time. Employees may resign from Midway at any time, for any reason, and may be terminated by Midway at any time, for any reason and, with or without cause.

Midway Slots & Simulcast reserves the right to end the employment relationship or rescind the offer of employment for unsatisfactory employment references, failure to provide proof of authorization to work in the United States, failure to submit to and pass Company required drug tests, providing false information on company documents, failure to disclose any criminal background or failing to successfully complete the criminal background investigation as deemed by the Video Lottery Enforcement Unit of the Delaware State Police.

This Policy & Procedure Education Booklet is provided by Midway Slots & Simulcast as a general guide and should not to be misconstrued as being all-inclusive.

# TEAM MEMBER BILL OF RIGHTS

Midway Slots and Simulcast recognizes and accepts the responsibility to provide the best possible work environment. It is our purpose to create and foster a productive and professional experience for all Team Members.

## ALL TEAM MEMBERS HAVE THE RIGHT TO:

1. Respect, courteous, impartial and fair treatment.

2. Consistent application of published rules/regulations/policies and procedures.

3. Fair and competitive wages and benefits.

4. A clean and safe environment.

5. Timely information concerning policies and procedures that affect our work lives.

6. A chance to be heard and get timely answers to questions and concerns, with access to all levels of management.

7. The necessary training and guidance to perform our duties with confidence.

8. Objective and timely feedback concerning performance, so that mistakes can be corrected and achievement can be recognized.

9. Consideration for advancement into positions for which one qualifies.

These goals are for the mutual benefit of all Team Members to provide each with a framework for our continuing commitment to creating an enjoyable work environment here at Midway Slots & Simulcast.

A214

# OUR COMPLIANCE RESPONSIBILITIES

A215

## NO HARASSMENT POLICY – H.R. POLICY # 41

Midway Slots and Simulcast strongly disapproves of any individual engaging in harassment of any kind. Harassment is defined as conduct of a sexual nature or based on color, race, religion, national origin, handicap, sex, age or other protected classification, for which submission is made a term and condition of employment or the basis for employment decision, which has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. This prohibition covers verbal, visual, as well as physical harassment.

Harassment may take different forms, and may involve, but is not limited to, visual displays, suggestive remarks or jokes, gestures, sexual demands, propositions, or unwanted physical contact. Whatever form it takes, Midway Slots and Simulcast will not permit any employee to illegally harass others with whom he/she has business interactions, including but not limited to other employees, visitors and vendors, or permit any outsider to harass its employees. This is true, not only in the workplace, but during business trips and business-related social events. All employees, supervisors and managers must comply with this policy and take appropriate measures to ensure that such conduct does not occur. Violations of this policy may result in disciplinary action up to and including termination or other appropriate remedial action.

1. Any Team Member who believes they have been subjected to harassment of any nature should do as follows:

1.1  Notify their immediate supervisor and/or the Director of Human Resources. However, under no circumstances must an employee report the harassment to an individual who he or she believes is responsible for the harassment.

1.2. Complete a statement detailing the incident.

1.3. Allow five (5) days following statement for a decision of findings. The Company will promptly investigate the complaint, and the investigation will, to the maximum extent feasible, remain confidential, on a strict need-to-know basis. However, investigation of such complaints may require disclosure to the accused individual and to other witnesses in order to gather pertinent facts.

2. Corrective action will be initiated on any Team Member found to have harassed another Team Member. The corrective action may vary to match the severity of the offense. Such discipline includes, but is not limited to, training, reassignment, demotion, compensation adjustment, or disciplinary action up to and including termination.

3. Managers who become aware of harassment are obligated by law to take prompt and appropriate action.

A216

# DELAWARE VIDEO LOTTERY

As you know, the State of Delaware and the Delaware Lottery, through its regulatory agency, the Delaware Video Lottery Enforcement Unit of the Delaware State Police, requires that all Team Members of Video Lottery Operations complete an Employee Information Form.

A promotion, a transfer or a change in responsibility of duties may require non-fingerprinted Team Members be fingerprinted and possibly complete an additional Employee Information Form at the discretion of the VLEU.

# DRUG FREE WORK PLACE – H. R. POLICY #35

Midway Slots & Simulcast believes in providing all Team Members with a safe and secure workplace. To help insure this philosophy, Team Members are not permitted to consume alcohol while on or off duty in the Slots facility, Simulcast, or other venues in the immediate proximity of Midway Slots & Simulcast.

1. All Team Members are subject to random drug screening.
     1.1 Periodically, at the discretion of the Dir., H.R., Team Members will be randomly selected.
     1.2 Random selection is performed by a random drawing of social security numbers.
     1.3 Refusal to submit to random drug screening at point of direction will result in termination.
2. Reasonable suspicion will be cause for immediate drug and alcohol screening.
     2.1 Reasonable suspicion is defined as follows:
          a.  Inappropriate behavior or conduct
          b.  Team Member involved in an accident while on duty resulting in personal injury or property damage.
     2.2 Any manager or supervisor having reasonable suspicion should consult with a second manager/supervisor in determining whether reasonable suspicion exists.
     2.3 A second supervisor should agree reasonable suspicion or cause exists.
     2.4 An observation/incident report should be completed once reasonable suspicion has been determined.
3. Any positive screening will result in immediate termination.
4. Screening results will be kept confidential.
     4.1  Initial results will be given to the Vice President/General Manager (or designated party) by SS#.
     4.2 Human Resources will keep pertinent information in locked files.
5. Refusal and/or failure submit to a drug and/or alcohol screen as instructed will result in immediate termination.

5

A217

## GAMBLING

Team Members are not permitted to play the Slot machines at Midway Slots & Simulcast, but may game at our competitors. Team Members not on duty are permitted to utilize the Mutuels of our Simulcast area at the permission of their Directors.

Team Members must remember that they are still representatives of the company even when not on duty and must behave in a responsible manner. Illegal, immoral or indecent conduct will be considered as a serious misconduct and require immediate discharge.

Team Members are <u>not</u> permitted to participate in <u>any other type of gambling activity</u> while on Company premises. This includes sports polls, sports betting, Baseball leagues, lotteries and card games.

