## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**CLIFTON J. SHOWELL, JR.**　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　Plaintiff,　　　　　　　　:　　　**CIVIL ACTION NO.** 05-462 JJF
　　　　　　　　　　　　　　　　　　　:
　　**v.**　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
**GAMING ENTERTAINMENT**　　　　　:
**(DELAWARE), L.L.C.,** d/b/a　　　:
**MIDWAY SLOTS & SIMULCAST**　　　:
**GAMING ENTERTAINMENT,**　　　　　:
a Delaware Limited Liability  Company**,**　:
　　　　　　　　　　　　　　　　　　　:
　　　　　Defendant.　　　　　　　　:

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**LAW OFFICE OF JOHN M. LaROSA**
**JOHN M. LaROSA, ESQUIRE**
Delaware Bar No. 4275
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
(302) 655-9329 (fax)
JLR@ LaRosaLaw.com

Attorney for Plaintiff Clifton J. Showell, Jr.

Dated: March 10, 2008

## TABLE OF CONTENTS

**Page Number**

TABLE OF AUTHORITIES..............................................................................................v

NATURE AND STAGE OF THE PROCEEDINGS........................................................1

SUMMARY OF ARGUMENT.......................................................................................2

STATEMENT OF FACTS..............................................................................................4

A.  The Parties. ...........................................................................................................4

B.  Plaintiff's Very Good Employment History..........................................................4

      1.  Plaintiff's Multiple Promotions. ......................................................................5

C.  Factors Usually Considered Were Ignored............................................................5

      1.  Defendant Introduced a New Computer System with Passwords. ...................5

      2.  Plaintiff Informed His Director That Many
          Supervisors Disclosed their Passwords to Subordinates.  ...............................5

      3.  Female Subordinate Wrongfully Used Plaintiff's
          Password Without His Presence, Knowledge, or Consent. ..............................7

      4.  Investigation Revealed Multiple Supervisors' Violations. ..............................8

D.  The Male Plaintiff Was the Only One Discharged. ................................................8

E.  Plaintiff's Female Director Discharged No Females for the Exact Same Violation......9

      1.  Disclosing Passwords to Subordinates. ...........................................................9

      2.  Improperly Using Passwords from Supervisors. .............................................9

F.  Female Director Replaced Plaintiff with a Younger Female.......................................10

STANDARD OF REVIEW............................................................................................11

ARGUMENT...................................................................................................12

I.    PLAINTIFF HAS ESTABLISHED THREE PRIMA FACIE CASES
      OF DISCRIMINATORY DISCHARGE BASED ON SEX, AGE, AND
      RACE UNDER THE INDIRECT EVIDENCE FRAMEWORK OF
      McDONNELL DOUGLAS. ...........................................................................12

A. Sex Discrimination. .....................................................................................12

B. Age Discrimination. .....................................................................................14

      1. Sufficiently Younger Replacement. ...............................................15

C. Race Discrimination. ...................................................................................16

II.   DEFENDANT'S LEGITIMATE, NON-DISCRIMINATORY
      REASONS FOR ITS ADVERSE ACTIONS ARE PRETEXTUAL. .................17

A. Prong 1–Defendant's Abundant Weaknesses, Incoherencies,
   Implausibilities, Inconsistencies, and Contradictions Support Plaintiff's Case. .........18

      1. The Weak, Incoherent, and Implausible
         Stated Reason that Plaintiff Violated Policy. ..................................21

      a. Defendant Had Absolutely No Password
         Policy When It Discharged Plaintiff!      .......................................21

      b. Defendant's Password Policy Was Created *After* Plaintiff Was Discharged!..22

      c. A "Final" Warning Memo Was Issued *After* Plaintiff's Discharge.................22

      2. The Weak and Implausible Stated Reasons that Plaintiff
         Breached Security and Undermined the Integrity of the System....................24

      a. There Was No Training on IGS Password Security. ........................................24

      b. In Practice, There Was No Effort to Protect Slot Supervisors' Passwords.......24

      3. Plaintiff Never Received the Fabricated January "Final Warning". ...............25

      a. Lack of Human Resources' Signature on the Fabricated "Final Warning." ....25

      4. Pope Had Prior Knowledge that IGS Passwords Were Disclosed. .................26

5. The Inconsistent Treatment of Younger Female
Supervisors Who Committed the Identical Offense. ......................................26

a. The Contradicted Allegation that Jenkins Had No Prior Discipline................27

B. Prong 2 – The Factfinder Can Infer That Discrimination Was More Likely
Than Not a Motivating or Determinative Cause of the Adverse Employment Action.27

1. Circumstantial Evidence of Sex Discrimination...............................................28

a. Selection and Promotion of the Female Replacement......................................28

b. Pope's Leniency on Her Female Subordinates. ...............................................28

c. Pope's Sex Bias Against Males. .......................................................................29

2. Circumstantial Evidence of Age Discrimination...............................................29

3. Circumstantial Evidence of Race Discrimination..............................................30

a. Caucasians Not Fired for Sharing Passwords...................................................30

b. Workplace Statistics..........................................................................................30

4. Other Circumstantial Evidence of Discrimination............................................30

a. Factors Usually Considered Were Ignored.......................................................30

b. Violation of Procedures....................................................................................31

i. Progressive Discipline Policy..................................................................31

ii. Suspicious Lack of Both a Written Report and a
Surveillance Tape of Plaintiff's Discharge............................................32

III.    DEFENDANT ALSO DISCRIMINATED AGAINST PLAINTIFF
IN THE TERMS AND CONDITIONS OF HIS EMPLOYMENT
BECAUSE OF HIS SEX AND HIS RACE........................................................33

A. Sex: Denied Non-management Position. ................................................................34

B. Race. ...................................................................................................................35

    1. Disparate Discipline for Use of Public Restrooms. ..........................................35

    2. Transfer of Plaintiff's Stepdaughter. ...............................................................36

IV.    PLAINTIFF EXHAUSTED HIS ADMINISTRATIVE
REMEDIES AND FILED A TIMELY COMPLAINT. ......................................37

V.    PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES. ..................................37

CONCLUSION............................................................................................................ 38

# TABLE OF AUTHORITIES

**Page Number(s)**

**Cases**

Bray v. Marriott Hotels, 110 F.3d 986 (3d Cir. 1997) ......................................................18

Collins v. State of Ill., 830 F.2d 692 (7th Cir. 1987) ..........................................................33

Cox v. Louisiana, 379 U.S. 536 (1965) ..............................................................................32

Durham Life Insur. Co. v. Evans, 166 F.3d 139 (3d Cir. 1999) .......................................33

Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509 (3d Cir. 1992).................13

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994) ................................2, 3, 17, 19, 21, 27, 38

Furnco Constr. Corp. v. Waters, 438 U.S. 567 (1978)................................................13, 21

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) ......................................................32

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) ...............................................32

Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999) ..........................................................13

Jones v. School Dist. of Phila., 198 F.3d 403 (3d Cir. 1999) ...........................................11

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) ..18, 27

Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999) ..................................................38

Lamb-Bowman, v. Delaware State Univ., 152 F.Supp.2d 553 (D.Del. 2001) .................11

Marzano v. Computer Science Corp. Inc., 91 F.3d 497 (3d Cir. 1996) ...........................12

Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933 (3d Cir. 1997) ..............13

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973) ...............11, 12, 14, 15

McQueeney v. Wilmington Trust Co., 779 F.2d 916 (3d Cir. 1985) ................................20

Miller-El v. Dretke, 545 U.S. 231 (2005) ........................................................................14

O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996) .....................14, 15

Pamintuan v. Nanticoke Mem'l Hosp., 192 F.2d 378 (3d Cir. 1999) ..............................11

Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843 (2001) ......................................38

Reeves v. Sanderson Plumbing Prod. Inc., 530 U.S. 133 (2000) .............................19, 20

Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120 (3d Cir. 1998) ..........................11

Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995) ......................................12, 15

Sheridan v. E.I. DuPont de Nemours and Co.,
100 F.3d 1061 (3d Cir. 1996)(en banc)................................................12, 13, 18, 19, 20, 21

Showalter v. University of Pittsburgh, 190 F.3d 231 (3d Cir. 1999) ........................11, 14

Simpson v. Kay Jewelers, Div. of Sterling, 142 F.3d 639 (3d Cir. 1998) .......................13

Smith v. Wade, 461 U.S. 30 (1983) ...................................................................................38

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981) ...........11, 12, 14, 19

Taylor v. Procter & Gamble Dover Wipes,
184 F.Supp.2d 402 (D.Del. 2002) ...................................................................11, 12, 13, 20

Watson v. Fort Worth Bank and Trust, 487 U.S. 977 (1988)...........................................12

Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) ...................................19, 20

## Statutes and Rules

42 U.S.C. § 1981 ...........................................................................................1, 2, 11, 38

42 U.S.C. § 1981a ......................................................................................................38

42 U.S.C. § 1981a(b)(1) ............................................................................................38

42 U.S.C. § 1983 ........................................................................................................38

ADEA .................................................................................................................passim

Fed.R.Civ.P. 6(a)..............................................................................................3, 38, 39

Fed.R.Civ.P. 56(c)..................................................................................................11

Title VII................................................................................................................passim

## NATURE AND STAGE OF THE PROCEEDINGS

This is a case of sex, age, and race discrimination in employment under Title VII, 42 U.S.C. § 1981, and the Age Discrimination in Employment Act ("ADEA"), in which the Defendant casino discharged Slot Shift Manager Clifton J. Showell, Jr., a then 47 year old, African-American male Plaintiff, allegedly for sharing his IGS computer password on a day he did not even work. Defendant also discriminated against Plaintiff in the terms and conditions of his employment because of his sex and his race.