## MOONLIGHTING

Team Members are permitted to work for other companies while employed by Midway Slots & Simulcast provided:

- The other Employer is **not** in the Video Lottery and/or related business in direct competition with Midway Slots & Simulcast.
- The Team Member promptly informs his/her Supervisor of the other employment.
- The other employment does not interfere with the Team Member's ability to satisfactorily perform his/her job with the Company.

A218

# OFF DUTY CODE OF CONDUCT

The policy of Midway Slots & Simulcast is to inform Team Members of the obligation to represent and support the organization in an exemplary manner at all times.

1. The off-duty conduct of Team Members may, under certain circumstances, reflect adversely on Midway Slots & Simulcast, as well as, pose risks to an employee's gaming license or registration.

2. All Team Members must conduct themselves in a manner that does not reflect a poor image, embarrass or negatively impact them or Midway Slots & Simulcast.

3. Illegal, immoral, indecent or criminal conduct, when off-duty, whether on-premises or off-premises, which adversely affects the Company, or the Team Member's own credibility to carry out their employment responsibilities, may result in disciplinary action that may include termination.

4. In accordance with applicable Delaware State Lottery Rules and all other applicable gaming law, in the event a Team Member is charged with a crime or offense, (not including simple traffic offenses, but including driving under the influence charges), the Team Member is _required_ to notify Human Resources within three (3) working days of the date of such charge.

5. Violations of this policy may result in disciplinary action, which may include termination.

A219

# KEY
# POLICIES

A220

## EMPLOYMENT OF RELATIVES – POLICY # 44

The policy of Midway Slots & Simulcast permits related Team Members to work for the organization following specific standards contained in this policy. Direct or indirect supervision of any person who is a member of their immediate family will not be permitted.

1. Immediate family is defined as any of the following: parent, spouse, child, sibling, grandparent, in-law or legal guardian. For the purpose of this policy, "immediate family" will also include co-habitants. For the purpose of this policy the term, "immediate family" may be defined as "relative".

2. Immediate family members of the surveillance team are not eligible for employment with Midway Slots & Simulcast.
   2.1 If a surveillance team member weds another employee, one must resign from Midway Slots & Simulcast employment.

3. Hiring relatives of Security Team Members will be individually evaluated to determine whether a conflict exists.

4. Relatives may not co-sign on control documents with another immediate family member.

5. Relatives may not directly or indirectly supervise each other.

6. Team Members and their supervisors who perform an audit function must not audit the paperwork of those in their immediate family as described above.

7. Related Team Members may work in the same department but not in a supervisory relationship and must acknowledge Midway Slots right to transfer or terminate their employment should the relationship cause the following: difficulties within the work environment, a violation of company policy or violation of Delaware Video Lottery regulations.

8. Team Members may not bid on supervisory/management positions if relatives are employed in that department.

9. Any Team Member who violates the above policy or falsifies Company records by concealing a relationship will be subject to disciplinary action, which may include termination.

A221

## BREAKS AND REST PERIODS

- Hourly Team Members who work 7.5 or more hours a day will be provided a 30 minute unpaid meal break
- Business conditions permitting, Hourly Team Members will be permitted two (2) fifteen (15) minute paid rest periods
- Scheduled meal breaks are taken at the discretion of your supervisor
- Hourly Team Members must punch in/out for meal breaks
- Meal breaks are not considered work time
- Breaks must be taken in the designated break area.
- "Rest periods" may only be taken at the direction of your supervisor, and only in a designated break area
- Team Members are provided a meal at no charge when Food and Beverage department is operating
- Meals are available in the 'International Buffet', Monday morning through Friday afternoon, and in the 'Side Show', Friday evening through Sunday evening
- All food or drinks are to be consumed in the 'International Buffet' or 'Side Show' and are not to be removed
- The 'Side Show' is a restricted area. Persons not employed by Midway Slots and Simulcast may not enter or utilize the facility
- Chewing gum and eating is prohibited in all guest areas and food preparation areas
- Smoking is permitted only in areas designated as Team Member smoking area

## TARDINESS AND ABSENTEEISM

The success of our Company depends on people working together. Our expectation is that our Team Members are adults and understand the need to meet scheduling obligations.

## CALL IN PROCEDURE

- Ask you Supervisor for the correct number to call to report a lateness or absence
- You must notify your Supervisor three (3) hours in advance of your scheduled starting time if you are going to be absent or late
- Call your Supervisor or the department Supervisor-in-charge **personally**
- You must call your Supervisor each day that you are absent
- Failure to give notice may be considered be a "No Call/No Show" which is considered a voluntary resignation.
- Repeated tardiness and absenteeism may result in disciplinary action including termination.

A222

## TIME RECORDS, TIME CARDS

In order to comply with applicable wage and hour laws, Midway Slots & Simulcast utilizes a time clock. Each Hourly Team Member is required to punch in and punch out with their own Company I.D. so proper pay can be ensured. Team Members are not permitted to punch in earlier than five (5) minutes before the start of their scheduled shift. Likewise, Team Members are to punch out no later than five (5) minutes after the end of their scheduled shift or as directed. You should always check with your Supervisor before punching out.

Your picture identification badge provides you access to the time clock. Team Members are required to have their badges in their possession at all times for both timekeeping as well as security reasons. Team Members who may have forgotten or temporarily misplaced their badges must obtain a temporary ID Badge from security.

Note: Sign in/out sheets may be utilized in conjunction with the clock. The same rules apply to the time sheet.

## TIP DECLARATION POLICY

All Team Members receiving more then $20.00 a month in tips, either in cash directly from the customer, tips from charge customers that are paid to you by the Company, or your share of any tips you receive under a tip-splitting arrangement, must report these tips to the Company as tip income.

A "Report of Tips to Team Member" form should be completed and turned in to your Supervisor at the end of your last scheduled shift prior to the end of the pay period.

Failure to declare tip income per this policy may result in progressive disciplinary action.

A223

## GENERAL APPEARANCE STANDARDS – H. R. POLICY #36

Midway Slots & Simulcast is in the entertainment business where personal appearance is important. The following appearance standards apply to all Team Members whether in direct contact with guests or in support areas during normal business hours, to present a neat, clean and professional image consistent with the high standards of service and entertainment our guests expect.