Plaintiff filed his original Complaint on July 5, 2005. B8.[1] After extensive fact and expert discovery, the principal witnesses include the following:

1.    Beverly Pope, Defendant's former female Director of Slot Operations, who made the decision to discharge Plaintiff. Pope at 5, 112; B335, 442;

2.    Sabrina Jenkins, a then 26 year old female Slot Shift Supervisor who, like Plaintiff, disclosed her IGS computer password but was not fired, Jenkins at 4, 8, 27-29; B455, 459, 478-80;

3.    Georgia Kimball, a Caucasian female Slot Attendant who used Plaintiff's password without his authorization which resulted in his discharge, Kimball at 8, Saxon at 69, Pl. at 215; B255, 503, 955;

4.    Patty Robinson, a Caucasian female Slot Attendant who had used Jenkins' password, Robinson at 6, Jenkins at 27; B478, 563; and

5.    Tracy Dorsey, a younger female with no supervisory experience who Pope promoted to replace Plaintiff as Slot Shift Supervisor, Dorsey at 4-6, 27; B614-15, 636.[2]

---

[1] Prior to a responsive pleading being filed, Plaintiff obtained the undersigned counsel and filed a First Amended Complaint on January 10, 2006. B27.

[2] Additional witnesses whose depositions also are cited herein include the following:

1.    John Ruffin, a former Surveillance Operator, Ruffin at 12; B682;

Defendant moved for summary judgment on February 29, 2008. This is Plaintiff's

Answering Brief in opposition to Defendant's Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

Plaintiff certainly can establish prima facie cases of sex, age, and race

discrimination under Title VII, § 1981, and the ADEA. When his employment ended,

Plaintiff was a 47 year old, African-American male who was qualified for his position of

more than 33 months. Defendant fired him, allegedly for sharing his IGS password.

Regarding sex and race discrimination, Defendant did not discharge at least seven

Caucasian female co-workers who also committed the same infraction. Regarding age

discrimination, Defendant replaced Plaintiff with a sufficiently younger female employee

at least six years younger than him.

By a preponderance of the evidence, under prong one of Fuentes, a jury can

choose to disbelieve any non-discriminatory reason offered by Defendant because

---

2.    Mario Flores, a former Slot Shift Manager, Flores at 5-6; B780-81;

3.    Rosetta Loper, a former Slot Attendant supervised by Plaintiff who was moved to the cashier's cage allegedly because she also was his stepdaughter, Loper at 10, 45; B845, 880;

4.    Scott Saxon, Director of Human Resources, Saxon at 6; B892;

5.    Daryl Nashold, a Caucasian Slot Shift Manager-Technical Manager to whom Plaintiff reported and who made racist jokes, Nashold at 8-9, Pl. at 54-59; B94-99, 979-80; and

6.    Jay Lewis, Executive Director of Security & Surveillance, the department that conducted an investigation in conjunction with the Slot Department that revealed that *multiple* supervisors had given out their IGS passwords, Lewis at 6, 15; B653, 662.

2

Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's stated reasons to make them unworthy of belief. Instead, a jury can find that discrimination was the real reason Defendant discharged him. Also under prong two of <u>Fuentes</u>, the natural probative force or weight of the evidence demonstrates discrimination. There is much circumstantial evidence of discrimination including (1) Plaintiff's female director's selection and promotion of a younger female replacement, (2) the director's relative leniency on his younger, white, and female co-workers, (3) her sex bias against males, (4) workplace statistics, (5) factors usually considered which were ignored, (6) violation of procedures regarding Defendant's progressive discipline policy, and (7) the suspicious lack of both a written report and a surveillance tape of Plaintiff's discharge. This circumstantial evidence allows a jury to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

Defendant also discriminated Plaintiff in the terms and conditions of his employment because of his sex and his race by denying him a non-management position needed for a medical issue, singling him out for discipline for using a public restroom, and transferring his stepdaughter away from his department.

Plaintiff has exhausted his administrative remedies regarding his claims of sex, age, and race discrimination under Title VII and the ADEA because he first filed a timely charge of discrimination and then after receiving his right to sue, he timely filed his original pro se Complaint in compliance with Rule 6(a) of the Federal Rules of Civil Procedure.

3

Finally, Plaintiff is entitled to punitive damages because Defendant's conduct involved reckless or callous indifference to his federally protected rights.

## STATEMENT OF FACTS

**A.  The Parties.**  Plaintiff Clifton J. Showell, Jr. is a 51 year old African-American male resident of Felton, Delaware.  First Amend. Compl. and Answ. at ¶ 6; B16, 28.[3]  From July 15, 1998 to March 5, 2004, he was employed continuously by Defendant Gaming Entertainment (Delaware), L.L.C., a Delaware limited liability company doing business as "Midway Slots & Simulcast Gaming Entertainment" ("Midway Slots"), and operating a casino in Harrington, Delaware.  First Amend. Compl. and Answ. at ¶¶ 7-8; B16, 28.[4]

**B.  Plaintiff's Very Good Employment History.**  Plaintiff was a good, honest, diligent, hard-working, loyal, and very understanding employee who always performed his job in an exemplary manner to the best of his abilities.  Flores at 35, Loper at 32, Robinson at 13, Jenkins at 14-15, Pl. at 116; B156, 465-66, 570, 810, 867.  Thus, he was nominated for the awards of Team Member of the Month in 1999, and Employee of the Month in 2002.  First Amend. Compl. and Answ. at ¶ 13, P4, 5; B2, 3; B17, 29.  In his last full year, he received a 5% raise and a very good 2003 evaluation.  Pl. at 205; B245.  In fact, throughout his employment, Plaintiff never received a negative annual evaluation.  Pl. at 204, First Amend. Compl. and Answ. at ¶ 11; B17, 29, 244.

---

[3]  Plaintiff was born on October 29, 1956.  Pl. at 3; B43.

[4]  Midway Slots has more than 500 employees.  First Amend. Compl. and Answ. at ¶ 8, Saxon at 9; B16, 28, 895.  Its departments include Slots, Security & Surveillance, Simulcast, Food and Beverage, Human Resources, Support Service, Facilities, Management Information Systems, Marketing, Finance, and Administrative & General.  Saxon at 13-14; B899-900.

4

    **1. Plaintiff's Multiple Promotions.** Plaintiff also received promotions from Defendant. He initially was a Slot Floor Attendant for about a year and a half. Pl. at 28-29, First Amend. Compl. and Answ. at ¶ 9; B17, 28, 68-69. Then, Vice President and General Manager Mike Vautrin promoted him to Lead Attendant due to his attendance record, job performance, and initiative. Pl. at 29, 37-38, Pope at 5; B69, 77-78, 335.[5] Then after just eight months, Vice President Rich Jeffries promoted him on June 6, 2001, to Slot Shift Supervisor, managing 14 to 20 people. Pl. at 34, 41, 43-45, Pl. at 47, D682, First Amend. Compl. and Answ. at ¶ 10; B17, 28, 74, 81, 83-85, 87, 1067.

**C. Factors Usually Considered Were Ignored.**

    **1. Defendant Introduced a New Computer System with Passwords.** In January of 2004, Defendant put in a computer new system, the IGS system, used by the Slot Department. Pl. at 81, 85, Saxon at 63, Nashold at 38; B121, 125, 949, 1009. As part of the System, Slot Attendants and Slot Shift Supervisors were issued their own unique IGS passwords. Dorsey at 19, Saxon at 63, Robinson at 26-27, Nashold at 38, Pl. at 85; B125, 583-84, 583-84, 629, 629, 949, 1009.

    **2. Plaintiff Informed His Director That Many Supervisors Disclosed their Passwords to Subordinates.** In 2004, it was common practice for managers to let their subordinates use their IGS passwords to complete the hopper-fill slips[6] which had to be

---

[5] Plaintiff was one of Defendant's first two Lead Attendants. Pl. at 39; B79.

[6] Each slot machine has a bucket or "hopper" inside of it, and the coins would be placed inside of these. Saxon at 18-19; B904-05. However, after the machine had emptied itself of coins and a customer won, a light would go off at the top of the machine, and a slot attendant then would have to take out a bag of approximately $500 in coins and do a "hopper fill" with that bag of coins. Saxon at 19; B905.

completed at the end of each night.  Robinson at 29, Pl. at 216, Kimball at 50, Pope at 47-48; B256, 377-78, 545, 586, 586.[7]  In mid-January, Slot Attendants Patty Robinson and Pam Chisholm told Plaintiff that Slot Shift Supervisors Bob Schueler and Sabrina Jenkins had given out their passwords to complete hopper-fill slips at a reasonable time.  Pl. at 183; B223.[8]  Approximately three or four Slot Shift Supervisors had disclosed their IGS passwords to Slot Attendants.  Nashold at 31, 39, Robinson at 28-29, Saxon at 66; B585-86, 585-86, 952, 1002, 1010.  So other than Plaintiff, slot shift supervisors working in the evenings used other Slot Attendants to assist them in completing the slips.  Jenkins at 26; B477.