**Clothing:** Non-costumed Team Members will be clean, tasteful, non-extreme, and appropriate to our standards of professionalism. Business suits or jackets, dress slacks, shirts and ties, Dockers style pants or khakis, polo shirts without logo or Midway polo shirts, may be worn by male Team Members. Coordinated pant outfits, suits, dresses, skirts, dress slacks, blouses and sweaters (in good taste) polo shirts without logo or Midway polo shirts, may be worn by female Team Members.

No denim skirts, overly tight slacks, midriffs, ankle lengths, mini skirts, muscle shirts, or other extreme or casual wear or dress that would not represent good business taste is allowed at any time. Jumpsuits, jeans, denims, painter's pants, sweat suits, shorts, coveralls and cut-offs are not permitted, nor are headscarves, caps, hats or other headwear permitted to be worn in working areas unless as part of an approved costume.

**Scents:** Any cologne, perfume, and after-shave must be subtle and used in moderation.

**Sunglasses:** Non-prescription sunglasses are not allowed to be worn in indoor work areas. Sunglasses may be worn in outdoor work areas during daylight hours, and may be suspended from the neck by a neutral color chain or cord. Frame styles should not be extreme.

**Jewelry:** The use of jewelry to enhance appearance should be kept to a minimum. No adornment may be worn which advertises a product, service, slogan, or illustration unless approved by management or is commonly recognized product logo (i.e. Nike, Adidas, Polo, Bud, Purveyor/Vendor products, etc.)

    **Earrings:**
- "chain type" earrings that extend longer than 1½ inches below the ear or may present a safety hazard are not allowed
- earrings may not promote a product, service or organization
- earrings that clash or are inconsistent with the business attire will not be allowed

    **Rings:** Must be tasteful and not pose a safety hazard or hinder job performance.

    **Bracelets:** Loud, dangling bracelets and visible ankle bracelets are not allowed.

    **Nose rings:** No nose rings or nose studs are permitted.

A224

**Body Piercing:** Except pierced ears, visible pierced body parts are not permitted.

**Name Tags and Company I.D. Cards:** A Company issued name tag with the Team Member's actual name or approved nickname and I. D. Card must be worn on the upper left chest at all times.

**Shoes:** Shoes must have a clean, polished appearance. Depending on position, single colored low cut, black sport shoes or sneakers may be allowed. Open heel clogs, slippers, and spiked heels are unacceptable business attire and some may tend to be safety hazards.

**Hosiery:** Socks and nylons in good business taste must be worn.

**Hair Styles:**

    <u>Men:</u> Hair styles and hair colors may not be in the extreme and should be neatly styled and appropriate for a business environment. Shaved designs, pony tails, tails, braids or shoulder length hair are not allowed.

    <u>Women:</u> Hair styles and hair colors may not be in the extreme and will be neatly styled and appropriate for a business environment. Hair may not cover the name tag. Shaved heads, shaved designs are not allowed.

**Facial Appearance:**

    <u>Men:</u> Beards are not permitted. Mustaches are to be neat and trim.

    <u>Women:</u> Makeup worn should be in good business taste, subtle, natural-looking, and not extreme.

**Nails:**

    <u>Men:</u> Nails must be clean and neatly trimmed at all times to a length that does not interfere with the performance of the job. Only clear nail polish is permitted.

    <u>Women:</u> Nails should be clean and neatly trimmed to a length that does not interfere with the performance of the job. If polished, nail polish and tasteful nail decals are permitted for female Team Members. Food handlers may not wear jeweled nails and the use of exotic metals for nail adornment or colored nail polish.

A225

## INTERNET USAGE POLICY – POLICY # 52

This company provides access to the vast information resources of the Internet to help you do your job. The facilities that provide access represent a considerable commitment of recourses for telecommunications, networking, software, storage, etc. This Internet Usage Policy is designed to help you understand our expectations for the use of those resources in the particular conditions of the Internet, and to help you use those resources wisely.

While we have set forth explicit requirements for Internet usage below, we would like to start by describing our Internet usage philosophy. First and foremost, the Internet for this company is a business tool, provided to you at significant cost. That means we expect you to use your Internet access primarily for business-related purposes, i.e., to communicate with customers and suppliers, to research relevant topics and obtain useful business information (except as outlined below). We insist that you conduct yourself honestly and appropriately on the Internet, and respect the copyrights, software licensing rules, privacy and property rights, and prerogatives of others, just as you would in any other business dealings. To be absolutely clear on this point, all existing company policies apply to your conduct on the Internet, especially (but not exclusively) those that deal with intellectual property protection, privacy, misuse of company resources, sexual harassment, information and data security, and confidentiality.

Unnecessary or unauthorized Internet usage causes network and server congestion. It slows other users, takes away from work time, consumes supplies, and ties up shared resources. Unlawful Internet usage may also expose the employee and the company to significant legal liabilities.

While our direct connection to the Internet offers a cornucopia of potential benefits, it can also open the door to some significant risks to our data and systems if we do not follow appropriate security discipline. As presented in greater detail below, that may mean preventing machines with sensitive data or application from connecting to the Internet entirely, or it may mean that certain users must be prevented from using certain Internet features like file transfers. The overriding principle is that security is to be everyone's first concern. Company employees can be held accountable for any breaches of security or confidentiality.

Certain terms in this policy should be understood expansively to include related concepts. "Company" includes our affiliates, subsidiaries, and branches. "Documents" covers just about any kind of file that can be read on a computer screen as if it were a printed page, including the so-called HTML files read in an Internet browser, any file meant to be accessed by a work processing or desktop publishing program or its viewer, or the files prepared for the Adobe Acrobat reader and other electronic publishing tools. "Graphics" includes photographs, pictures animations, movies or drawings. "Display" includes monitors, flat-panel active or passive matrix displays, monochrome LCD's, projectors, televisions and virtual-reality tools.

A226

14

## 1. General

1.1 The company has software and systems in place that monitor and record all Internet usage. Our security systems are capable of recording (for each and every user) each World Wide Web site visit, each chat, newsgroup or e-mail message, and each file transfer into and out of our internal networks, and we reserve the right to do so at any time. No employee should have any expectation of privacy as to his or her Internet usage. Our managers will review Internet activity and analyze usage patterns, to assure that company Internet resources are devoted to maintaining the highest levels of productivity.