Specifically to help her complete the slips, Slot Shift Supervisor Sabrina Jenkins, a 26 year old female, shared her password with Slot Attendant Patty Robinson even though she was not supposed to do so.  Jenkins at 4, 8, 27, Saxon at 66-67; B455, 459, 478, 952-53.[9]  As a result, Schueler and Jenkins were able to go home at a reasonable

---

[7]  The responsibilities of the Slot Attendants and Slot Shift Supervisors are the hopper fills and the jackpots to the customers.  Saxon at 15; B901.  Specifically, hopper-fill slips had to be completed every night by 2:00 a.m.  Dorsey at 21-22, Pope at 47-48; B377-78, 631-32.  There was a two hour window for them to be completed.  Dorsey at 22; B632.  If they were not completed in a timely manner, a supervisor would have to come in three to four hours later and override the transaction.  Dorsey at 22, Pope at 49; B379, 632.

[8]  Slot Attendant Georgia Kimball also explained to Plaintiff that that was the way the Slot Attendants were getting the tickets processed.  Kimball at 18; B513.  In fact, "that's the way it had been done for months and months" before Plaintiff's discharge.  Kimball at 20; B515.  Thus, the majority of the Slot Attendants and Lead Attendants were given their supervisors' passwords.  Kimball at 19; B514.

[9]  Jenkins' date of birth is January 25, 1978.  Jenkins at 4; B455.

6

time. Pl. at 178; B218. In contrast, often to get his work done, Plaintiff was there until three o'clock in the morning. Pl. at 178; B218.

So in January of 2004, Plaintiff actually told his supervisor, female Director of Slot Operations Beverly Pope that Sabrina Jenkins and Bob Schueler gave out their passwords. Pl. at 178, 181, 183, Pope at 5; B218, 222, 223, 335. Thus, Pope "was aware that it was working like that." Kimball at 20; B515. Though Pope was aware that they had shared their passwords, there was nothing said to them. Jenkins at 27, Pl. at 178; B218, 478.[10] So Plaintiff gave his password to Kimball solely so she could complete the hopper-fill slips. Pl. at 183, Kimball at 48; B223, 543. He assumed that if Pope said it's okay for the younger female Jenkins, then it should have been okay for him. Pl. at 178; B218.

**3. Female Subordinate Wrongfully Used Plaintiff's Password Without His Presence, Knowledge, or Consent.** On Sunday, February 29, 2004, Plaintiff was not working and thus was not even on the premises of the casino. Kimball at 56, Pope at 52, First Amend. Compl. and Answ. at ¶ 22; B18, 29, 382, 551. Nevertheless, to override a jackpot, Kimball used his password without his permission. Pl. at 196, Kimball at 25, Pope at 50-51; B236, 380-81, 520. She had short paid a customer and went back to get the money owed and used Plaintiff's pass code to do so. Pope at 50-51, 54; B380-81, 384. Admittedly, Kimball input the amount wrong but was able to get the money because she used Plaintiff's password. Kimball at 26, Pope at 53; B383, 521.

---

[10] Schueler was not disciplined only because he passed away before Beverly Pope became aware of this. Robinson at 30-31; B587-88.

7

Previously, Plaintiff told Kimball never to use his password when he was not

there.  Pl. at 216; B256.  Also, he had not told her that day that she could use it.  Kimball

at 57-58; B552-53.  Furthermore, Plaintiff did not know that Kimball was using his

password for that particular reason.  Kimball at 56; B551.  Thus at deposition, Kimball

confessed, "*I* was wrong." Kimball at 26; B521 (emphasis added).

**4.  Investigation Revealed Multiple Supervisors' Violations.**  Surveillance

Manager David Zerbe conducted a surveillance review and ascertained that Kimball had

conducted the override even though the system indicated that Plaintiff had done so.

Lewis at 14-15; B661-62.  Defendant's Surveillance Department in conjunction with the

Slot Department conducted an investigation into which Slot Department employees were

disclosing IGS passwords.  Lewis at 15, Nashold at 32; B662, 1003.[11]  As a result of the

investigation, it was revealed that *multiple* Slot Shift Supervisors had given out their

passwords! Lewis at 13, 15, Nashold at 31, Saxon at 68; B660, 662, 954, 1002.  See

Statement of Facts, Part E.1, infra.

**D.  The Male Plaintiff Was the Only One Discharged.**  Director of Slot Operations

Beverly Pope participated in the investigation and then made the decision to terminate

Plaintiff.  Lewis at 15, Pope at 58-59; B388-89, 662.  Pope said, "I got to terminate him."

Pope at 62; B392.  Thus, "they walked him out." Ruffin at 70; B740.

Plaintiff was terminated on March 5th, 2004.  Pl. at 229; B269.  Pope fired him

for Kimball's use of his password without his consent on a day that he wasn't even there!

---

[11]  "There was a lot of scampering going on as far as the way the passwords were being secured, [and] people [were] being called in and asked if they had disseminated their passwords[.]" Ruffin at 63; B733.

Saxon at 69, Pl. at 215; B255, 955.  Plaintiff was the only person terminated in conjunction with the investigation.  Lewis at 20, 955; B667.

**E.  Plaintiff's Female Director Discharged No Females for the Exact Same Violation.**

    **1.  Disclosing Passwords to Subordinates.**  Pope did not discharge similarly situated female employees for the same violation Plaintiff committed.  Two female peers,[12] then 26 year old Slot Shift Supervisor Sabrina Jenkins and Lead Slot Attendant Brandy Shahan, also in her late 20's, gave out their passwords knowingly to complete hopper-fill slips, but they kept their jobs.  Pl. at 165, Jenkins at 12-13, 28-29, Robinson at 28, Kimball at 55, Lewis at 15-17; B205, 463-64, 550, 585, 586, 662-64.[13]  After it was discovered that Jenkins had disclosed her IGS password, her boss Pope interviewed her.  Saxon at 80; B966.  However, unlike its treatment of Plaintiff, Defendant did not fire Jenkins.  Jenkins at 28-29; B479-80.

    Also, female Slot Attendant Nicole Maker had given out her password.  Lewis at 15-17; B662-63.  The Security & Surveillance Department reported this to Pope, and Maker was taken into the office and questioned about it.  Lewis at 16, Robinson at 44-45; B601-02, 663.  However, Maker was not fired for this incident; she is still there.  Kimball at 52-53; B547-48.

    **2.  Improperly Using Passwords from Supervisors.**  Pope also interviewed Slot Attendant Patty Robinson.  Pope at 56-57; B386-87.  Robinson had used a supervisor's

---

[12]  Slot Shift Supervisors and Lead Slot Attendants are managers at Midway Slots.  Nashold at 10; B981.

[13]  Shahan eventually voluntarily left Midway to join the military.  Dorsey at 24-25; B634-35.

IGS password but wasn't supposed to do so.  Robinson at 36, Lewis at 18, Kimball at 53; B548, 593, 665.[14]  However, Defendant never issued her a final warning nor discharged her for using a supervisor's password.  Robinson at 37, Kimball at 51; B546.  Robinson is still employed there.  Kimball at 53; B548, 594.

Also, Pam Chisholm, a white female in her 20's, used a supervisor's IGS password.  Kimball at 54; B549.  Again, former Slot Attendant Georgia Kimball, a white female, improperly used her supervisor's IGS password.  Nashold at 32; B1003.  However, she merely was spoken to about this.  Robinson at 45; B602.  Finally, Joyce, a white female, used a supervisor's IGS password and is still working for Defendant.  Kimball at 54-55; B549-50.

In stark contrast, Plaintiff's employment ended shortly after Defendant discovered that he and these women had shared IGS passwords.  Robinson at 34-35; B591-92.  However, if Plaintiff was fired for his action, they should have been fired for the same action.  Pl. at 215; B255.  Instead, not one female was terminated for the same offense!  Pl. at 166; B206.

**F. Female Director Replaced Plaintiff with a Younger Female.**  When Plaintiff was fired, there was a vacancy.  Nashold at 47; B1018.  In addition to firing Plaintiff (Saxon at 69), Beverly Pope decided to promote to Slot Shift Supervisor, Tracy Dorsey, a female more than six years younger than Plaintiff.  Dorsey at 6, Nashold at 47, Pope at 70, Saxon

---

[14]  Jenkins shared her password with Robinson.  Jenkins at 27; B478.

at 24-25, Robinson at 35; B400, 592, 616, 910-11, 910-11, 955, 1018.[15]  So Dorsey filled Plaintiff's vacancy and replaced him as a Slot Shift Supervisor.  Pope at 70; B400.

## STANDARD OF REVIEW

"[I]n discrimination cases, the court's role is 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" Lamb-Bowman, v. Delaware State Univ., 152 F.Supp.2d 553, 557-58 (D.Del. 2001) (citing Fed.R.Civ.P. 56(c).  "The moving party bears the burden of proving that no genuine issue of material fact exists." Id. at 558.  "The court will 'view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion.'" Id. at 557-58.  Summary judgment is defeated "where an issue of material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility." Schoonejongen v. Curtiss-Wright Corp., 143 F.3d  120, 130 (3d Cir. 1998).

---

[15]  Dorsey's birth date is January 28, 1963.  Dorsey at 4; B614.