1.2 We reserve the right to inspect any and all files stored in private areas of our network in order to assure compliance with policy.

1.3 The display of any kind of sexually explicit image or document on any company system is a violation of our policy on sexual harassment. In addition, sexually explicit material may not be archived, stored, distributed, edited or recorded using our network or computing resources.

1.4 The company uses independently-supplied software and data to identify inappropriate or sexually explicit Internet sites. We may block access from within our networks to all such sites that we know of. If you find yourself connected accidentally to a site that contains sexually explicit or offensive material, you must disconnect from that site immediately, regardless of whether that site had been previously deemed acceptable by any screening or rating program.

1.5 This company's Internet facilities and computing resources must not be used to violate the laws and regulations of the United States or any other nation, or the laws and regulations of any state, city, province or other local jurisdiction in any material way. Use of any company resources for illegal activity is grounds for immediate dismissal, and we will cooperate with any legitimate law enforcement activity.

1.6 Any software or files downloaded via the Internet into the company network become the property of the company. Any such files or software may be used only in ways that are consistent with their licenses or copyrights.

1.7 No employee may use company facilities to download or distribute pirated software or data.

1.8 No employee may use the company's Internet facilities to propagate any virus, worm, Trojan horse, or trap-door program code.

A227

1.9 No employee may use the company's Internet facilities to disable or overload any computer system or network, or to circumvent any system intended to protect the privacy or security of another user.

1.10    Each employee using the Internet facilities of the company shall identify himself or herself honestly, accurately and completely (including one's company affiliation and function where requested) when participating in chats or newsgroups, or when setting up accounts on outside computer systems.

1.11    Only those employees or officials who are authorized to speak to the media, to analysts or at public gatherings on behalf of the company may speak/write in the name of the company to any newsgroup or chat room. Other employees may participate in newsgroups or chats in the course of business when relevant to their duties, but they do so as individuals speaking only for themselves.

1.12    The company retains the copyright to any material posted to any forum, newsgroup, chat or World Wide Web page by any employee in the course of his or her duties.

1.13    Use of company Internet access facilities to commit infractions such as misuse of company assets or resources, sexual harassment, unauthorized public speaking and misappropriation of intellectual property are also prohibited by general company policy.

1.14    Because a wide variety of materials may be considered offensive by colleagues, customers or suppliers, it is a violation of company policy to store, view, print or redistribute any document or graphic file that is not directly related to the user's job or the company's business activities.

1.15    Employees may use their Internet facilities for non-business research or browsing during meal time or other breaks, or outside of work hours, provided that all other usage policies are adhered to.

1.16    Employees with Internet access must take particular care to understand the copyright, trademark, libel, slander and public speech control laws, so that our use of the Internet does not inadvertently violate any laws which might be enforceable against us.

1.17    Employees with Internet access may download only software with direct business use, and only with prior approval of the M.I.S. Director, and must arrange to have such software properly licensed and registered. Downloaded software must be used only under the terms of its license.

A228

1.18    Employees with Internet access may not use company Internet facilities to download entertainment software or games, or to play games against opponents over the Internet.

1.19    Employees with Internet access may not use company Internet facilities to download images or videos unless there is an express business-related use for the material.

1.20    Employees with Internet access may not upload any software licensed to the company or data owned or licensed by the company without the express authorization of the manager responsible for the software or data.

## 2. Technical

2.1 User Ids and passwords help maintain individual accountability for Internet resource usage. Any employee who obtains a password or ID for an Internet resource from the Company must keep that password confidential. Company policy prohibits the sharing of user IDs or passwords obtained for access to Internet sites.

2.2 Employees should schedule communications –intensive operations such as large file transfers, and the like, for off-peak times.

2.3 Any file that is downloaded must be scanned for viruses before it is run or accessed.

## 3. Security

3.1 The company has installed an Internet firewall to assure the safety and security of the company's networks. Any employee who attempts to disable, defeat or circumvent any company security facility will be subject to immediate dismissal.

3.2 Files containing sensitive company data, as defined by existing corporate data security policy, that are transferred in any way across the Internet must be encrypted.

3.3 Only those Internet services and functions with documented business purposes for this company will be enabled at the Internet firewall.

A229

# YOUR SPECIAL BENEFITS

A230

## BEREAVEMENT PAY – H.R. POLICY #24

Eligible Team Members granted bereavement pay for an immediate family member will be paid for time actually lost from their regularly scheduled work, up to a maximum of three work days. The days considered for pay no longer need be the day prior to, the day of and the day following the funeral. Eligible Team Members granted bereavement pay for an extended family member will be paid for one (1) work day. Benefit pay and worked time may not exceed forty (40) hours in any given work week.

For benefit purposes, "immediate family" is defined as a Team Member's spouse, child, parent, step-parent, foster parent, brother, sister, brother-in-law, sister-in-law, grandparent or grandchild of the Team Member or spouse. "Extended family" shall include aunt, uncle, niece or nephew. Proof of death and family relationship may be required.

## VACATION - H. R. POLICY #31

It is each Team Member's responsibility to ensure their vacation is requested in a timely manner and their time is used within the year of eligibility. Team Members may be paid in lieu of time off at the discretion of the V.P./G.M. **Remember: Vacation time does not carry over from year to year.**

All Full Time Team Members are entitled to the equivalence of two weeks paid vacation after one continuous year of full time employment and three weeks after five continuous years of full time employment. All vacation time will be paid at the Team Member's base rate of pay or minimum wage, whichever is greater.

The most notable changes that have been implemented include the availability to take vacation in days and not requiring Team Members to take full week vacations. At this time, there are no 'black out' periods in the summer months.

## LOCKERS & LOCKER ROOMS

Lockers and locker rooms have been provided for your convenience. Team Members are provided a locker to use to store personal items while on duty. All personal items must be removed from the lockers at the end of each shift. Team Members are to provide their own lock. MONEY AND OTHER VALUABLES SHOULD NOT BE KEPT IN THE LOCKERS. Midway Slots & Simulcast is not responsible for the loss of valuables stored in lockers and/or left unattended by Team Members.