<u>**ARGUMENT**</u>

**I.  PLAINTIFF HAS ESTABLISHED THREE PRIMA FACIE CASES OF DISCRIMINATORY DISCHARGE BASED ON SEX, AGE, AND RACE UNDER THE INDIRECT EVIDENCE FRAMEWORK OF <u>McDONNELL DOUGLAS</u>.**[16]

**A.  Sex Discrimination.**  Plaintiff can prove a prima facie case of sex discriminatory discharge under Title VII.  Under the first step of the three step "pretext" or "indirect evidence" framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973), and <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981), the record demonstrates that Plaintiff has proven a prima facie case that he was discharged because of his sex.

> To establish a prima facie case of [sex] discrimination under Title VII, a plaintiff must establish that: (1) he . . . is a member of a protected class; (2) he . . . is qualified for the former position; (3) he . . . suffered an adverse employment action; and (4) either non-members of the protected class were treated more favorably than the plaintiff, or the circumstances of the plaintiff's termination give rise to an inference of [sex] discrimination.

<u>Taylor v. Procter & Gamble Dover Wipes</u>, 184 F.Supp.2d 402, 409 (D.Del. 2002).

"The burden of establishing a prima facie case . . . is not onerous."  <u>Burdine</u>, 450 U.S. at 253; <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 986 (1988); <u>Sheridan v. E.I. DuPont de Nemours and Co.</u>, 100 F.3d 1061, 1084 (3d Cir. 1996)(en banc); <u>Marzano v. Computer Science Corp. Inc.</u>, 91 F.3d 497, 508 (3d Cir. 1996); <u>Sempier v. Johnson &</u>

---

[16]  Though Defendant argues there is no direct evidence of discrimination, (<u>see</u> Def. Op. Brf. Argument § B.1), Plaintiff has never alleged his was a direct evidence case.  Rather, here, as "[i]n most [employment discrimination] cases, specific intent to discriminate [is] not . . . demonstrated by 'smoking gun' evidence.  As a result, the evidentiary burden . . . [will] . . . be satisfied by the introduction of circumstantial evidence." <u>Gavalik v. Continental Can Co.</u>, 812 F.2d 834, 852 (3d Cir. 2008).

Higgins, 45 F.3d 724, 728 (3d Cir. 1995); Ezold v. Wolf, Block, Schorr and Solis-Cohen,

983 F.2d 509, 523 (3d Cir. 1992)(the prima facie case is "easily made out").  Indeed,

disputes over its elements are deferred to the pretext stage of the analysis.  Iadimarco v.

Runyon, 190 F.3d 151, 163 (3d Cir. 1999); Matczak v. Frankford Candy and Chocolate

Co., 136 F.3d 933, 939 (3d Cir. 1997).  According to the Third Circuit, the favorable

treatment of merely one non-protected employee is enough to meet the prima facie

burden.  Simpson v. Kay Jewelers, Div. of Sterling, 142 F.3d 639, 645-46 (3d Cir. 1998).

An "initial presumption of discrimination arises from the plaintiff's prima facie

case of discrimination because [the court] presume[s such] acts, if otherwise unexplained,

are more likely than not based on the consideration of impermissible factors."  Sheridan,

100 F.3d at 1069 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)

(internal quotation marks omitted)).  Moreover, inferences of discrimination can arise

from substantial generalized evidence of discriminatory intent.  Taylor, 184 F.Supp.2d at

409-10.

Here, Plaintiff belonged to a protected class as a male.  He was qualified for the

position of Slot Shift Manager because he held that role for 33 months from June 6, 2001

to March 5, 2004.  D682, Pl. at 229; B1067, 269.  He suffered an adverse action when he

was discharged allegedly for disclosing his password and was replaced by a less

experienced female who had never been a supervisor.  Dorsey at 6; B616.  Non-members

of the protected class were treated more favorably than him because at least three

females: Slot Shift Supervisor Sabrina Jenkins, Lead Slot Attendant Brandy Shahan, and

Slot Attendant Nicole Maker all disclosed their passwords and at least four females: Slot

13

Attendants Georgia Kimball, Nicole Maker, Joyce and Patty Robinson all improperly used supervisors' passwords, and no female was discharged for the same alleged violation.[17]  Accordingly, Plaintiff has proven his prima facie case, and it gives rise to a reasonable inference that sex discrimination was the reason for Plaintiff's discharge. Burdine, 450 U.S. at 253.

**B.  Age Discrimination.**  The framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973), also applies to claims brought under the ADEA.  See, e.g., O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996); Showalter v. University of Pittsburgh, 190 F.3d 231 (3d Cir. 1999). Under the three step "pretext"or "indirect evidence" framework, the evidence also demonstrates that Defendant intentionally discharged Plaintiff because of his age.  Under the first step, plaintiff has proven a prima facie case that he was discharged because of his age.

Under the ADEA, "[w]hen the plaintiff alleges unlawful discharge based on age, the prima facie case requires proof that (i) the plaintiff was a member of the protected class, i.e., was 40 years of age or older  . . . , (ii) that the plaintiff was discharged, (iii) that the plaintiff was qualified for the job, and (iv) that the plaintiff was replaced by a *sufficiently younger person* to create an inference of age discrimination." Showalter v. University of Pittsburgh, 190 F.3d at 234 (emphasis added).  "In order for a plaintiff to

---

[17]  The responsibilities of the Slot Attendants and Slot Shift Supervisors are the hopper fills and the jackpots to the customers.  Saxon at 15; B899.  Though some of these employees had different job titles than Plaintiff, the United States Supreme Court has never announced a rule "that no comparison is probative unless the situation of the individuals compared is identical in all respects." Miller-El v. Dretke, 545 U.S. 231, 247 n.6 (2005).  So, Slot Attendants and Slot Shift Supervisors are similarly situated employees.

satisfy the sufficiently younger standard, [the Third Circuit has] noted that there is no particular age difference that must be shown, but while different courts have held that *a five year age difference can be sufficient*, a one year difference cannot." Id. at 236 (internal quotation marks, citations, and ellipses omitted)(emphasis added). See also Sempier v. Johnson & Higgins, 45 F.3d at 729 (holding that the fourth prong of a prima facie age discrimination case was satisfied where plaintiff was replaced by two individuals-one who was four years younger than plaintiff and the other who was ten years younger).

**1. Sufficiently Younger Replacement.**  The United States Supreme Court has held that "the fact that an ADEA plaintiff was replaced by someone outside the protected class is *not a proper element of the McDonnell Douglas prima facie case*." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. at 312 (emphasis added).  Rather, "[b]ecause the ADEA prohibits discrimination on the basis of age and *not class membership*, the fact that a replacement is *substantially younger* than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." Id. at 313 (emphasis in original).  Therefore, "[t]he fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*." Id. at 312 (emphasis in original).  In so holding, the Court hypothesized that "there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40 year-old is replaced by a 39 year-old than when a 56 year-old is replaced by a 40 year-old." Id.

15

Here, Plaintiff was age 47, was discharged on March 5, 2004, was absolutely qualified for his job of over 33 months, and was replaced that same year by Tracy Dorsey, then age 41.  D682, Pl. at 229; B1067, 269.  Because there is an age difference of more than 6 years, Dorsey is sufficiently younger than Plaintiff as a matter of law in the Third Circuit under Showalter, 190 F.3d at 236.[18]  Accordingly, plaintiff has demonstrated his prima facie case, under our unique facts.  Jones v. School Dist. of Phila., 198 F.3d 403, 411 (3d Cir. 1999).

**C.  Race Discrimination.**  Finally, Plaintiff can prove a prima facie case of race discriminatory discharge under Title VII and § 1981.  Under the first step of the three step "pretext" or "indirect evidence" framework of McDonnell Douglas Corp., 411 U.S. at 802-05, and Burdine, 450 U.S. at 252-53, the record demonstrates that Plaintiff has proven a prima facie case that he was discharged because of his race.

> To establish a prima facie case of racial discrimination under Title VII, a plaintiff must establish that: (1) he . . . is a member of a protected class; (2) he . . . is qualified for the former position; (3) he . . . suffered an adverse employment action; and (4) either non-members of the protected class were treated more favorably than the plaintiff, or the circumstances of the plaintiff's termination give rise to an inference of race discrimination.

Taylor, 184 F.Supp.2d at 409.[19]

---

[18]  In addition to replacing Plaintiff with the sufficiently younger Dorsey, Pope did not discipline five females for sharing IGS passwords, each of whom was at least more than seven years younger than Plaintiff.  See Argument II.B.2, infra.

[19]  "[S]ection 1981 claims [also are analyzed] under the familiar McDonnell Douglas shifting burden framework used in Title VII discrimination cases."  Pamintuan v. Nanticoke Mem'l Hosp., 192 F.2d 378, 385 (3d Cir. 1999).

Here, Plaintiff belonged to a protected class as an African-American.  Again, he was qualified for the position of Slot Shift Manager because he held that role for 33 months.  D682, Pl. at 229; B1067, 269.  He suffered an adverse action when he was discharged allegedly for disclosing his password and was replaced by a less experienced female who had never held a supervisory position.  Dorsey at 6; B616.  Non-members of the protected class were treated more favorably than him because Caucasian Lead Slot Attendant Brandy Shahan disclosed her password and Caucasian Slot Attendants Georgia Kimball, Pam Chisholm, Joyce and Patty Robinson all used supervisors' passwords, and no Caucasian was discharged for committing the same alleged violation.  Accordingly, Plaintiff has proven his prima facie case, and it gives rise to a reasonable inference that race discrimination was the reason Plaintiff was discharged.  Burdine, 450 U.S. at 253.