During locker inspections, any items found which are against Company Policy and/or illegal will be confiscated by Security who will notify Human Resources. Disciplinary action may be taken for failure and/or refusal to comply with locker inspections and/or the storage of inappropriate/illegal items.

A231

# COMMITMENT TO SAFETY

Midway Slots & Simulcast believes in the self-respect and importance of the individual Team Member and his or her right to derive personal satisfaction from the job. The prevention of occupational injuries and illnesses is of such a consequence to this belief that it will be given a top priority at all times.

An accident prevention program has been established that emphasizes the integration of safety and health measure into each job task so that safety/health and job performance are inseparable. This is accomplished through the cooperative efforts of managers, supervisors and Team Members who seek to obtain the lowest possible accident rates.

Safety orientation for new and transferred Team Members timely and appropriate training, a Management/Team Member Safety and Health Committee, and Active Self-Inspection program, proper mechanical guards, and personal protective equipment are some of the tools used to reduce work hazards.

By accepting mutual responsibility to operate safely, we are contributing to the well-being of personnel, and subsequently, the Company.

Team members are required to follow safe work practices and precautions while on duty. Any Team Member who is injured while on duty must report to management immediately and have an **Injury Investigation Form** completed. Otherwise, there may be a delay in insurance processing should medical attention be required. Failure to immediately report an injury, unsafe conditions or practice safe work habits may result in disciplinary action. Repeated occurrence of injuries may result in further disciplinary action, up to and including discharge.

Any Team Member who requires medical attention, as a result of an on the job injury, must submit to a drug/alcohol test. A positive test will result in disciplinary action, possible termination.

A232

# KEY INFORMATION

A233

## OPEN DOOR PHILOSOPHY

Midway Slots & Simulcast wants to promote an environment that encourages its Team Members to openly communicate problems and concerns. All doors up to and including the Vice President/General Manager are open to you.

Steps to be followed are:

1. Discuss it first with your Supervisor or Director.
2. If the problem is not resolved after a reasonable length of time, or if it is something you feel you simply cannot discuss with your Supervisor, contact Human Resources.
3. If the problem is still not resolved, schedule an appointment with the Vice President/General Manager for final resolution.

It is our policy that all Team Member suggestions and complaints will be given full consideration. There will be no discrimination or reprisal against any Team Member for utilizing the Open Door process.

## CONFIDENTIALITY

Our guests, employees and vendors often furnish information to Midway Slots & Simulcast with the understanding that it will be kept confidential and used only by authorized persons as necessary. During the course of your employment you may receive or have access to verbal, written or electronic media information concerning employees, guests, vendors and services provided by or to Midway Slots & Simulcast. This information may include, but is not limited to, guest information, employee information, business plans, advertising/marketing strategies, vendor/supplier information, financial information and contract prices or terms.

It is our obligation, as an employee of Midway Slots & Simulcast, to maintain information in a confidential manner. Disclosure of such information may violate State or Federal laws and can harm to the organization. Unauthorized release of information will result in disciplinary action, which may include termination or legal action.

## CHANGE OF STATUS INFORMATION

It is the Team Member's responsibility to immediately notify his/her Supervisor and the Human Resource Office of changes in name, address, telephone number, persons to be notified in case of emergency, martial status, or number of dependents, and provide appropriate documentation.

A234

22

# GROSS MISCONDUCT

Conduct which may result in immediate termination encompasses, but is not limited to, the following:

1. Theft, attempted theft, or removal from the premises without authorization, of food, liquor, other company property, or the property of another Team Member or a guest.

2. Destruction, damage, or improper use of the Company's, another Team Member's or a guest's property.

3. Possession or consumption of alcoholic beverages or illegal drugs, distribution or use of non-prescribed narcotics, being under the influence of it, on Company time or premises.

4. Gambling on Company time or in violation of the Company gambling policy.

5. Falsification of Company records including tip reports, time records, guest checks, employment records, intentional omission of information, misrepresentation of facts (verbal or written) to your supervisor, etc.

6. Stealing Company time, sleeping on the job, abusing break period, etc.

7. Failure to carry out a reasonable job assignment or job request of management after being warned that failure to do so can result in termination.

8. Disorderly conduct including fighting, physical or verbal harassment of another Team Member or guest, use of abusive, profane, or obscene language while on Company property.

9. Possession of any type of weapon or firearm on Company premises.

10. Insubordination toward Supervisor.

11. Conviction of a felony for an offense committed while employed by the Company and failing to notify Human Resources of such convictions other than minor traffic offenses within 3 working days in accordance with Company H. R. POLICY #41.

12. Tampering with the fire alarm system.

13. Any perceived act of violence toward a coworker, member of management, guest or vendor to include, but not limited to verbal threats, intimidation or unwelcome physical contact.

A235

14. Hustling tips.

15. Rudeness to or mistreatment of a guest or failure to give the highest degree of friendly and courteous service.

16. Fraternization or behavior between Team Members, Team Members and Management, or Team Members and Guests, during working hours, other than that, which is necessary in the performance of Company business and could be construed as Sexual Harassment.

17. Violation of any Delaware State Video Lottery rules and/or regulations. Suspension for alleged violation of Delaware State Video Lottery rules, then termination, even if Delaware State Video Lottery only suspends the license.

18. Any illegal, immoral or indecent conduct by a Team Member either on or off Company time or property.

19. Failing to perform work duties in a safety conscious manner (involvement in horseplay, unsafe use of equipment or performing duties in an unsafe manner.)

20. Solicitation of any kind, and/or requesting or accepting loans from guests or Team Members.

21. Any conflict of interests, which may include employment by the Video Lottery and/or related business in direct competition with Midway Slots & Simulcast.