## II.  DEFENDANT'S LEGITIMATE, NON-DISCRIMINATORY REASONS FOR ITS ADVERSE ACTIONS ARE PRETEXTUAL.

Defendant's legitimate, non-discriminatory reasons for its adverse actions against Plaintiff are pretextual.  Once plaintiff's prima facie showing is made, "the employer [i]s obliged to proffer a nondiscriminatory reason for its adverse employment action." Sheridan, 100 F.3d at 1065-66.  "[T]o defeat summary judgment when the defendant answers the . . . prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d

17

759, 764 (3d Cir. 1994); Sheridan, 100 F.3d at 1067.  Here, Plaintiff can proceed under

either of the two prongs found in Fuentes, 32 F.3d at 764, and which were reaffirmed

twice by the Third Circuit en banc in Sheridan, 100 F.3d at 1067, and in Keller v. Orix

Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)(en banc).

Here, Defendant's stated reason is that Plaintiff's disclosure of his password was a

violation of policy, was a breach of security, and undermined the integrity of the IGS

system.  Saxon at 70; B956.  Thus, Pope testified that she discharged him because of the

importance of the IGS passwords.  Pope at 58-59, 62; B388-89, 392.

**A.  Prong 1–Defendant's Abundant Weaknesses, Incoherencies, Implausibilities,
Inconsistencies, and Contradictions Support Plaintiff's Case.**  Under prong one,

plaintiff proceeds with a "credibility" or "unworthy of credence" case.  Bray v. Marriott

Hotels, 110 F.3d 986, 990 (3d Cir. 1997).  Here "plaintiff must demonstrate such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could

rationally find them 'unworthy of credence.'"  Sheridan, 100 F.3d at 1072; Bray, 110 F.3d

at 990; Keller, 130 F.3d at 1108-09.

The district court's role here will be limited.  "The role of determining whether

the inference of discrimination is warranted must remain within the province of the jury,

because a finding of discrimination is at bottom a determination of intent."  Sheridan, 100

F.3d at 1071.

18

> In making that finding, the jury must perform its traditional
> function of assessing the weight of the evidence, the credibility of
> the witnesses through observation of both direct testimony and
> cross-examination at trial, and the strength of the inferences that
> can be drawn from the elements of the prima facie case and the
> evidence that undermines the employer's proffered reasons for its
> actions.  This is uniquely the role of the factfinder, not the court.

Id. at 1071-72.

All the trial court must determine is "whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible . . . ." Id. at 1072.  "But once the court is satisfied that the evidence meets this threshold requirement, it may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer." Id.

It is a "mistaken assumption" that the prima facie case presumption "drops from the case . . . [and that] the underlying facts lose their probative value." Sheridan, 100 F.3d at 1069 (internal punctuation omitted).[20]  "In deciding the 'ultimate question' of whether the employer unlawfully discriminated . . . the factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination." Id. at 1066 (quoting Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).  In other words, "if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, . . . the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima

---

[20]  "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000)(internal punctuation omitted)(quoting Burdine, 450 U.S. at 255 n.10).

19

facie case." <u>Fuentes</u>, 32 F.3d at 764; <u>Sheridan</u>, 100 F.3d at 1071.  Rather, "no additional

proof of discrimination is <u>required</u>." <u>Hicks</u>, 509 U.S. at 511; <u>Sheridan</u>, 100 F.3d at 1066,

1071.

"It is the jury's determination that the reason given was pretextual together with

the evidence that supported the prima facie case that will sustain a finding of intentional

discrimination . . . ." <u>Sheridan</u>, 100 F.3d at 1071.  "Proof that the defendant's explanation

is unworthy of credence is simply one form of circumstantial evidence that is probative of

intentional discrimination, and it may be quite persuasive." <u>Reeves v. Sanderson</u>

<u>Plumbing Prod., Inc.</u>, 530 U.S. 133, 147 (2000)  The "trier of fact can reasonably infer

from the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose." <u>Id.</u>  This is because "[r]esort to a pretextual explanation is, like

flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of

course, evidence of illegal conduct." <u>Sheridan</u>, 100 F.3d at 1069.  Additionally, evidence

that an employer failed to follow disciplinary policies is evidence of discrimination when

"such evidence comes with a backdrop suggesting [discriminatory] animus." <u>Taylor</u>, 184

F.Supp.2d 416 (internal punctuation omitted).

Regarding the effect of the falsity of a defendant's stated reason or other evidence,

the Third Circuit has said, "a party's <u>falsehood</u> . . . in the preparation and presentation of

his cause, his fabrication or suppression of evidence by bribery or spoilation, is receivable

against him as an indication of his consciousness that his case is a weak or unfounded

one; and from that consciousness may be inferred the fact itself of the cause's lack of

truth and merit." <u>Sheridan</u>, 100 F.3d at 1069 (citing <u>McQueeney v. Wilmington Trust</u>

Co., 779 F.2d 916, 921-22 (3d Cir. 1985)).  Importantly, there the en banc court also

declared "[w]e routinely expect that a party give honest testimony in a court of law; there

is no reason to expect less of an employer charged with unlawful discrimination."

Sheridan, 100 F.3d at 1069.

"Thus, when all legitimate reasons for [an adverse employment action against

plaintiff] have been eliminated as possible reasons for the employer's actions, it is more

likely than not the employer, who we generally assume acts only with some reason, based

his decision on an impermissible consideration . . . ." Sheridan, 100 F.3d at 1069 (citing

Furnco Constr. Corp., 438 U.S. at 577).  Specifically, "[t]he factfinder's disbelief of the

reasons put forward by the defendant . . . may, together with the elements of the prima

facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's

proffered reasons will permit the trier of fact to infer the ultimate fact of intentional

discrimination." Id.

Here, there are abundant weaknesses, incoherencies, implausibilities,

inconsistencies, and contradictions in Defendant's version of the case, such that a

reasonable fact finder could find it unworthy of belief.  Fuentes, 32 F.3d at 765.  Thus,

the prima facie showing, when joined with disbelief, permits a jury to return a verdict of

discrimination.  Sheridan, 100 F.3d at 1071.

## 1. The Weak, Incoherent, and Implausible Stated Reason that Plaintiff Violated Policy.

### a. Defendant Had Absolutely No Password Policy When It Discharged Plaintiff!

Despite Defendant's suggestion that Plaintiff violated a written policy against disclosing

his password, when Plaintiff was fired, there was no written policy regarding IGS

21

passwords.  Kimball at 48, Ruffin at 80, P282; B543, 750.  Rather, the whole IGS System was new, and there were no policies.  Pl. at 274; B315.  In sum, there was no policy, design or written procedure regarding passwords at the time Plaintiff was terminated! Ruffin at 80, Pope at 90, Pl. at 182; B222, 750.

**b.  Defendant's Password Policy Was Created *After* Plaintiff Was Discharged!** In reality, the policy was created after Plaintiff's termination.  P282; B1072.  Specifically, after the incident with Kimball which resulted in Plaintiff's discharge, Defendant decided to make it a written policy that improper use of the IGS passwords would result in termination of employment.  Kimball at 48; B543.  Defendant had a practice of "creating policy after a questionable act . . . on several occasions." P282; B1072.  So Defendant's suggestion that Plaintiff violated a specific policy in disclosing his password is **inconsistent** with and **contradicted** by the testimony of Kimball, Ruffin, and Plaintiff.

**c.  A "Final" Warning Memo Was Issued *After* Plaintiff's Discharge.**  Beverly Pope issued a "final" warning prohibiting sharing IGS Passwords only *after* she discharged Plaintiff.  *After* the investigation in March of 2004, Pope issued and circulated a final warning memo telling all Slot Department Supervisors and Lead Attendants not to share their IGS passwords. Lewis at 20-21, Jenkins at 28, Nashold at 44, Pope at 67, 96; B397, 426, 479, 667-68, 667-68, 667-68, 1015.  It was Pope's idea to issue this memo.

22

Saxon at 64; B950.[21]  Pope did this to prevent future unauthorized disclosures of the IGS

passwords.  Nashold at 45; B950.[22]

Such discipline is supposed to give employees an opportunity to correct

unacceptable behavior.  Saxon at 64; B950.  So Pope provided her female employees with

an opportunity to prevent such behavior.  Saxon at 65; B951.  It also was an opportunity

to prevent individuals from being terminated.  Saxon at 66; B952.  However, she did not

provide this opportunity to the male Plaintiff.  Instead, Pope decided to terminate

Plaintiff! Saxon at 69; B955.

However, the people who received Pope's Final Warning Memo also had shared

their IGS password.  Saxon at 65; B951.  Yet, Jenkins, Shahan, and Maker were not

discharged for disclosing their passwords.  For these younger female offenders, the

measure taken to fix the problem was to issue this final warning memo.  Saxon at 68;

B954.  Again, Plaintiff was the only person terminated in conjunction with the Security &

Surveillance Department's investigation into the disclosure of IGS passwords! Lewis at

20; B667.  Because this drastically disparate measure was taken for identical conduct,

Defendant's explanation for firing Plaintiff is **weak**, **incoherent**, and **implausible**!