A236

**Reporting Concerns:**

_____

_____

_____

_____

A237

Name_____    Date _____

# Policy & Procedure Education Checklist

| | Policy Reviewed | Initials |
|---|---|---|
| 1. | Team Member Bill of Rights | |
| 2. | No Harassment Policy | |
| 3. | Delaware Video Lottery | |
| 4. | Drug Free Workplace Policy | |
| 5. | Gambling | |
| 6. | Moonlighting | |
| 7. | Off Duty Code of Conduct | |
| 8. | Employment of Relatives | |
| 9. | Breaks and Rest Periods | |
| 10. | Tardiness & Absenteeism – Call In Procedure | |
| 11. | Time Cards/Time Records | |
| 12. | Tip Declaration | |
| 13. | General Appearance Standards | |
| 14. | Internet Usage | |
| 15. | Bereavement Policy | |
| 16. | Vacation Policy | |
| 17. | Lockers and Locker Room | |
| 18. | Commitment to Safety | |
| 19. | Open Door Philosophy | |
| 20. | Confidentiality | |
| 21. | Change of Status Information | |
| 22. | Gross Misconduct | |
| 23. | Reporting Concerns: | |

The above information has been reviewed with me. I have been given the opportunity to ask questions about this booklet and the information provided and agree to adhere to these and all policies of Midway Slots and Simulcast. I understand that questions regarding these or other Company policies may be directed to the Human Resources Department.

_____    _____    (4/2001)
Signature                              Date

A238

**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION UNIT**

*Recd 3/8/05 AM*

State Case No.: 04050464

Clifton J. Showell, Jr.
9354 S. Dupont Highway
P.O. Box 223
Felton, DE 19943

vs.

Midway Slots & Simulcast
P.O. Box 310
Harrington, DE 19952

### FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

*No-Cause Determination and Dismissal with Corresponding Right to Sue Notice.*

In this case, the Department has completed its investigation and found that there is no reasonable cause to believe that an unlawful employment practice has occurred. The Department hereby issues a No-Cause Determination and Dismissal and provides the Charging Party with a Delaware Right to Sue Notice.

This No Cause determination is based on the following facts:
In this complaint of alleged employment discrimination, Charging Party must be able to demonstrate that he was disparately treated based on race, sex, and age as compared to similarly situated co-workers with regard to discipline/discharge. Charging Party's comparators were not similarly situated to him. Charging Party was on his last and final warning within Respondent's constructive disciplinary action process when he was caught allowing a subordinate to use his supervisory code/password in his absence. The individuals Charging Party's compares himself to were disciplined and, in essence, demoted for the same infraction, however they were not at the final stage of the constructive disciplinary process as was Charging Party who was discharged.

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Unit.

2/28/05
Date issued

Julie K. Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

DOL Form C-12NC : 10/04

EXHIBIT
Showell 16
11-2-06

A239

D00039



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
The Windsor
24 N. W. Front Street
Suite 100
Milford, DE 19963

Telephone: (302) 422-1134
Fax: (302) 422-1137

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

June 1, 2004

Personnel/EEOC Manager
**Midway Slots & Simulcast**
Route 13
Harrington, DE 19952

**RE:**   Showell, Jr. v. Midway Slots & Simulcast
Case No.: 04050464/17CA400456
<u>Notice of Charge of Discrimination</u>

Dear Sir/Madam:

The above-referenced Charge of Discrimination, a copy of which is enclosed, has been filed against your company. The Department of Labor offers the opportunity to engage in voluntary confidential mediation of charges filed with the agency. See the enclosed mediation program description and invitation form printed on yellow paper. Acceptance of the invitation to engage in mediation suspends all enforcement activity, including any requirement to respond to the charge, until the completion of the mediation process.

If you are not interested in mediation, **within twenty (20) days from receipt of this letter,** you must complete and return the enclosed "General Respondent Questionnaire". You may also file a Position Statement with copies of documents or other evidence supporting your position. Any information you provide may assist this office in our investigation, but does not foreclose further investigation if necessary. **Please send all information to the attention of Trina R. D.** **Wheedleton, Labor Law Enforcement Officer II at the above listed address.**

Sincerely,

Julie Cutler

Julie Cutler, Supervisor
Office of Labor Law Enforcement

Enclosures

A240

  

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Philadelphia District Office

21 South 5ᵗʰ Street, Suite 400
Philadelphia, PA 19106-2515
(215) 440-2600
TTY (215) 440-2610
FAX (215) 440-2847, 2632 & 2848

EEOC Charge Number _17CA400456_         DDOL Charge Number _04050464_

### NOTICE OF CHARGE OF DISCRIMINATION

You are hereby notified that the above-referenced charge of employment discrimination has been received by the Labor Law Enforcement Section of the Delaware Dept. of Labor (DDOL) and sent to the EEOC for dual-filing purposes. This Notice is being sent to you by the DDOL, on behalf of EEOC, simultaneously with DDOL's notification to you of the filing of the charge with DDOL. The charge has been assigned the EEOC and DDOL charge numbers shown above. A copy of the charge is included with these Notices.

While EEOC has jurisdiction (upon the expiration of any 60-day deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of DDOL's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that there has been a violation of the statute(s) administered by EEOC.

You are therefore urged to cooperate fully with the DDOL. All facts and evidence provided by you to the DDOL in the course of its proceedings will be considered by EEOC when it reviews the DDOL's final findings and orders. In many instances the EEOC will take no further action, thereby avoiding the necessity of an investigation by both the DDOL and the EEOC. This likelihood is increased by your full cooperation with the DDOL.

As a party to the charge, you may request that EEOC review the DDOL's final decision and order. For such a request to be honored, you must notify the EEOC in writing within of 15 days of your receipt of DDOL's final closure notification. Such a request should be forwarded to EEOC at the address shown in the letterhead above, to the attention of the State and Local Unit. If the DDOL terminates its processing without issuing a final finding and order or the charge is otherwise one which requires further EEOC processing, you will be contacted further by EEOC. Regardless of whether the DDOL or EEOC process the charge, the Recordkeepng and non-retaliation provisions of Title VII, the ADA and the ADEA as explained in the "EEOC Rules and Regulations" apply.

_6/1/04_
**Date**

_Marie M. Tomasso_

**Marie M. Tomasso, District Director**

A241

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**
(State, or local Agency, if any)

and EEOC

| ENTER CHARGE NUMBER | |
|---|---|
| ☐ FEPA | 04050464 |
| ☐ EEOC | 17CA400456 |

**NAME** (Indicate Mr., Mrs., Ms)
Mr. Clifton James Showell Jr.

**HOME TELEPHONE NO.** (Include Area Code)
(302) 284-8229

**STREET ADDRESS**
9354 S. Dupont Highway P.O. Box 223

**CITY, STATE AND ZIP CODE**
Felton DE 19943

**COUNTY**
Kent

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (If more than one, list below.)