---

[21]  The memo read in part, "Effective immediately under no circumstances shall you furnish or provide any Slot Department Team Member with your IGS password.  Failure to comply with this directive shall result in immediate termination." Pope at 67; B397.

[22]  Though of no aid to Plaintiff, the memo did effectively prevent further, unauthorized disclosures of the IGS passwords.  Pope at 96, Saxon at 68; B954.  Nobody "did anything [wrong] with their IGS password after [the memo]." Pope at 96; B426.

**2. The Weak and Implausible Stated Reasons that IGS Passwords Were Important and Plaintiff Breached Security and Undermined the Integrity of the IGS System.**

**a. There Was No Training on IGS Password Security.** When the IGS computer system was added, "[n]ot very much[]" training was provided. Kimball at 14; B509. Plaintiff received only 20 minutes of training on how to use the system. Pl. at 84; B124. During the training, "it wasn't discussed[]" whether you should give out your password to other employees. Jenkins at 32, Kimball at 16; B483, 511. So like Jenkins and Shahan, Plaintiff gave his password to Kimball solely so she could complete the hopper-fill slips. Nashold at 43, Pl. at 183, Kimball at 48; B223, 543, 1014. He "didn't think that he was doing anything wrong by getting this work done." Kimball at 20; B515. Nevertheless, Plaintiff was fired allegedly because his disclosure of the password was a breach of security, and undermined the integrity of the system. Saxon at 70; B956. However, Defendant's lack of training on IGS password security makes this termination reason **weak** and **implausible**.

**b. In Practice, There Was No Effort to Protect Slot Supervisors' Passwords.** Pope testified that she fired Plaintiff because of the importance of the IGS passwords. Pope at 62; B392. However, at Midway Slots, "there was not a true and genuine effort to protect passwords[.]" Ruffin at 51; B721. Slot supervisors' passwords were posted on the board inside of the main cashier's cage right by where the slot supervisors were. Ruffin at 51; B721. So Pope's assertion that Plaintiff was fired because IGS passwords were so important and his disclosure was such a serious act is **weak** and **implausible**!

24

**3. Plaintiff Never Received the Fabricated January "Final Warning."** Pope alleges that before his discharge, a Final Written Warning was issued to Plaintiff on January 14, 2004, for missing a meeting. Pope at 76; B406.[23] Pope alleges she issued him this warning in person. Pope at 76, 87; B406, 417.[24] Though Defendant has produced a January 14, 2004 final warning that says, "Employee refused to sign", somebody wrote that in there because on 1/14/04, Beverly Pope, wasn't even in the state of Delaware when this document was alleged to have been issued. D14-16, Pl. at 159; B199, 1041-43. Rather, Pope went to Reno, Nevada that weekend after Bob Schueler passed away. Pope at 73; B403.

Yet when Defendant called Plaintiff in to discharge him, they said he had already been handed his last warning, but Plaintiff said, "[O]h, no[!]" Pl. at 159; B199. Prior to his discharge, Plaintiff was never given the final warning. Pl. at 159; B199. In reality, on the day of termination, he saw the final warning for the first time. Pl. at 159; B199. So Pope's claim that she previously issued Plaintiff a Final Written Warning is **inconsistent** with and **contradicted** by her own travel schedule and the testimony of Plaintiff!

**a. Lack of Human Resources' Signature on the Fabricated "Final Warning."**

Furthermore, when an employee receives a final warning, a member of Human Resources is to be present. Jenkins at 18; B469. However, Defendant offered that no human

---

[23] Defendant's progressive discipline policy says a final warning must be issued before an employee can be terminated. Pl. at 113; B153. See Argument, Part II.B.4.b.i, infra.

[24] Notably, though he was Plaintiff's direct supervisor at the time, Daryl Nashold never signed the final written warning. Nashold at 31; B1002. Furthermore, Nashold did not approach Plaintiff about his failing to attend the meeting. Pl. at 161; B201. This is further evidence of the **weakness** and **implausibility** of Pope's explanation.

resources personnel was present for the alleged final warning.  Saxon at 51, Answ. at ¶ 34; B30, 937.  Furthermore, no human resources representative ever signed the fabricated final warning.  Saxon at 51, First Amend. Compl. and Answ. at ¶ 35; B19, 30.  This is further evidence of the **implausibility** of Defendant's allegation that it presented Plaintiff the final warning document in January.

**4.  Pope Had Prior Knowledge that IGS Passwords Were Disclosed.**  Also, Pope testified that she did not become aware that anyone had given out their IGS password until the incident with Kimball in March of 2004.  Pope at 50-51; B380-81.  In reality, Plaintiff previously told Pope that Jenkins and Schueler gave out their passwords in January of 2004.  Pl. at 178; B218.  See also Statement of Facts, Part C.2, supra.  So Pope was aware that they gave out their passwords.  Jenkins at 27, Robinson at 31, Kimball at 20; B478, 515, 588.  However, nothing was said to either of them.  Pl. at 178; B218.[25]  So Pope's testimony is **inconsistent** with and **contradicted** by the testimony of Kimball, Jenkins, Robinson, and Plaintiff!

**5.  The Inconsistent Treatment of Younger Female Supervisors Who Committed the Identical Offense.**  Again, Pope rationalized that she fired Plaintiff because of the importance of the IGS Passwords.  Pope at 62; B392.  However, three younger female supervisors committed the identical offense.  Specifically, the then 26 year old female Slot Shift Supervisor Sabrina Jenkins gave out her password.  Jenkins at 4, Saxon at 66-67, Robinson at 28, Nashold at 40; B455, 585, 585, 952-53, 1011.  Also,

---

[25]  Again, Schueler was not disciplined for this only because he passed away before Beverly Pope became aware of this.  Robinson at 30-31; B587-88.

Lead Slot Attendant Brandy Shahan, a white female in her late 20's, gave out her password. Kimball at 55-56, Robinson at 28, Nashold at 39-40; B550-51, 585, 1010-11. Also, female Slot Attendant Nicole Maker had given out her password. Lewis at 15-17; B662-63. Like Plaintiff, Jenkins and Shahan had given out their passwords to help get the hopper-fill slips completed, but they were not fired. Nashold at 43, Robinson at 31; B588, 1014. Also. Maker was not fired for this incident, and she is still there. Kimball at 52-53; B547-48. So Pope's leniency with her younger female subordinates is **inconsistent** with her treatment of Plaintiff!

### a. The Contradicted Allegation that Jenkins Had No Prior Discipline.

Furthermore, in not discharging Jenkins for the identical offense Plaintiff committed, Pope testified that she was not fired because she "didn't have anything in her file at that time." Pope at 58; B388. Though Jenkins previously received other write-ups from Midway, she was not fired when it was discovered she shared her password. Jenkins at 28-29; B479-80. So Pope's explanation for her leniency with Jenkins is **inconsistent with** and **contradicted** by Jenkins' own sworn admission at deposition and Defendant's documentary record! Jenkins at 29, see D14-16, 1716-18; B480, 1041-46.

### B. Prong 2 – The Factfinder Can Infer That Discrimination Was More Likely Than Not a Motivating or Determinative Cause of the Adverse Employment Action.

The second prong of <u>Fuentes</u> requires evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." <u>Fuentes</u>, 32 F.3d at 762; <u>Keller</u>, 130 F.3d at 1111. Here, the weight of the evidence, including (1) Plaintiff's female director's promotion of a younger

27

female replacement, (2) the director's relative leniency on Plaintiff's younger, white, and female co-workers, (3) the director's sex bias against males, (4) workplace statistics, (5) violation of procedures including Defendant's progressive discipline policy, (6) factors usually considered which were ignored, and (7) the suspicious lack of both a report and a surveillance tape of Plaintiff's discharge, allows a jury to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

**1. Circumstantial Evidence of Sex Discrimination.**

**a. Selection and Promotion of the Female Replacement.**  Again, in addition to making the decision to terminate Plaintiff, (Saxon at 69), Beverly Pope also made the decisions to hire and then in 2004, to promote female Tracy Dorsey to Slot Shift Supervisor to replace Plaintiff.  Dorsey at 6, Nashold at 47, Pope at 70, Saxon at 24-25, 31, Robinson at 35; B400, 592, 616, 910-11, 955, 1018.  See Statement of Facts, Part F, supra.

**b. Pope's Leniency on Her Female Subordinates.**  In addition to replacing Plaintiff with female Tracy Dorsey, Pope did not discharge seven similarly situated female employees for sharing IGS passwords: Slot Shift Supervisor Sabrina Jenkins, Lead Slot Attendant Brandy Shahan, and Slot Attendant Nicole Maker (disclosed passwords) and Slot Attendants Georgia Kimball, Pam Chisholm, Joyce and Patty Robinson (used passwords).  Jenkins at 4, Kimball at 54-56, Robinson at 5; B455, 549-50, 562.  See Statement of Facts, Part E, supra.