**NAME**
Midway Slots & Simulcast

**NO. OF EMPLOYEES OR MEMBERS** 25+

**TELEPHONE NUMBER** (Incl. Area Code)
(302) 398-4920

**STREET ADDRESS**
Route 13 Harrington, Delaware 19952

**CITY, STATE AND ZIP CODE**

**NAME**

**TELEPHONE NUMBER** (Include Area Code)

**STREET ADDRESS**

**CITY, STATE AND ZIP CODE**

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ AGE
☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST    11/2003
LATEST    5/11/2004
☐ CONTINUING ACTION

**THE PARTICULARS ARE** (If additional space is needed, attached extra sheet(s).)

I.  I am an individual whose gender is male, race is black, and over the age of 40 (48). I began my employment with Respondent on July, 19, 1997 and was terminated from my position as a Slot Shift Manager on May 11, 2004.

II. I was informed by Respondent's Human Resource Manager, Scott Saxon, (white, male, early 40's) in an interoffice memorandum that I was terminated for an improper action.

III. I believe Respondent violated Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, as amended, and the state of Delaware's Discrimination in Employment Act, as amended, when I was terminated for an improper action. It is a common practice for managers to let others use their passwords to complete assigned work. I was Respondent's only black male manager in my department out of total of 6 managers. Respondent has a low representation of black male managers in other departments as well. Sabrina Jenkins (bi-racial, female, 30's), the late Bob Schueler (white, male, 53) also allowed others to use passwords to complete their job assignments.  The managers who were recently hired are under the age of 40 two are white and 2 are female. I believe that Respondent's actions were a pretext to mask discrimination based on my race, age, and sex. There are no longer any black male managers over the age of forty in the department in which I was employed. The terms and conditions of my employment were also different than my similarly situated co-workers. I also requested to step down from my management position but was not allowed. Sabrina Jenkins, Sonja (last name unknown, white, female, 40's), Regina Burrell (black, female, 40's) were allowed to step-down from their managers position. Respondent also did not abide by their disciplinary policy when I was terminated written-up and issued a final warning.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | **SIGNATURE OF COMPLAINANT** |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>5/24/04  _Clifton J. Showell Jr._<br>Date    Charging Party (Signature) | **NOTARY** - (When necessary to meet State and Local Requirements)<br><br>Subscribed and sworn to before me this date<br><br>(Day, month, and year) |

EEOC FORM 5
REV 6/92    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

A242

Midway Slots and Simulcast
Slots Department

To:  All Midway Slots and Simulcast Slot Dept. Supervisors and Leads

From:  Beverly Pope, Dir. of Slots

Date:  4 March 2004

Re:  IGS Password

Effective immediately under no circumstances shall you furnish or provide any Slot
Department Team Member with your IGS password. Failure to comply with this directive
shall result in immediate termination.  Your signature below indicates that you have been
formally presented with this document and completely understand its contents.

_Blake_____3492_ Team Member Signature and Date

_____0679_ Witness Signature and Date

A243

Scott A. Saxon

1    guess the answer really is every shift supervisor at some

2    point had to work the night shift.

3        Q.    When they needed to fill in for --

4        A.    Correct.

5        Q.    -- somebody that was regularly assigned to their

6    night shift who was sick or on vacation?

7        A.    Yes.

8        Q.    So is it fair to say that the Slot Department

9    employees, and specifically the slot shift supervisors,

10   had regularly assigned shifts, but they were expected to

11   have flexibility and fill in for other shifts?

12       A.    Yes.

13       Q.    Midway Slots has a progressive discipline policy;

14   is that correct?

15       A.    Yes.

16       Q.    And does that progressive discipline policy

17   include various steps that are to be taken before an

18   employee is discharged?

19       A.    No.

20       Q.    There are no steps to be taken before an employee

21   is to be discharged?

22       A.    Within the progressive discipline policy, the

23   disciplines that are administered are contingent upon the

24   infraction.

Scott A. Saxon

1    Q.    Okay.  And what would be the lowest level of

2    discipline in the progression, in the progressive

3    discipline policy?

4    A.    Verbal counseling.

5    Q.    And what would be the next highest level of

6    discipline within the progressive discipline system?

7    A.    It would depend upon the severity and the

8    frequency of the offense.  It could --

9    Q.    What would be the least severe, what would be the

10   least severe of the remaining disciplinary actions that

11   are more severe than verbal counseling?

12   A.    Written warning.

13   Q.    And what would be the next least severe

14   disciplinary action within the progression?

15   A.    Again, it would depend upon the frequency and the

16   severity of the infraction.  It could be, you could

17   repeat steps, you could omit steps, you could skip steps.

18   You could go backwards, depending upon what the

19   infraction was.

20   Q.    I understand.  Assuming steps are not repeated,

21   so we don't keep repeating the same types of steps, and

22   assuming that the supervisor issuing the discipline

23   decides to take it to the next lowest step, what would be

24   the next lowest step beyond a written warning?

Scott A. Saxon

1    A.    A three-day suspension.  Or, let me qualify, a

2    suspension.  It doesn't necessarily have to be three

3    days.  It could be for one day.  And with that, a

4    suspension is in essence a final warning.

5              However, as I said before, you could skip or

6    omit steps, and you could just, in lieu of issuing a

7    suspension, you could just give a final written warning.

8              So, for example, if an individual has gone

9    through steps to correct their behavior for attendance

10   infractions, they probably would not be granted three

11   more days off, which is essentially why they are being

12   written off.  They would just go straight to a final

13   warning.

14   Q.    Okay.  So you have told us that some steps that

15   can be administered under the progressive discipline

16   policy include verbal counseling, written warning, final

17   warning, a suspension.  And what is the range of days

18   that a suspension could be?

19             Well, let me strike that question.  First,

20   what is the least amount of days or amount of time one

21   could be suspended for?  Is there a half-a-day

22   suspension?