28

**c. Pope's Sex Bias Against Males.**  Pope had a sex bias against Plaintiff and other males compared to her female subordinates.  Pope felt that Plaintiff should "just leave[.]" Pope at 79; B409.  Plaintiff never did anything physically to Pope nor told her he didn't like her.  Pope at 103-105; B433-34.  Again, Plaintiff never even received a negative annual evaluation.  Pl. at 204, First Amend. Compl. and Answ. at ¶ 11; B17, 29, 244.  Yet, Pope felt that Plaintiff had always caused her blood pressure to go up.  Pope at 60; B390.  So Pope simply decided "he needed to be terminated." Pope at 80; B410.

In addition to the male Plaintiff, Pope also discharged a male named Tony Williams and one other man.  Pope at 40, 100; B370, 430.  Also, Hispanic male Slot Shift Manager Mario Flores had to evaluate the performance of a white female Slot Attendant named Donna who wasn't doing a good job.  Flores at 52; B827.  Yet, she complained to Beverly Pope that Flores didn't give her what she deserved and also made a "false accusation" of sexual harassment against him.  Flores at 46-47, 52; B B821-22, 827.  In response, Defendant terminated Flores because of her complaint even though it was a "false accusation." Flores at 46-47, 57; B821-22, 832.

**2.  Circumstantial Evidence of Age Discrimination.**  In addition to replacing Plaintiff with Tracy Dorsey, who was more than six years younger than him, Pope did not discharge five similarly situated younger women for sharing IGS passwords, each of whom was then at least more than seven years younger than Plaintiff.  They are Slot Shift Supervisor Sabrina Jenkins, age 26; Lead Slot Attendant Brandy Shahan, late 20's; and Slot Attendant Nicole Maker, late 20's (disclosed) and Slot Attendants Pam Chisholm,

20's; and Patty Robinson, age 40 (used).  Jenkins at 4, Kimball at 54-56, Robinson at 5; B455, 549-551, 562.  See Statement of Facts, Part E, supra.

### 3.  Circumstantial Evidence of Race Discrimination.

**a.  Caucasians Not Fired for Sharing Passwords.**  Plaintiff's termination also was based upon his race.  Pl. at 191; B231.  As previously noted, Defendant did not discharge five female Caucasians who disclosed or shared IGS passwords.  Again, they are Lead Slot Attendant Brandy Shahan (disclosed) and Slot Attendants Georgia Kimball, Pam Chisholm, Joyce and Patty Robinson (used).  Kimball at 54-56, Robinson at 5; B549-551, 562.  See Statement of Facts, Part E, supra.

**b.  Workplace Statistics.**  The workplace statistics at Midway Slots is further evidence of race discrimination.  The majority or 60% of Midway's Slot Shift Managers were white.  Loper at 31, Ruffin at 105; B775, 866.  Thus on his shift, Plaintiff was the only African-American Slot Shift Manager.  Kimball at 45; B540.  In sum, "at Midway Slots, . . . there was a serious discrimination problem." Ruffin at 30-31; B700-01.

### 4.  Other Circumstantial Evidence of Discrimination.

**a.  Factors Usually Considered Were Ignored.**  Additional circumstantial evidence of discrimination is that in firing only the Plaintiff for a security breach, Defendant ignored factors that are usually considered, including the facts that (1) it had installed a new computer system with passwords, (2) many supervisors disclosed their passwords to subordinates, (3) Plaintiff's female subordinate wrongfully used his password without his presence, knowledge, or consent, and (4) Defendant's investigation revealed multiple supervisors' violations.  See Statement of Facts, Part C, supra.

30

**b. Violation of Procedures.**

**i. Progressive Discipline Policy.** Even if Plaintiff previously had received a Final Warning, Defendant violated its progressive discipline policy by discharging him for just a second offense in 2004. Defendant's progressive discipline policy includes various steps that have to be taken before an employee is discharged. Jenkins at 17, Lewis at 9; B468, 656. The initial step is a verbal counseling. Jenkins at 17, Nashold at 25; B468, 996. Then an employee gets a first written warning before a second written warning. Nashold at 25, Jenkins at 17, Dorsey at 12- 13; B468, 622-23, 996. Then, you get a second written warning before the third written warning. Nashold at 25, Dorsey at 13; B623, 996. Then after the third written warning, there is a final written warning. Pope at 90, Nashold at 26; B420, 997. So under the progressive discipline policy after you have had these series of warnings, you can be terminated. Pope at 89, Jenkins at 18; B419, 469. Only "when you exhaust *everything else*, there is termination." Nashold at 26-27; B997-98 (emphasis added). However, after the year, it's erased, and you start all over again. Pl. at 113; B153.

Even if a final warning was issued to Plaintiff in January, he was discharged that March after just one prior written warning that year. Yet even the decision maker, Pope herself, understood and admitted that Plaintiff would have had to get a third written warning before he would get the final warning under the progressive discipline policy. Pope at 90; B420. Furthermore, the fabricated document even states there was no previous disciplinary action. <u>See</u> D14; B1041. So even if Defendant had issued Plaintiff

31

this Final Warning in January, the evidence on the face of the moving party's own document is that it skipped at least one step, a first warning.[26]

However, here Defendant never issued Plaintiff the fabricated final written warning in 2004.  See Argument, Part II.A.3, supra.  So alternatively, Defendant skipped as many as four steps (first, second, third, and final warnings) in its progressive discipline policy in firing Plaintiff.

Furthermore, Defendant 1) followed its progressive discipline policy with regard to the younger female Jenkins, 2) never violated that policy with regard to the younger white female Robinson by issuing her a disciplinary action prematurely, and 3) followed all the steps in the policy in the white female Kimball's case.  Jenkins at 29, Robinson at 41, Kimball at 47; B480, 542, 598.  This selective or discriminatory enforcement of rules and regulations also is compelling evidence of causation.  See Holder, 987 F.2d at 197; Hill v. City of Scranton, 411 F.3d 118, 131-32 (3d Cir. 2005); Cox v. Louisiana, 379 U.S. 536, 557-558 (1965).

**ii.  Suspicious Lack of Both a Written Report and a Surveillance Tape of Plaintiff's Discharge.**  Finally, the weight of the evidence of discrimination includes a suspicious lack of both a written report and a surveillance tape of Plaintiff's discharge. "Usually when someone is terminated [at Midway,] there is a tape of [the] pe[rson] being walked out the door . . . ." Ruffin at 31; B701.  However, when Plaintiff was discharged,

---

[26]  Furthermore, even if the document is authentic, again, no human resources representative ever signed the alleged final warning.  D14-16, Saxon at 51, First Amend. Compl. and Answ. at ¶ 35; B19, 30, 937, 1041-43.  Defendant even admits that this was a violation of its progressive discipline policy.  See Def. Op. Brf. at 5 n.1.

the Security & Surveillance Department didn't have a tape of it.  Ruffin at 31; B701.

Furthermore, "normally [when someone is discharged] there would be a report . . . in a

book that you can read, but in [Plaintiff]'s case, there was no report in the book that says

why [he was discharged]." Ruffin at 50; B720.  This suspicious lack of both a written

report and a surveillance tape of Plaintiff's discharge is further evidence of

discrimination.

### III.  DEFENDANT ALSO DISCRIMINATED AGAINST PLAINTIFF IN THE TERMS AND CONDITIONS OF HIS EMPLOYMENT BECAUSE OF HIS SEX AND HIS RACE.

Defendant also discriminated against Plaintiff in the terms and conditions of his

employment based on his sex and his race by denying him a non-management position for

a needed medical reason, by singling him our for discipline for using a public restroom,

and by transferring his African-American stepdaughter out of his Department.[27]  As the

Seventh Circuit observed, "[o]ne does not have to be an employment expert to know that

an employer can make an employee's job undesirable or even unbearable without money

or benefits ever entering into the picture." Collins v. State of Ill., 830 F.2d 692, 703 (7th

Cir. 1987).  Adverse action also may be found in a "reassignment with significantly

different [job] responsibilities," Durham Life Insur. Co. v. Evans, 166 F.3d 139, 152-53

(3d Cir. 1999), or by decreasing an employee's earning potential and causing "significant

disruption in his working conditions." Id. at 153.  The law is clear that adverse action is a

very broad umbrella which covers a multitude of sins.

---

[27]  In the interest of judicial economy, after discovery, Plaintiff abandons his claim of age
discrimination in the terms and conditions of his employment.

**A. Sex: Denied Non-management Position.**  Pope also discriminated against Plaintiff because of his sex by denying him a non-management position needed for a medical reason.  In November of 2003, Plaintiff needed dental surgery to have his teeth removed. Pope at 92, Saxon at 51; B422, 937.  He requested a demotion to a non-management position, Slot Attendant.  Nashold at 35, Saxon at 53; B939.  Beverly Pope did not grant his request.  Nashold at 35; B1006.  Though Defendant now claims that it would have permitted him to work on the casino floor, (see Def. Op. Brf. at 14), in reality, Plaintiff was forced to take an unpaid, medical leave of absence because he was told that he couldn't work on the slot floor without teeth in his mouth.  Cf. Def. Op. Brf. at 14 with Pope at 93 and Pl. at 208-209; B248-49, 423.

Defendant didn't offer to put him in a different position during the time that he didn't have his teeth.  Pl. at 209; B249.  However, Defendant provided accommodations such as light duty when other employees could not be on the casino floor for long periods of time because of a medical problem.  Dorsey at 16; B626.  Specifically, Defendant accommodated female managers with medical issues, including Slot Shift Manager Regina Burrell in 2002, and Slot Shift Manager Sonja Clendaniel in 2004.  Pl. at 221, Lewis at 10, Dorsey at 16-18, Jenkins at 21, Flores at 41; B261, 472, 626-28, 657, 816.