23   A.    Yes, someone could be, for the end of the day be

24   considered suspension.  That would be the least.  The

Scott A. Saxon

Page 39

1    most that's ever been administered has been five days.

2        Q.   And could there be any number of days in between,

3    such as one-, two-, three- and four-day suspensions?

4        A.   Yes.

5        Q.   And other than verbal counselings, written

6    warnings, final written warnings, suspensions ranging

7    from half-a-day or the end of a shift to anywhere from

8    one to five days, are there any other disciplinary

9    actions that possibly can be administered under the

10   progressive discipline policy at Midway?

11       A.   Depending upon the severity and frequency, an

12   individual could be placed on an action plan for

13   improvement, which would be for a prescribed amount of

14   time, 30 or -- for example, 30 or 60 or 90 days, at the

15   conclusion of which a determination would be made about

16   the person's future employment.

17       Q.   And when would an individual be put on an action

18   plan for improvement?

19       A.   If there were repeated offenses that were a

20   demonstration on an individual's part that they, for

21   example, were unwilling to abide by certain standards.

22   Typically it would be more standards-oriented.

23       Q.   What do you mean by standards?

24       A.   Not turning their paperwork in on time, failing

Scott A. Saxon

Page 40

1    to address customers with customer service standards that

2    we uphold, those types of things.

3        Q.    And this is something, an action plan for

4    improvement is something that could be issued if there is

5    repeated infractions of the same offense?

6        A.    Well --

7        Q.    Is that what you were saying?

8        A.    No.    For repeated behavior.    If it is an offense,

9    it is an offense.    Stealing is an offense.    We are not

10   going to put you on an action plan for stealing.    If it

11   is -- if the way an individual, their appearance would be

12   more behavioral.

13       Q.    Other than verbal counselings, written warning,

14   final written warning, suspensions, action plans for

15   improvement, are there any other forms of discipline

16   within the progressive discipline policy at Midway?

17       A.    Yes.    Termination.

18       Q.    Other than termination, is demotion a possible

19   course of action within Midway's progressive discipline

20   policy?

21       A.    Yes.

22       Q.    And when could an individual be demoted?

23       A.    If they could not demonstrate the ability to

24   satisfactorily perform their duties on a continued basis.

A248

Scott A. Saxon

Page 41

1    Although I wouldn't classify a demotion as a disciplinary

2    action.

3        Q.    And other than verbal counseling, written

4    warning, final written warning, action plans for

5    improvement, termination, is there any other courses of

6    action or types of discipline within the progressive

7    discipline policy at Midway?

8        A.    No.

9        Q.    As far as written warnings, are there first,

10   second and third written warnings as possible courses of

11   action?

12       A.    Yes.

13       Q.    And when would an individual, when would an

14   individual be given a second written warning?

15       A.    In some of the positions that we have, such as a

16   cashier, a cashier handles vast sums of money, it would

17   not be unheard of for a cashier to handle $100,000 in

18   cash in a four-hour period, there are great opportunities

19   for them to have overages or shortages, and we call that

20   a variance.  Over or under, it is a variance.  In that

21   absolute value of those, what we do is we call them an

22   aggregate total.

23            So over a period of six months, they will

24   accumulate, and when an individual reaches a certain

A249

Scott A. Saxon

Page 42

1    threshold, it would warrant corrective counseling.

2              And if that individual, after that,

3    receiving that write-up, goes greater than six months

4    with no variances, then suddenly has a variance that

5    falls back to that threshold, it wouldn't progress them

6    to the next step.  It would only be their second warning

7    for the same infraction.

8              Thus could happen with a third.  However,

9    they are in the progressive policy becomes a threshold in

10   and of itself that we are not going to allow a person to

11   just go first and second and third until they get a 15th

12   warning.  There is going to be a point where the person

13   may not have the ability to perform the functions of the

14   job, in which case we may offer, in this case like we

15   talked about before, demotion, or if it continued would

16   result in the progressive step of suspension, then

17   termination.

18   Q.    Okay.  You said, if I understand you telling us,

19   there is not a 15th written warning.  And looking at your

20   disciplinary forms, it appears that there is the

21   possibility of first, second, third written warning, and

22   then final written warning.  Are those all possibilities

23   within the progressive discipline system?

24   A.    Yes, they are possible.  But it may not be

Scott A. Saxon

Page 43

1    applicable to all positions and all infractions.

2        Q.    Is final written warning and final warning the

3    same thing, in your mind?

4        A.    Yes.

5        Q.    When is a final warning applicable or

6    appropriate?

7        A.    If an individual has been provided an opportunity

8    to correct their behavior and has not heeded the warnings

9    that they have had previously, that would be the

10   threshold.  Or if an individual, their offense was so

11   egregious that any repeat could not be tolerated, that

12   would warrant a final written warning.

13       Q.    Can you give me any examples of behavior that

14   might be so egregious that they would merit a final

15   written warning?

16       A.    Giving out your passwords that were supposed to

17   be secured.

18       Q.    That's something for which you should be placed

19   on a final written warning?

20       A.    Yes.  It is one of those things that, as one

21   example.

22            Another example would be inappropriate

23   sexual remarks in the workplace or discriminatory remarks

24   in the workplace, depending upon the severity or the

A251

Scott A. Saxon

1    pervasiveness of the remarks.

2            Essentially, violations of what are known,

3    what someone knew or should have known.

4    Q.    Under Midway's progressive discipline policy,

5    must a human resources representative be present whenever

6    an employee is issued a third or a final warning?

7            MR. REIDENBERG:   I'm going to object to the

8    form and foundation of the question because I'm not sure

9    if you are asking him in 2004 or currently, and I just

10   think it needs to be clarified.

11   Q.    Okay.  Starting with currently, under Midway's

12   current progressive discipline policy, must a human

13   resources representative be present whenever an employee

14   is issued a third or final warning?

15   A.    Not according to the policy.

16   Q.    Okay.  And according to the policy in 2004, is a

17   human resources representative to be present when an

18   employee is issued a final warning?

19   A.    Not according to the policy.

20   Q.    Is it the practice at Midway that a human

21   resources representative is present when an employee is

22   issued a final warning?

23   A.    Not in all cases, no.

24   Q.    You have been sitting in on some depositions in