In approximately 2002, female Slot Shift Supervisor Regina Burrell had knee surgery and couldn't stand for long periods of time.  Flores at 40, 41, Saxon at 57, Dorsey at 17, Pl. at 221-22, Nashold at 36; B261-62, 627, 815, 816, 943, 1007.  Though she had been a Slot Shift Supervisor, Defendant allowed her after the surgery to take a reduced role as a Slot Attendant.  Flores at 41, Pl. at 223, Jenkins at 19, Saxon at 56, Nashold at

34

36; B263, 470, 816, 816, 942, 1007.  Also, in 2004, Slot Shift Supervisor Sonja

Clendaniel had "female problems[,]" and went out of work with her medical issue, but

Defendant allowed her to come back and fill a spot as a Lead Slot Attendant.  Pope at 93-

94, Pl. at 223, Robinson at 21; B263, 423-24, 578.  "No term or condition changed in her

employment . . . ." Saxon at 60; B946.  Thus, Defendant tried to accommodate females

Burrell and Clendaniel with respect to their medical issues.  Saxon at 61; B947.[28]

Because Pope did not do likewise for Plaintiff, Defendant discriminated against him in

the terms and conditions of his employment because of his sex.

**B.  Race.**

    **1.  Disparate Discipline for Use of Public Restrooms.**  As a supervisor, the

African-American Plaintiff previously was written up for using a public restroom.  Pl. at

69; B109.  However, his "[w]hite counterpart supervisors" could "go in any bathroom

they like[d]." Pl. at 69; B109.  Specifically, Caucasian Slot Shift Managers William Bates

---

[28]  Defendant also has provided other female Slot Department employees an opportunity to
work off the floor.  Robinson at 22; B579.  When Patty Robinson broke her ribs from an injury
outside of work, she couldn't lift bags.  Robinson at 22; B579.  So she told Pope that she needed
light duty and was granted light duty.  Robinson at 22, 24; B579, 581.  In response, Pope allowed
her to work off the casino floor in the office processing paperwork and not as a supervisor and
thus, accommodated her with light duty.  Robinson at 23-25, Nashold at 34; B580-82, 1005.

and Daryl Nashold[29] could use the public restrooms and were not disciplined.  Pl. at 73;

B113.[30]

      **2.  Transfer of Plaintiff's Stepdaughter.**  Defendant also altered the terms and

conditions of Plaintiff's employment because of race by making his African-American

stepdaughter, Rosetta Loper, change departments.  Loper at 25, 36; B860, 871.  She was

moved out of the Slot Department after Plaintiff and her mother, Yvonne Loper, got

married.  Flores at 23; B798.  Defendant moved her to the cashier's cage and gave her a

pay-cut because the fact that Plaintiff was her stepfather and supervisor was deemed to be

a conflict of interest.  Loper at 14-15; B849-50.  However, white folks who were married

or dating, such as Cherie and William, were allowed to work together in the cashier's

cage.  Loper at 37; B872.  These Caucasians were not disciplined or transferred.  Loper at

38; B873.  So in reality, Plaintiff's stepdaughter was moved because she was African-

---

[29]  Nashold would avoid conversations or cut them short and give Plaintiff snappy responses.
Pl. at 53; B93.  Also, Nashold called certain African-Americans "bus people" because they
arrived by bus from Baltimore, Washington, Philadelphia, and New York.  Pl. at 56; B96.  "The
buses from D.C. and Philadelphia and places like that . . . were 99.9 percent African-American."
Ruffin at 104; B774.

Furthermore, Caucasian slot attendants would not serve these so called "bus people."  Pl. at
58; B98.  But in contrast, a bus full of white Russians coming off a crew ship "were dealt with
kid gloves because they were tourists and the other [African-American] people were not."  Ruffin
at 103; B773.

[30]  Previously, when Nashold was a Slot Attendant, Plaintiff heard him make a lot of
derogatory racial jokes toward African-Americans .  Pl. at 54, 58; B94, 98.  He and other
Caucasian Slot Attendants would call it "Mother's Day" on the first of the month when African-
American mothers who they thought were on welfare would come in to gamble.  Pl. at 56-57,
Ruffin at 103, 104; B96- 97, 773, 774.  In sum, there were racial jokes made "[e]veryday
working at the casino."  Loper at 16; B851.  Of course, African-Americans would not join in on
these jokes.  Pl. at 59; B99.

American.  Loper at 25; B860.  Thus here too, Defendant altered the terms and conditions

of Plaintiff's employment based on race.

## IV.  PLAINTIFF EXHAUSTED HIS ADMINISTRATIVE REMEDIES AND FILED A TIMELY COMPLAINT.

Plaintiff has exhausted his administrative remedies regarding his claims of

discrimination under Title VII and the ADEA and filed a timely Complaint.  Plaintiff

filed his charge of discrimination on May 24, 2004.  D1; B4.  On April 4, 2005, the

EEOC mailed Plaintiff his right to sue.  B7.  Plaintiff then filed his original Complaint

pro se on July 5, 2005.  D.I.2; B8, 14.  In accordance with this Court's procedure for pro

se Title VII Complaints, he attached to it his EEOC Notice of Suit Rights dated April 4,

2005.  B7.[31]  Assuming, arguendo, that Plaintiff received his right to sue on the same day

it was mailed, ninety days from receipt was Sunday, July 3, 2005.  Because the Court was

closed on Sunday and on Monday, July 4, 2005, for the legal holiday of Independence

Day, his filing was timely.  See Fed.R.Civ.Pro. 6(a).  Thus, Plaintiff exhausted his

administrative remedies and filed a timely Complaint.

## V.  PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES.

Despite Defendant's argument to the contrary, Plaintiff is entitled to punitive

damages here.  For Title VII violations, available relief includes punitive damages where

there is "intentional discrimination 'with malice or with reckless indifference to the

---

[31]  Defendant argues that this document was not produced in discovery.  However, the facts that Defendant originally was carbon copied on the right to sue letter (see B8, 14), and that defense counsel has seen the pro se Complaint, which he correctly identifies as D.I.2, and which includes the Notice of Suit Rights, makes Defendant's failure to exhaust argument suspect at best.

federally protected rights of an aggrieved individual.'" <u>Kolstad v. American Dental</u>

<u>Ass'n</u>, 527 U.S. 526, 548 (1999)(quoting 42 U.S.C. § 1981a(b)(1)).  Thus, "punitive

damages may be awarded . . . 'when the defendant's conduct is shown to be motivated by

evil motive or intent, or when it involves reckless or callous indifference to the federally

protected rights of others.'" <u>Id.</u> (quoting <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983)(§ 1983

case from which § 1981a's punitive damages' standard is derived)).  Section 1981 also

permits the recovery of punitive damages, and under that law, "such damages . . . are not

limited by statute." <u>See</u> <u>Pollard v. E.I. du Pont de Nemours & Co.</u>, 532 U.S. 843, 851

(2001).  Here, Defendant was aware that federal law prohibited it from discharging

Plaintiff based on his sex, his race, or his age because as it admits in its opening brief,

Defendant had an anti-discrimination policy.  <u>See</u> Def. Op. Brf. at 21.  Thus in firing

Plaintiff, Defendant acted with reckless or callous indifference to his federally protected

rights to be free from employment discrimination in the workplace.  Therefore, Plaintiff is

entitled to punitive damages here.

<u>**CONCLUSION**</u>

Plaintiff has established prima facie cases of sex, age, and race discrimination

under Title VII, § 1981, and the ADEA.  By a preponderance of the evidence, under

prong one of <u>Fuentes</u>, a jury can choose to disbelieve any non-discriminatory reason

offered by Defendant and find that discrimination was the real reason it discharged him

because he has demonstrated such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in Defendant's stated reasons to make them unworthy of

belief.  Also under prong two of <u>Fuentes</u>, the natural probative force or weight of the

38

evidence, including  (1) Plaintiff's female director's selection and promotion of a younger female replacement, (2) the director's relative leniency on his younger, white, and female co-workers, (3) her sex bias against males, (4) workplace statistics, (5) factors usually considered which were ignored, (6) violation of procedures regarding Defendant's progressive discipline policy, and (7) the suspicious lack of both a written report and a surveillance tape of Plaintiff's discharge, demonstrates discrimination.  Defendant also discriminated Plaintiff in the terms and conditions of his employment because of his sex and his race by denying him a non-management position needed for a medical issue, singling him out for discipline for using a public restroom, and transferring his stepdaughter away from his department.  Plaintiff has exhausted his administrative remedies regarding his Title VII and ADEA claims because he timely filed his original pro se Complaint in compliance with Federal Rule 6(a).  Finally, Plaintiff is entitled to punitive damages because Defendant's conduct involved reckless or callous indifference to his federally protected rights.  For all of the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

**LAW OFFICE OF JOHN M. LaROSA**

/s/ John M. LaRosa_____
**JOHN M. LaROSA, ESQUIRE**
Delaware Bar No. 4275
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
(302) 655-9329 (fax)
JLR@ LaRosaLaw.com

Attorney for Plaintiff Clifton J. Showell, Jr.

Dated: March 10, 2008

39